# United States Navy–Marine Corps Court of Criminal Appeals

Before
DALY, KISOR, and COGLEY
Appellate Military Judges

_____

**UNITED STATES**

*Appellee*

**v.**

**Craig R. BECKER**
Lieutenant (O-3), U.S. Navy
*Appellant*

**No. 202200212**
_____

Decided: 17 December 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Aaron C. Rugh (arraignment and motions)
Stephen F. Keane (trial)

Sentence adjudged 30 April 2022 by a general court-martial tried in Mons, Belgium, consisting of officer members. Sentence in the Entry of Judgment: confinement for life with the possibility of parole and a dismissal.[1]

For Appellant:
*Mr. David Sheldon* (argued)
*Major Joshua P. Keefe, USMC* (argued)

---

[1] Appellant was credited with having served 831 days of pretrial confinement.

For Appellee:
*Colonel Joseph M. Jennings, USMC* (argued)
*Lieutenant Colonel James A. Burkart, USMC*
*Lieutenant Colonel Candace G. White, USMC*
*Mr. Brian K. Keller*

Judge COGLEY delivered the opinion of the Court, in which Chief Judge DALY and Senior Judge KISOR joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

COGLEY, Judge:

Appellant was convicted, contrary to his pleas, of one specification of premeditated murder, for killing his then wife, Mrs. Jean Bravo,[2] by causing her to fall from the seventh floor of their apartment building, in violation of Article 118, Uniform Code of Military Justice (UCMJ).[3] Appellant was also convicted, contrary to his pleas, of one specification of battery (for poisoning Mrs. Bravo with zolpidem on the night of her death) and of two specifications of conduct unbecoming of an officer and a gentleman for wrongfully impersonating Mrs. Bravo by sending messages from her phone and for falsely telling Belgian Police that he did not know the passcode to Mrs. Bravo's phone, in violation of Articles 128 and 133 of the UCMJ.[4]

Appellant asserts 15 assignments of error (AOE). Twelve warrant discussion.[5] None warrant relief. We rephrase and reorder Appellant's AOEs as follows:

———————————

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[3] 10 U.S.C. § 918.

[4] 10 U.S.C. §§ 928, 933.

[5] Appellant's thirteenth AOE is whether the cumulative effect of all the assigned errors in Appellant's court-martial deprived him of the constitutional right to a fair

(1) Whether the Government violated Appellant's speedy trial rights pursuant to the Fifth Amendment, Sixth Amendment, Article 10, UCMJ, and Rule for Courts-Martial (R.C.M.) 707;

(2) whether Appellant was deprived of his right to counsel as a result of delay in asserting jurisdiction;

(3) whether the military judge abused his discretion by denying Appellant's challenges to two members for implied bias;

(4) whether the military judge abused his discretion when he allowed the Government to introduce text messages sent by Appellant several days prior to Mrs. Bravo's death;

(5) whether the military judge abused his discretion by allowing the Government to introduce evidence that Appellant picked up Mrs. Bravo and threw her to the ground in 2013;

(6) whether the military judge erred by permitting the Government to introduce Prosecution Exhibit 37, pictures of 10 milligram tablets of zolpidem;

(7) whether the military judge abused his discretion and prevented Appellant from presenting a complete defense when he excluded Mrs. Bravo's text messages from seven months prior;

(8) whether the military judge erred by refusing to grant a mistrial;

(9) whether the military judge properly instructed the panel;

(10) whether trial defense counsel were ineffective;

(11) whether the record of trial is complete; and

---

trial. As this Court analyzed and concluded, Appellant suffered no material prejudice in his court-martial; accordingly, this assignment of error is without merit.

Appellant's fourteenth AOE is whether Appellant was denied his constitutional right to a unanimous verdict. This issue is without merit. *See United States v. Anderson*, 83 M.J. 291 (C.A.A.F. 2023).

Appellant's final AOE is whether the military judge abused his discretion in denying the trial defense team's attempt to introduce evidence that "it was unusual for Mrs. Bravo to date black men based on her expressed racial animus, using racial epithets, including the n-word." *See* Appellant's Brief at 136. After review of the record and the briefs of the parties, we find this AOE to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

(12) whether the evidence was legally and factually sufficient
to support a finding of guilty for Appellant's convictions.[6]

Further, we also analyze the length of the appellate review process in this case given the length of time it has taken. We find no prejudicial error and affirm.

## I. BACKGROUND

At approximately 2100 on 8 October 2015, witnesses heard a woman, later identified as Mrs. Bravo, screaming from a high window of an apartment building in Mons, Belgium where Appellant and Mrs. Bravo lived.[7] According to one witness, Mrs. Bravo sounded panicked and afraid, and another, Ms. June LaPlume, saw her tilt backwards and fall out of the window, striking the building as she fell down, grabbing a window, trying not to fall. Some bystanders, Mr. Adam Hotel and his girlfriend,[8] heard Mrs. Bravo call for help before her fall and ran toward her while calling for emergency services. Mr. Hotel and his girlfriend found Mrs. Bravo lying on her back on the ground, bleeding from her head. She was still alive at this point. Mr. Hotel looked up and saw a bald man looking out a window and down at Mrs. Bravo on the ground. When shown a photograph of the building, Mr. Hotel identified the window in the upper right of the photograph as the window this bald man was looking out of, which was the same window Mrs. Bravo had exited from.[9] Mr. Hotel also described a bald man, who Mr. Hotel said was apparently the same man who had been looking out the window, who had apparently come down to the street while speaking on his phone. This bald man said something to Mr. Hotel in English that Mr. Hotel did not understand, walked to Mrs. Bravo, knelt and exchanged some words in English with her. Mr. Hotel did not speak English and could not testify as to what they said to each other. Ambulance crew and local Belgium police responded to the scene and provided aid. Mrs. Bravo was able to speak to

---

[6] NMCCA Rules of Appellate Procedure Rule 18.1 states that assignments of error "should not be argumentative or conclusory." Several of Appellant's AOEs ran afoul of rule 18.1. For example, Appellant's fourth AOE was originally framed as follows: "whether the military judge abused his discretion when he admitted evidence regarding *an unproven allegation* of battery from 2013 and *highly prejudicial text messages unrelated* to the charged offenses." *See* Appellant's Brief at 2 (emphasis added). Similarly, Appellant's sixth AOE was originally phrased as: "whether the military judge improperly admitted evidence that was *irrelevant, without foundation, and demonstrative.*" *See* Appellant's Brief at 2 (emphasis added).

[7] A number of these facts are restated from our prior opinion relating to an interlocutory appeal. *See United States v. Becker*, 81 M.J. 525 (N-M. Ct. Crim. App. 2021).

[8] Mr. Hotel's girlfriend is mentioned in Mr. Hotel's testimony, but she did not testify at trial.

[9] R. at 1894-1901.

the ambulance crew. Ambulance crew members did not testify at the court-martial; and what was said between Mrs. Bravo and the ambulance crew was not understood by other witnesses, so there was no record at trial of what she may have said to them. At a certain point, the ambulance crew intubated Mrs. Bravo and took her to the hospital. Despite their efforts, Mrs. Bravo was declared dead at the hospital at 2230. Responding local Belgian police at the scene began an investigation into what happened.

Appellant told local Belgian police that Mrs. Bravo jumped from the window after drinking wine and taking medicine earlier in the evening. He said that Mrs. Bravo was in her bedroom while he was on the phone in another room. He further stated that he heard a scream and entered her bedroom as she jumped out of the window. Appellant went on to say to one of the local officers, Officer Alan Stone, that he could see her "bottoms and legs slipping away" as he entered her bedroom and that he tried to reach her, but could not.

Appellant told Mrs. Bravo's father, James Houston, after Mr. Houston arrived in Belgium, that when Appellant came around the corner into Mrs. Bravo's bedroom, he saw a hand or leg disappear out the window. Mr. Houston tried to clarify by asking "[w]ell what do you mean a hand or leg? You can't see the difference between a hand and a leg?" Mr. Houston testified that Appellant's response was "[w]ell, you know, I can't recall."[10]

However, Ms. LaPlume, who witnessed Mrs. Bravo fall from across the street, testified that she exited the window feet down, head up and she was trying not to fall. An expert in biomechanical engineering and functional anatomy, Dr. Victoria Felix, later testified that based on scratch marks left along the angled roof below the window that Mrs. Bravo fell from and the injuries to the front part of her body from nails in the roof, Mrs. Bravo went out the window with her feet down, her head up, and her stomach against the roof where she slid until hitting a balcony and falling to the sidewalk.[11] Dr. Felix could not give a conclusive opinion whether Mrs. Bravo exited the window herself or if she was pushed by another person. However, she said that because the trace of the right foot marks on the roof begins more than a meter below the window, it was likely she was assisted by another person.[12]

Having gone up to the apartment on the night of Mrs. Bravo's death, Mons Police Officer Frank Vale, located Mrs. Bravo's cell phone—in the apartment's living room—and asked Appellant's assistance in unlocking it. Appellant told

---

[10] R. at 2852-53.

[11] R. at 2346; R. at 2375-76.

[12] R. at 2366.

the officer that he did not know the security code. Officer Vale then took possession of Mrs. Bravo's cell phone and locked it in the glove compartment of his vehicle.

Close in time to when Mrs. Bravo was declared dead at 2230, a local Belgian magistrate who was not at the scene determined that the indication at that point was that Mrs. Bravo had committed suicide and told the responding police in a phone call that there was no further need to secure the scene. Officer Vale returned Mrs. Bravo's cell phone to Appellant at this point.

The local police nevertheless renewed their investigation into Mrs. Bravo's death, on 12 October 2015, four days after Mrs. Bravo's death after they had received additional reports calling into question the magistrate's initial suicide determination. The local police interviewed several local witnesses and requested Naval Criminal Investigative Service (NCIS) agents' assistance in interviewing potential witnesses in the United States and in other countries.

According to the investigation and the evidence at trial, in early September 2015, Appellant had discovered that Mrs. Bravo was having an affair. He confronted her about it, and she admitted it. The two began sleeping in different rooms in their apartment and eventually agreed to separate. On 18 September 2015, Mrs. Bravo and Appellant signed a separation agreement wherein they divided marital property and established a custody arrangement for their infant daughter. By this point, Mrs. Bravo and Appellant had each started relationships with different people. And, as a point of contention, Mrs. Bravo started taking their infant daughter on her visits to her new boyfriend.

The investigation brought to light a previous allegation of assault made in 2013 while Mrs. Bravo and Appellant were staying in a hotel, on base, in Belgium. Appellant discovered that Mrs. Bravo had an extramarital affair and woke her up, dragged her out of the bed, and picked her up and threw her on the ground. Mrs. Bravo immediately left the room and reported the incident to the hotel desk clerk and the responding military police officer. She later recanted her allegation.

A search of phones belonging to Appellant and Mrs. Bravo seized by Belgian police yielded several pieces of evidence. First, Belgian investigators discovered that just days before Mrs. Bravo's death, Appellant had a conversation by text with his girlfriend, Justine Robinson, about a person named "Dave" and a lost dog named "Luna" that the girlfriend was helping to search for. Appellant's girlfriend speculated that "Dave" may have had something to do with "Luna's" disappearance. Appellant said in the text conversation that "[t]here would be a vulture (me) circling and descending if he fucked with that dog." Following that, Appellant's girlfriend stated she would have to contemplate before letting Appellant know if "Dave" did anything to the dog and "would it

be worth [Appellant] going to jail" for avenging the dog. Appellant responded that "[h]e wouldn't know it was me" because "[s]tupid people act on emotion [and] [s]ubversive acts require well thought out plans . . . ." Appellant's girlfriend responded: "I'd happily help you draw up plans."

Appellant had previously served as an aide to a flag officer at North Atlantic Treaty Organization (NATO) Special Operations Headquarters in Mons. The day before Mrs. Bravo's death, Appellant returned to his old office to ask about the status of an application package he had submitted for graduate school. As he was leaving, he turned and asked the current occupant of his former desk, Lieutenant Colonel (LTC) Whiskey, if he ever found a bag of pills in one of the desk drawers. By chance, LTC Whiskey had found a bag of pills tucked in the very back of one of the drawers when he was cleaning it out two weeks earlier. LTC Whiskey described the pills as "small, round, pinky-nail size, pink."[13] LTC Whiskey intended to bring the bag of pills to a medical office to dispose of them but had not yet done so. Appellant asked for the bag of pills and LTC Whiskey gave the bag of pills to him. LTC Whiskey asked what they were for, and Appellant responded, "they're for my ADD."[14] LTC Whiskey reported this interaction to Supreme Allied Headquarters Allied Powers Europe (SHAPE) police officers after learning of Mrs. Bravo's death.

Mrs. Bravo's toxicology report indicated that she consumed zolpidem, a sleeping pill also known as Ambien, on the night of her death. Hair analysis indicated that it was a single use, in that she had not used the substance in the six months preceding her death. Neither Appellant nor Mrs. Bravo had a current prescription for zolpidem. The flag officer whom Appellant worked for was prescribed zolpidem and one of Appellant's duties was to pick up the officer's prescription medication. LTC Whiskey was presented with several photographs of zolpidem pills and agreed that the pills Appellant retrieved closely matched one of the pictures of the zolpidem pills.

There was also evidence that only three weeks earlier, Appellant had a prescription filled for a 90-day supply of Strattera to treat attention deficit hyperactivity disorder (ADHD). A pharmacist testified that Strattera comes in the form of an oblong capsule that does not resemble zolpidem.

Two days before Mrs. Bravo's death, Appellant reported to SHAPE police officers that Mrs. Bravo had a drinking problem and that he was worried about his legal rights should there be a disturbance with the people helping Mrs. Bravo move out of their apartment. Appellant did not mention anything about

---

[13] R. at 1732.

[14] R. at 1733.

a drug use problem. The officer who took the report noted that it appeared more important to Appellant that his report be documented than that the police actually take any action. Appellant specifically told the officer that he wanted there to be a "trace of the fact that we had this conversation." Appellant also said he did not want the officer to contact Mrs. Bravo.

On the day that Mrs. Bravo died—and despite just reporting to law enforcement that she had a drinking problem —Appellant purchased a bottle of wine for Mrs. Bravo. Despite Appellant's report to SHAPE police that Mrs. Bravo had a drinking problem, an analysis of alcohol metabolite in Mrs. Bravo's hair after her death showed that over the past three months the amount of alcohol metabolite in her hair was compatible with someone who abstains from drinking alcohol.[15] Yet, her hair analysis could not rule out whether she drank alcohol on the night of her death.[16]

A toxicology report after Mrs. Bravo's death showed a level of alcohol in her blood below the testing threshold, meaning that it would be considered a negative result for the presence of alcohol in Mrs. Bravo's body.[17] However, it could not be ruled out that she consumed no more than two glasses of wine in the two hours before her death and the alcohol had been eliminated by her body.[18]

Phone records indicated that on the night of Mrs. Bravo's death, Appellant was on the phone with his girlfriend, Ms. Robinson, at three separate points close in time to Mrs. Bravo's death. During a brief period between two of these calls, the first call ending at 2028 on 8 October 2015 and the next beginning at 2041, 13 minutes later, text messages were sent from Mrs. Bravo's phone to her boyfriend describing a positive change in Appellant's demeanor, that she still loved Appellant, and, lastly, "F[***] my life." The latter message was the last message sent from Mrs. Bravo's phone, sent at 2039 on 8 October 2015. The first emergency call from an eyewitness on the street was made at 2051, 12 minutes later.

Mrs. Bravo's boyfriend, Craig Jones, reported the messages to law enforcement after learning of her death and told the investigators that the messages were inconsistent with Mrs. Bravo's typical pattern of speech in text messages and with her upcoming plans. Mr. Jones also indicated a dramatic shift in the

---

[15] R. at 2475.

[16] R. at 2475.

[17] R. at 2616-17.

[18] R. at 2618.

messages from his understanding of Mrs. Bravo's feelings about Appellant. According to her boyfriend, the messages were inconsistent or out of character in several ways. First, because they did not acknowledge Mrs. Bravo's plans to visit Mr. Jones later that evening, or her plan to move in with Mr. Jones. Second, because they did not acknowledge her plan to visit China with her father, James Houston, the following day. Lastly, because in her previous messages to Mr. Jones, she never identified Appellant by his first name. They also had a more affectionate tone regarding Appellant than she had previously used with Mr. Jones.

Appellant spoke with several other witnesses in the time following Mrs. Bravo's death and made some noteworthy statements. According to Mr. Houston, Appellant told him that after Mrs. Bravo fell and as she was lying on the ground, Mrs. Bravo told Appellant, "you did this to me." In contrast, Appellant told Belgian authorities in a follow-up interview that Mrs. Bravo told him "I'm scared" and "I love you." Appellant also denied looking down from the window after Mrs. Bravo fell, denied any feelings of jealousy, and denied any instances of violence in the past. In contrast to his earlier denial to Officer Vale, Appellant told Belgian authorities that he had guessed Mrs. Bravo's passcode and found the messages she had allegedly sent Mr. Jones on the night of her death. Two days after her death, Appellant spoke with one of Mrs. Bravo's friends. He told her friend that Mrs. Bravo had made his life a "living nightmare" ever since Mrs. Bravo had told police that he had been violent with her two years prior.

Having canceled the planned trip to China, Mr. Houston booked a flight from Florida to Belgium and arrived early on Saturday, 10 October 2015. After arriving and trying to acquaint himself with what happened, he noticed marks along the shingles on the roof below the window that Mrs. Bravo had exited from, which he described as "from something dragging;" as well as a broken shade on a window below, and he took photographs to preserve a record of the marks because he was unsure how long they would remain.[19] Mr. Houston later turned the photographs over to Belgian police.[20]

The investigation also revealed that Mrs. Bravo had suffered from mental health issues. One expert opined that she was at an elevated risk for suicide due to the risk factors present in her life and her mental health history.

---

[19] R. at 2842-2848.

[20] R. at 2848.

Belgian authorities arrested and confined Appellant on 18 March 2016. He remained confined by Belgian authorities until 14 July 2016 and was then released from confinement and placed under house arrest by Belgian authorities. The United States asserted jurisdiction on 5 January 2018. Appellant was released from house arrest and turned over to the United States. Belgian authorities closed their case. Appellant was not subject to pretrial restraint once he was turned over to the United States.

Appellant was tried by general court-martial and convicted of premeditated murder, battery, and two specifications of conduct unbecoming of an officer and a gentleman (for sending the texts from Mrs. Bravo's phone and lying to officers about knowing how to access Mrs. Bravo's phone).

Additional facts to resolve Appellants AOEs are included below.

## II. DISCUSSION

**A. The Government Did Not Violate Appellant's Speedy Trial Rights Pursuant to the Fifth Amendment, Sixth Amendment, Article 10, or R.C.M. 707.**

Appellant makes several arguments under this AOE. He generally asserts that the Government's delay in exercising jurisdiction and bringing him to trial violated the Fifth Amendment, Sixth Amendment, Article 10, UCMJ, and Rule for Courts-Martial (R.C.M.) 707. He specifically argues: (1) that the Government violated the Fifth Amendment by "unreasonably delaying the preferral of charges;" (2) that the six and a half years between being placed in confinement by the Belgian authorities and his trial deprived him of his Sixth Amendment and Article 10 right to a speedy trial; and (3) that the Government violated R.C.M. 707(a)(1) "when it failed to bring LT Becker to trial within 120 days of preferring charges . . . ."[21] Appellant's third argument does not warrant discussion.[22]

1. *Fifth Amendment*

a. <u>Standard of Review</u>

Trial defense counsel moved to dismiss all charges and specifications based on speedy trial considerations, and the military judge denied that motion. A

---

[21] Appellant's Brief at 48–60.

[22] *Matias,* 25 M.J. at 363. The military judge noted, and we agree, that Appellant did not assert violations of speedy trial after the United States asserted jurisdiction over his case. *See* App. Ex. LXXXVI at 7. Moreover, Appellant was "brought to trial," within the meaning of R.C.M. 707, within 120 days after accounting for excludable delay. *See* Preliminary Hearing Report at 4.

military judge's denial of a motion to dismiss based upon speedy trial rights is reviewed de novo, regardless of whether the speedy trial ruling was analyzed under Article 10, the Fifth Amendment, the Sixth Amendment, or R.C.M. 707.[23] This Court will not disturb the military judge's findings of facts unless they are clearly erroneous.[24]

In *United States v. Lovasco*, the Supreme Court examined a potential violation of Fifth Amendment due process in connection with a lengthy pre-indictment delay.[25] In that case, a prosecutor waited to indict the accused for over 18 months after the charged events occurred. In the interim, two potential witnesses died. The *Lovasco* Court observed that statutes of limitations are the primary guarantee against states bringing stale charges.[26] However, the Court also acknowledged that statutes of limitations might not fully define a defendant's rights in the period before an indictment, and that Fifth Amendment due process may have a limited role to play to prevent oppressive delay.[27] Nevertheless, even when some prejudice is present, that is not enough on its own to end the inquiry. A reviewing court must consider the reasons for the delay as well.[28]

In *Lovasco*, the prosecutor delayed indictment in the hope the investigation might identify more people who participated in the charged theft.[29] The Court in *Lovasco* distinguished investigative delay from "delay intended to gain tactical advantage over the accused."[30] The *Lovasco* Court recognized that the accused and society benefit by prosecutors waiting to assemble evidence beyond a reasonable doubt and not being required to immediately indict on minimum evidence to establish probable cause, in that cases with weak evidence may be dropped and complex cases can be more fully developed.[31] Indeed, *Lovasco*

---

[23] *United States v. Cooper*, 58 M.J. 54, 57-60 (C.A.A.F. 2003); *United States v. Cooley*, 75 M.J. 247, 259 (C.A.A.F. 2016); *United States v. Doty*, 51 M.J. 464, 465 (C.A.A.F. 1999).

[24] *Id.* (citing *United States v. Cossio*, 64 M.J. 254, 256 (C.A.A.F. 2007)).

[25] *United States v. Lovasco*, 431 U.S. 783 (1977).

[26] *Id.* at 789.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 795 (citing *United States v. Marion*, 404 U.S. 307 (1971)).

[31] *Id.* at 790-96.

holds that the Due Process Clause does not require prioritizing "mere speed" over "orderly expedition."[32]

In *United States v. Reed*, a similar question arose involving an alleged rape that occurred during a weekend party in a hotel room in November 1991.[33] Approximately two years elapsed between the time of the incident and the preferral of charges in September 1993. The lapse in time was due to delays in identifying and locating witnesses. The accused was held beyond the end of his active obligated service on 4 September 1993 to await the outcome of the investigation. The accused was informed of the charges on 27 September 1993. The defense alleged that being held over the end of active obligated service and an inability to identify and locate two witnesses who were allegedly in the hotel room the night of the incident amounted to prejudice. Citing *Lovasco,* the CAAF held that an accused has the burden of showing both an "egregious or intentional tactical delay and actual prejudice." The CAAF noted that the delay was caused by the difficulty of locating witnesses throughout the world and that the appellant had not met the burden of showing egregious or intentional tactical delay. Further, the CAAF noted that any prejudice to the appellant was minimal because no witnesses or evidence were lost and the appellant was only placed on legal hold for 23 days until he was informed of the charges. As a result, the CAAF found there was no violation of due process.

In *United States v. Evans*, this Court had the opportunity to analyze this issue.[34] In *Evans*, the accused was charged with possessing child pornography on multiple devices. A single charge was preferred in August 2011. After an Article 32 investigation, the charge was referred to a general court-martial with trial scheduled to begin in February 2012. While preparing for trial, near the eve of its start, trial counsel perceived an error in the digital forensic report. Due to miscommunication with NCIS agents, trial counsel concluded the report was incomplete and that there was a risk that potentially exculpatory information could have been overlooked. As a result, trial counsel persuaded the convening authority to withdraw and dismiss the charge while a second forensic analysis was done. In June 2012, after the second forensic analysis, the charge was re-preferred. The second forensic report showed that trial counsel had been mistaken in her belief that the first report was incomplete. Plea negotiations, pretrial posturing, defense requested delays and holidays delayed the trial until January 2013.

---

[32] *Id*. at 794-96.

[33] *United States v. Reed*, 41 M.J. 449 (C.A.A.F. 1995).

[34] *United States v. Evans*, No. 201300174, 2014 CCA LEXIS 368 (N-M. Ct. Crim. App. June 26, 2014).

In reviewing a speedy trial challenge on appeal, in its Sixth Amendment analysis, this Court observed that no specific prejudice was alleged by the appellant, but appellant's counsel asserted that the delay allowed the Government to perfect its case, arguing that "[b]ecause of the delay, the Government gained a tactical advantage and was able to bolster the credibility of its forensic testing."[35] Nevertheless, this Court noted that "the Government's ability to prepare or improve its case is not the sort of prejudice contemplated by the fourth of the four-factor analysis of *Barker v. Wingo*.[36] That prejudice is concerned with impediments to the ability of the Defense to make its own case."[37] Turning to the Fifth Amendment due process analysis of pre-preferral delay, this Court noted that to prevail, the appellant would have to demonstrate "egregious or intentional tactical delay and actual prejudice."[38] While noting the Government's actions were not a model of expediency, this Court found in *Evans* that the appellant had not demonstrated either.[39]

b.  Analysis

Once the United States asserted jurisdiction, the Belgian court dismissed its case against Appellant and he was released from Belgian custody.[40] The Belgian investigating magistrate also finally shared the investigation report with United State authorities after repeated requests.[41] Nevertheless, the concern about the ability to compel Belgian witnesses to testify at a court-martial endured. In light of these facts, Appellant's assertion that the United States attempted to circumvent the constitutional protections otherwise afforded an accused lacks merit. Certain officials, including the then Acting Judge Advocate General of the Navy, VADM James Crawford, were concerned that a court-

---

[35] *Id.* at *18.

[36] *Barker v. Wingo*, 407 U.S. 514, 530 (1972) (establishing the following four factor analysis to assess whether there was a violation of an appellant's due process right to timely post-trial and appellate review (1) the length of the delay; (2) the reasons for the delay, (3) the appellant's assertion of the right to timely post-trial and appellate review, and (4) prejudice).

[37] *Id.* at *18-19 (quoting *United States v. Abad*, 514 F.3d 271 (2d. Cir. 2008)).

[38] *Id.* at *20 (quoting *Reed*, 41 M.J. at 452).

[39] *Id.* at *20.

[40] App. Ex. V, Attach. W, Tab C at 6.

[41] App. Ex. V, Attach. W, Tab C at 3.

martial would not be the best venue to bring the case in the interest of justice.[42] Relatedly, prosecutors have the burden to establish guilt beyond a reasonable doubt and should not be forced to bring charges before they are satisfied they will be able to do so.[43] Doing this was not an attempt to gain a tactical advantage in this case.

As a result, we conclude Appellant's Fifth Amendment due process rights were not violated by the legitimate and independent efforts of two sovereign governments to work as thoroughly as possible to investigate a death of a U.S. citizen in a foreign country and to work in good faith to determine which one would assert jurisdiction over Appellant.

### 2. *Sixth Amendment and Article 10*

#### a. <u>Standard of Review</u>

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.[44] In the military, Sixth Amendment speedy trial protections are triggered by preferral of charges or the imposition of pretrial restraint.[45] The Supreme Court has held that the speedy trial clause does not apply to the period before an accused is indicted, arrested, or otherwise officially accused.[46] An arrest or indictment by one sovereign does not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign.[47]

If Sixth Amendment speedy trial protections are triggered, courts must consider the following factors in determining whether an appellant has been denied his right to a speedy trial: (1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant.[48] In considering prejudice ~~to the appellant~~, courts

---

[42] App. Ex. V, Attach. W, Tab C at 3-5. Indeed, prosecutors are obligated not to bring a case before gathering enough evidence to establish probable cause. Model Rules of Pro. Conduct, R. 3.8, Special Resp. of a Prosecutor.

[43] *Lovasco*, 431 M.J. at 791.

[44] U.S. Const. amend. VI.

[45] *United States v. Danylo*, 73 M.J. 183, 186 (C.A.A.F. 2014).

[46] *United States v. MacDonald*, 456 U.S. 1, 6 (1982) (citing *Marion*, 404 U.S. at 313).

[47] *Id.* at 10 n.11; *see also United States v. Abu Ali*, 395 F. Supp. 2d 338, 385 (E.D. Va. 2005).

[48] *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005) (citing *Barker*, 407 U.S. at 530).

should evaluate the three interests speedy trial was designed to protect: (1) "to prevent oppressive pretrial incarceration;" (2) "to minimize anxiety and concern of the accused;" and (3) "to limit the possibility that the defense will be impaired."[49] The Sixth Amendment is not primarily intended to prevent prejudice to the defense caused by the passage of time. That interest is protected primarily by the Due Process Clause and by statutes of limitations.[50]

Article 10 protections are triggered when a person is subject to arrest or confinement. It provides that "[w]hen a person subject to this chapter is ordered into arrest or confinement before trial, immediate steps shall be taken – (A) to inform the person of the specific offense of which the person is accused; (B) to try the person or to dismiss the charges and release the person."[51] If Article 10 speedy trial protections are triggered, the same four factors as above are considered to determine if there is a speedy trial violation.[52] In reviewing claims for a violation of speedy trial under Article 10, "we do not demand constant motion, but reasonable diligence in bringing charges to trial."[53]

Relevant here, a fundamental principle of international law is that "[a] sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction."[54] Where an act or omission is subject to trial by court-martial and by one or more civil tribunals, foreign or domestic, the determination which nation, state, or agency will exercise jurisdiction is a matter for those nations, states, and agencies concerned, and is not a right of the suspect or accused.[55] As a matter of policy, efforts should be made to maximize the exercise of court-martial jurisdiction over persons subject to the UCMJ to the extent possible under applicable agreements.[56]

A treaty normally establishes the procedures and standards for determining which state will exercise jurisdiction over an offense. The treaty involved in this case is the Agreement Between the Parties to the North Atlantic Treaty

---

[49] *Barker*, 407 U.S. at 531.

[50] *MacDonald*, 456 U.S. at 8.

[51] Article 10, UCMJ.

[52] *Cossio*, 64 M.J. at 256.

[53] *Mizgala*, 61 M.J. at 127.

[54] *Wilson v. Girard,* 354 U.S. 524, 529 (1957) (citing *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 136 (1812)).

[55] Rules for Courts-Martial (R.C.M. (2019)) 201(d)(3).

[56] R.C.M. (2019) 201, Discussion.

Regarding the Status of Forces (NATO SOFA).[57] The NATO SOFA also gives the receiving state, in this case, Belgium, the right to exercise jurisdiction.[58]

Further, we note that investigating crime "increasingly requires cooperation" and rendering assistance to foreign law enforcement officers does not in and of itself transform a separate and independent investigation into a "joint" investigation.[59] "Similarly, conducting a parallel investigation (e.g., simultaneous yet separate, independent investigations) does not make the federal government accountable for the actions of non-federal entities . . . ."[60]

####    b.  Analysis

Belgian authorities placed Appellant into confinement in a Belgian facility from 18 March 2016 until 14 July 2016 when he was subsequently released and placed under house arrest at the request of his Belgian attorney. On 5 January 2018, Appellant was released from Belgian custody once the United States asserted jurisdiction. Following Appellant's release from house arrest, he was not subject to any further pretrial restraint. The threshold question we must answer is whether the imposition of restraint by Belgian authorities on 18 March 2016 created a responsibility for United States authorities under the Sixth Amendment and Article 10. For the reasons discussed below, we answer in the negative.

#### (1) The Government's Responsibilities Under the Sixth Amendment and Article 10 Were Not Triggered by the Imposition of Restraint by Belgian Authorities.

There were three pretrial motions to dismiss relating to speedy trial. Two were filed in September and November of 2019, and both were denied in a combined ruling on 23 September 2020. The first related only to the 2013 assault and the second to all charges and specifications. Appellant filed the third motion for reconsideration on 15 November 2021, which was also denied. The military judge made extensive findings of fact as part of the 23 September 2020

---

[57] Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Forces, 19 June 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846, 199 U.N.T.S. 67 (NATO SOFA).

[58] *Id.* at para. 1.b.

[59] *United States v. Brooks*, 79 M.J. 501, 508 (A. Ct. Crim. App. 2019) (quoting *United States v. Getto*, 792 F.3d 221, 231 (2d Cir. 2013)).

[60] *Id.*

ruling.[61] We find they are not clearly erroneous and adopt them here. Some are restated below.

Because murder is an offense under both the laws of the sending and receiving states, both states had a concurrent right to exercise jurisdiction.[62] The only case in which the NATO SOFA creates exclusive jurisdiction for the sending state is for an offense related to the security of that state and punishable by its law, but not by the law of the receiving state.[63] When there is concurrent jurisdiction, the NATO SOFA gives primary jurisdiction to the sending state over members of its force in cases where an offense is committed solely against the person or property of another member of the force or civilian component of that State or of a dependent; or arising out of an act or omission done in the performance of official duty.[64] The receiving state has primary jurisdiction over other offenses.[65] In a situation where the state having the primary right to jurisdiction, in this case the United States, decides not to exercise its primary jurisdiction, it is required to notify the other state as soon as practicable.[66] The state with primary jurisdiction is required to give sympathetic consideration to requests for a waiver of its jurisdiction where the other state considers such waiver to be of particular importance.[67]

Belgian authorities independently led the investigation into Mrs. Bravo's death. They identified Appellant as a person of interest and directed him not to leave the country. NCIS agents provided some assistance, interviewing potential witnesses in the United States and in Europe and participated in the scene reconstruction. Despite a level of cooperation with Belgian authorities, NCIS agents were not granted access to Mrs. Bravo's autopsy results, crime scene documentation, and witness statements.

In his 23 September 2020 ruling, the military judge adopted a timeline of events related to the investigation of Appellant and the assumption of jurisdic-

---

[61] Appellate Exhibit LXXXVI at 4-7.

[62] As noted above, in this case the sending state is the United States, and the receiving state is Belgium.

[63] NATO SOFA, art. VII, para. 2.a.

[64] *Id.* at para. 3.a.

[65] *Id.* at para. 3.b.

[66] *Id.* at para. 3.c.

[67] *Id.*

tion by the United States contained in a memorandum from then Judge Advocate General of the Navy, VADM James Crawford.[68] We adopt that timeline here and restate key events in it as follows:

> The Belgian Federal Police (BFP) notified Army Criminal Investigation Division (CID) on 9 October 2015 of Mrs. Bravo's death. Army CID then notified the NCIS field office in Naples, Italy. At that time, BFP intended to remain the lead agency consistent with existing practice.[69]

> On 12 October 2015, Belgian authorities notified Appellant that he was a person of interest in their investigation into Mrs. Bravo's death. Belgian authorities arrested and placed Appellant into confinement on 18 March 2016. On 23 March 2016, a Belgian confinement review hearing officer continued Appellant's confinement.[70]

> Between June 2016 and October 2016, U.S. military and Belgian authorities, including the Belgian Ambassador met and exchanged letters discussing whether Belgian citizens could be compelled to appear as witnesses at a U.S. court-martial. Despite the applicability of a Mutual Legal Assistance Treaty (MLAT), Belgian authorities insisted that Belgian witnesses could not be compelled to appear in a foreign court under Belgian law.[71] On 14 July 2016, after a request from Appellant's Belgian attorney, he was released from Belgian jail and placed on house arrest.[72] Still, the CNE and the various legal advisors at all levels cited several concerns including the difficulty in compelling attendance of Belgian witnesses and the need for assistance from Belgian law enforcement.[73]

> On 9 August 2017, the Belgian investigating magistrate concluded her investigation and transferred the case to the prosecuting magistrate for possible prosecution.[74]

---

[68] App. Ex. LXXXVI at 5-7.

[69] App. Ex. LXXXVI at 5.

[70] App. Ex. LXXXVI at 6.

[71] App. Ex. LXXXVI at 6.

[72] App. Ex. LXXXVI at 7.

[73] App. Ex. LXXXVI at 7.

[74] App. Ex. LXXXVI at 7.

On 13 November 2017, the Belgian prosecuting magistrate notified the U.S. Army Northern Law Center (NLC), the designated United States representative to Belgium for coordination of all foreign criminal jurisdiction matters, that he recommended referral of charges in Belgian court.[75]

After a review in January and February 2017 by the Navy Region Legal Service Officer and the Force Judge Advocate for Commander, Naval Forces Europe (CNE) that recommended against asserting jurisdiction, the CNE submitted a request to the Secretary of Defense seeking approval not to assert primary jurisdiction in Appellant's case.[76]

The Secretary of Defense denied the convening authority's request on 2 January 2018.

On 5 January 2018, the NLC informed Belgium that the United States was asserting its primary right to jurisdiction over the case.

On 8 January 2018, the Belgian criminal court dismissed its case against [Appellant] and [Appellant] was released from Belgian custody and returned to U.S. military authority.[77]

We are persuaded that the Belgian authorities, who have a "primary responsibility under customary international law for conducting criminal investigations of incidents within their sovereign territory,"[78] had their own separate interest investigating the death of Mrs. Bravo.[79] We find that this does not conflict with the terms of the NATO SOFA since both the United States and Belgium had concurrent jurisdiction under its terms. Indeed, the provision

---

[75] App. Ex. LXXXVI at 5-7.

[76] During this time, between April and December 2017, Appellant undertook efforts to force the U.S. Government to assert jurisdiction including corresponding with the Secretary of State, seeking a writ of mandamus in the United States District Court for the District of Columbia, and communicating with members of the U.S. Congress.

[77] App. Ex. LXXXVI at 7.

[78] App. Ex. V, Attach. W, Tab C, at 2; While not binding on this Court, the Rome Statute of the International Criminal Court is cited in App. Ex. V, Attach W, Tab C and we are persuaded that it is competent evidence of customary international law standing for sovereign nations having a primary responsibility to conduct criminal investigations within their territory. *See generally* Art. 17 and 18 of the Rome Statute of the Int'l Crim. Ct.

[79] *See* Art. 8 of the Belgian Code d'Instruction Criminelle (1808).

of concurrent jurisdiction in the NATO SOFA is premised on the idea that a sovereign NATO member country would have an interest in investigating a serious crime committed within its territory and that rather than being treated as a country occupied by a hostile force, the exercise of concurrent jurisdiction is a matter of diplomacy and cooperation among allies.

The United States was required under terms of the NATO SOFA to give notice if it would not assert its primary jurisdiction and, while it may not have resulted in a model of swift action, a good faith request seeking the approval of the Secretary of Defense was sought to do that. The NATO SOFA does not require Belgium, under these circumstances, to wait to take investigative action until receiving a clear indication whether the United States would assert jurisdiction. Given the legitimate concerns expressed by multiple legal advisors and the support the request received from a number of senior officers as it was routed to the Secretary of Defense, the United States authorities in Belgium overseeing this case had a good faith belief the request would be granted.

Once the United States finally did assert its right to primary jurisdiction, following the Secretary of Defense rejecting the convening authority's request, Belgium relinquished jurisdiction to the United States. However, this did not occur until January 2018. Thus, up to that point, we find that both the United States and Belgium were proceeding as though Belgium would exercise jurisdiction consistently with the terms of the NATO SOFA. We find that Belgian authorities were not acting in a "joint venture" with, or as agents of United States' law enforcement, when they confined Appellant under their own law and authority.[80]

It is clear from the chain of events that Belgian authorities were proceeding as though they were going to bring the case to trial and it was obvious that they were focused on that goal. In October 2015, the Belgian investigating magistrate prohibited the BFP from releasing investigative information to NCIS.[81] By November 2017, the Belgian prosecutor recommended referral of charges to the appropriate Belgian criminal court after the Belgian investigation concluded.[82]

Simultaneously with the Belgian investigation, NCIS agents took some limited investigative steps at the request of the BFP, including participating in scene reconstruction, forensic support and witness interviews in Europe and the United States. The NCIS agents also took some investigative steps of its

---

[80] *See Abu Ali*, 395 F. Supp. 2d. at 384-85.

[81] App. Ex. V, Attach. W, Tab C at 1.

[82] App. Ex. V, Attach. W, Tab C at 6.

own, including agents traveling to Belgium in December 2016 to ascertain the willingness of Belgian witnesses to testify in a court-martial. However, NCIS lacked authority to conduct a full, independent investigation in Belgium. NCIS agents consulted with military lawyers from the U.S. Army Northern Law Center (NLC) and the U.S. Navy Region Legal Service Office, Europe, Africa, Southwest Asia (RLSO EURAFSWA). There was consideration given by U.S. military lawyers to bringing a court-martial in the future, following the Belgian investigation. This was influenced by a perception that Belgian authorities would stop all investigative activities once the United States asserted jurisdiction and that that would make it difficult or impossible for NCIS agents to gather sufficient evidence for a court-martial.[83] Nevertheless, as noted by the military judge, as the Belgian investigation drew near its close, doubts grew among U.S. military officials in Europe whether the United States could successfully prosecute the case at all because of a concern that Belgian witnesses could not be compelled under Belgian law to testify in a court-martial. This included several witnesses with relevant testimony who told RLSO EURAFSWA lawyers and NCIS agents they would not voluntarily testify.[84] As a result, upon the advice of several senior military lawyers in Europe, the CNE requested not to assert primary jurisdiction in this case. The Secretary of Defense denied this request; subsequently, the United States asserted primary jurisdiction under the NATO SOFA on 5 January 2018.

We conclude that the Belgian authorities were acting independently under their own legal authority and consistent with their responsibilities as a sovereign nation under international law to prosecute crimes committed within their borders. We further conclude that Appellant's confinement by Belgian authorities did not trigger Appellant's speedy trial rights under Article 10 or the Sixth Amendment.

#### (2) The Government did not violate the Sixth Amendment or Article 10 even if restraint occurred on 18 March 2016.

Even if we concluded that imposition of restraint by Belgian authorities on 18 March 2016 was somehow a triggering event for Appellant's speedy trial rights, we would nonetheless conclude, after applying the four-part *Barker* analysis, that Appellant's speedy trial rights were not violated.

As to the first and second *Barker* factors, measuring from 18 March 2016 may arguably weigh in Appellant's favor, though given the complexities of a

---

[83] App. Ex. V, Attach. W, Tab C at 2.

[84] App. Ex. V, Attach. W, Tab C at 5.

case involving foreign witnesses and evidence, expert witnesses, forensic evidence and that it was a case involving murder, this is a close call. Still, we find the reasons for the delay to be justified. The United States reasonably sought to resolve the application of jurisdiction with its Belgian counterparts, respecting its sovereignty and ability to pursue its own criminal investigation. Indeed, the United States strongly considered allowing the Belgian authorities to prosecute the case themselves. Once the United States asserted jurisdiction, NCIS agents continued to investigate to allow United States prosecutors to feel satisfied they would be able to prove the case beyond a reasonable doubt.

As to the third *Barker* factor, we find that Appellant demanded the United States assert jurisdiction but did not demand a speedy trial. Indeed, if speed were Appellant's only consideration, the Belgian trial would likely have occurred sooner than the court-martial and would have been the better option. Appellant's efforts to demand trial by court-martial indicate that being tried in a court-martial was more important to him than mere speed.

Lastly, we find the Appellant did not suffer any prejudice. Appellant identifies two potential witnesses who died between the time Appellant was arrested and the beginning of the court-martial in support of his claim of prejudice. However, the two potential witnesses who died were of speculative value.

According to Appellant, one potential witness, Mr. Sierra, could have provided an alternate explanation for other witnesses seeing a man looking out a window of the building the Mrs. Bravo fell from, meaning the bald man seen looking down from the window at Mrs. Bravo on the ground may have been someone other than Appellant. Mr. Sierra was interviewed by Officer Vale that evening and reported that he heard a scream and an impact on his balcony. In his trial testimony, Officer Vale was asked, but could not remember if Mr. Sierra was bald or whether Mr. Sierra had told Officer Vale that he looked out his window.[85] However, Appellant himself stated to multiple people that he was in the room Mrs. Bravo fell from and that he went downstairs and spoke to Mrs. Bravo while she was still alive.

Further, another witness from the street level where Mrs. Bravo fell, Mr. Hotel, testified that the man who looked out the window and the man who came downstairs and spoke to him and Mrs. Bravo in English (which he did not understand) were the same man, and that this man was looking out the window Mrs. Bravo fell from in the upper right corner of a photograph of the building admitted as Prosecution Exhibit 39.[86] Thus, even if Mr. Sierra had

---

[85] R. at 2044.

[86] R. at 1894-1901.

been alive at the at the time of trial it is entirely speculative whether this would have been a viable alternate explanation for the bald man looking out the window. Also, because of the evidence that Appellant told multiple people that he was in the room Mrs. Bravo fell from, it would not have changed the outcome since it was still established that he was in the room, even if he did not look out the window. Moreover, Mr. Sierra died in May 2016, only two months after Appellant was arrested and over one year before the Belgian investigation was complete. Thus, by any reasonable timeline, Mr. Sierra would have died before trial.

Mrs. Bravo's mother passed away in February 2018, and Appellant alleges, speculatively, that she could have provided the members with a more in-depth understanding of Mrs. Bravo's mental health issues.[87] Also, Mrs. Bravo's mother died very shortly after the U.S. asserted jurisdiction and it would have been very unlikely she would have been available under any reasonable trial timeline.

Accordingly, Appellant's speedy trial rights were not violated even if we found (which we do not) that confinement by Belgian authorities triggered Appellant's speedy trial rights pursuant to the Sixth Amendment or Article 10, UCMJ.

**B. Appellant Was Not Deprived of His Right to Counsel as a Result of Delay in Asserting Jurisdiction.**

Appellant argues that the delay in asserting jurisdiction by the Government deprived him of his Fifth and Sixth Amendment rights in that he was questioned or interrogated by Belgian police or by Belgian judges on a number of occasions. Some of the police interrogations took place in a custodial setting. Appellant acknowledges that he was assisted by a Belgian attorney, but not an American attorney.[88] Appellant does not assert that he was deprived of the right to counsel under Belgian law. Rather, Appellant argues that the United

---

[87] Appellant's Brief at 59.

[88] Appellant's Brief at 63–64. Appellant also argues that he was deprived his Fifth Amendment rights because he was questioned on the night of Mrs. Bravo's death without a lawyer present. Appellant's Brief at 63–64 ("Mrs. Bravo fell from her apartment on 8 October 2015. Belgian police responded. One of those officers . . . asked [Appellant] to recount his evening. No lawyer was present for [Appellant] to consult with."). This argument is without merit because (1) there was no evidence Appellant was in custody by Belgian authorities; (2) Appellant was not a person of interest or suspected of a crime at that point; and (3) American investigators were not involved in the investigation at that point. *See United States v. Cunningham*, No. 202200263, 2024 CCA LEXIS 182, *10–14 (N-M. Ct. Crim. App. May 8, 2024); *see also Matias*, 25 M.J. at 363.

States always intended to assert jurisdiction over Appellant and purposely delayed asserting jurisdiction to deprive Appellant of a competent United States attorney. According to Appellant, the delay permitted Belgian authorities to interrogate Appellant without the assistance of an American attorney and then for the United States authorities to use the fruits of these interrogations against him in his later United States court-martial.[89] Nevertheless, Appellant does not identify specific interrogations or statements he now objects to, or how the fruits of the interrogations or statements were used against him.[90]

When offered by trial counsel, the military judge sua sponte rejected admission of a written statement that Appellant gave to Belgian police that had been written in French.[91] Statements made by Appellant to local police on the night of Mrs. Bravo's death were given in the form of testimony by the officers without objection.

We already addressed Appellant's alleged violations of his speedy trial rights in the previous AOE and in our analysis of pre-preferral delay, we concluded that Belgian authorities have a "primary responsibility under customary international law for conducting investigations of incidents within their territory,"[92] and had their own separate interest in investigating and pursuing prosecution of Appellant for murdering Mrs. Bravo.[93] To the extent this AOE is redundant with the previous one, we point to our analysis and conclusion regarding the previous AOE. Here, we analyze the one issue not raised in the previous AOE: whether the Government used pre-preferral delay as a subterfuge to avoid compliance with Appellant's constitutional rights. We conclude the Government did not use pre-preferral delay as a subterfuge to avoid compliance with Appellant's rights under the United States Constitution.

*1. Standard of Review*

As a general matter, Appellant's brief correctly cites the standard of review for constitutional error in *United States v. Simmons*.[94] However, this AOE relates to a more specific issue for which there is more precisely fitting case law.

---

[89] Appellant's Brief at 64.

[90] Appellant's Brief at 61-68.

[91] R. at 2173.

[92] App. Ex. V, Attach. W, Tab C, at 2; *See* Art. 17 and 18 of the Rome Statute; *see also* The Obligation to Extradite or Prosecute (Aut Dedere Aut Judicare) Final Report of the International Law Commission 2014, 54 I.L.M. 758 at 9.

[93] *See* Art. 8 of the Belgian Code d'Instruction Criminelle (1808).

[94] *See United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004).

*United States v. Payne* highlights a divergence in the law concerning the question whether "military and civilian investigations merged into an indivisible entity" is one of fact or law, and, in turn, whether the standard of review should be either whether the military judge's conclusion is reviewed as "clearly erroneous" or reviewed "de novo."[95] Rather than attempt to resolve that divergence here, we will apply the de novo standard.

A "person subject to the code" includes a person acting as a knowing agent of a military unit or of a person subject to the code.[96] A person subject to the code who is required to give warnings under Article 31 may not interrogate or request any statement from an accused or a person suspected of any offense without first:

> (1) informing the accused of the nature of the accusation;

> (2) advising the accused or suspect that the accused or suspect has the right to remain silent; and

> (3) advising the accused or suspect that any statement made may be used as evidence against the accused or suspect in a trial by court-martial.[97]

"When evidence of a testimonial or communicative nature within the meaning of the Fifth Amendment to the Constitution of the United States either is sought or is a reasonable consequence of an interrogation, an accused or person suspected of an offense is entitled to consult with counsel as provided by paragraph (2) of this subdivision, to have such counsel present at the interrogation, and to be warned of these rights prior to the interrogation, if:

> (A) the interrogation is conducted by a person subject to the code who is required to give warnings under Article 31 and the accused or suspect is in custody, could reasonably believe himself or herself to be in custody, or is otherwise deprived of his or her freedom of action in any significant way; or

> (B) the interrogation is conducted by a person subject to the code acting in a law enforcement capacity, or the agent of such a person, the interrogation is conducted subsequent to the preferral

---

[95] *United States v. Payne,* 47 M.J. 37, 42 (C.A.A.F. 1997).

[96] Military Rules of Evidence, *Manual for Courts-Martial, United States* (Mil. R. Evid. (2019)) 305(b)(1).

[97] Mil. R. Evid. (2012) 305(c).

of charges and the interrogation concerns the offenses or matters that were the subject of the preferral of charges."[98]

Warnings under Article 31, UCMJ and the Fifth and Sixth Amendments are not required during an interrogation conducted abroad by officials of a foreign government or their agents unless such interrogation is conducted, instigated, or participated in by military personnel or their agents. A statement obtained from a foreign interrogation is admissible unless it was obtained through the use of coercion, unlawful influence, or unlawful inducement.[99]

Article 31, UCMJ, extends to the civilian investigator "(1) when the scope and character of the cooperative efforts demonstrate 'that the two investigations merged into an indivisible entity'[100]; and (2) when the civilian investigator acts 'in furtherance of any military investigation, or in any sense as an instrument of the military.'"[101] Importantly, the CAAF has held that the fact that an individual is eventually tried by the military does not alone indicate that foreign officials conducting a parallel investigation under their own authority are agents of the military or that the investigations are so intertwined that rights' warnings would be required.[102]

Courts have analyzed whether foreign investigations were a deliberate subterfuge to avoid compliance with the Fourth Amendment, Fifth Amendment, and Article 31(b), essentially answering whether the civilian and military investigations were so intertwined that the foreign civilian law enforcement authorities were acting as agents of the United States military.[103] Four such cases are particularly relevant given that the foreign investigating agency was subject to the NATO Status of Forces Agreement: *United States v. French*, *United States v. Jones*, *United States v. Grisham*, and *United States v. Coleman*.[104] In each case, a United States servicemember was suspected of committing a crime in the local community, where local law enforcement agencies were required to

---

[98] Mil. R. Evid. (2012) 305(d).

[99] Mil. R. Evid. (2012) 305(h)(2).

[100] *United States v. Penn*, 18 C.M.A. 194, 199, 39 C.M.R. 194, 199 (1969) (citing *United States v Swift*, 17 C.M.A. 227, 232, 38 C.M.R. 25, 30 (1967)).

[101] *Penn*, 18 C.M.A. at 199, 39 C.M.R. at 199 (citing *United States v. Grisham*, 4 C.M.A. 694, 697, 16 C.M.R. 268, 271 (1945)).

[102] *United States v. French*, 38 M.J. 420, 426 (C.M.A. 1993).

[103] *French*, 38 M.J. 420; *United States v. Jones*, 6 M.J. 226 (C.M.A. 1979); *Grisham*, 4 C.M.A. 694, 39 C.M.R. 194; *United States v. Coleman*, 25 M.J. 679 (A.C.M.R. 1987).

[104] *Id.*

investigate crimes occurring in their area of responsibility.[105] Under the terms of the controlling SOFAs, either the local authorities or U. S. military authorities could potentially have jurisdiction.[106] Also, in each case, there was cooperation by the United States military with local authorities that the appellants argued were indicia that the investigations were "joint" and that they should have been given Article 31(b) warnings.[107]

For example, in *French*, an Air Force Office of Special Investigations (OSI) agent and the appellant's first sergeant were present during an interrogation by British authorities. The OSI agent said to the appellant at one point that it would be better to remain quiet than to keep lying.[108] In *Jones*, the United States law enforcement authorities made Jones available for interrogation by foreign authorities in their office.[109] In *Grisham*, an American interpreter was used when the appellant was questioned by French police and a United States military police officer was present.[110] Lastly, in *Coleman*, the appellant made an oral admission to German police and then invoked his right to an attorney under German law. He was also later interrogated by United States military investigators who, with full knowledge that he requested an attorney of the German police, secured a waiver of Article 31(b) rights and obtained a written statement from him. Some other parallel actions were taken by both German and United States authorities upon learning of the death of the appellant's child such as providing transportation and lunch for appellant's interrogation by German authorities.[111] In each of these cases, despite some activities conducted by the authorities of the United States and another country in parallel, or in an effort to be cooperative, the court concluded that the local authorities

---

[105] *French,* 38 M.J. at 421 (possessing lysergic acid diethylamide and possessing and using marijuana in England); *Jones*, 6 M.J. at 227 (larceny and assault and battery in Germany); *Grisham*, 4 C.M.A. at 695, 16 C.M.R. at 269 (unpremeditated murder in France); *Coleman*, 25 M.J. at 681 (battery on a child under the age of sixteen, aggravated assault, and murder in Germany).

[106] *French,* 38 M.J. at 424; *Jones*, 6 M.J. at 227; *Grisham*, 4 C.M.A. at 698, 16 C.M.R. at 272; *Coleman*, 25 M.J. at 685-86.

[107] *French,* 38 M.J. at 421-22; *Jones*, 6 M.J. at 227; *Grisham*, 4 C.M.A. at 698, 16 C.M.R. at 272; *Coleman*, 25 M.J. at 687.

[108] *French*, 38 M.J. at 422.

[109] *Jones*, 6 M.J. at 227.

[110] *Grisham*, 4 C.M.A. at 697, 16 C.M.R. at 271.

[111] *Coleman,* 25 M.J. at 681-85.

were not operating as agents of the United States military and that the investigations were not so intertwined that rights warnings would be required.[112]

Importantly, in *Jones*, the Court of Military Appeals declined to adopt "a rule which would require American officials to advise an accused of his rights under American law whenever they turn him over to foreign officials or otherwise make him available for interrogation by such officials."[113] The *Jones* Court held that such a rule would be "judicial legislation" and would face "practical difficulties," notably "that such advice may be inconsistent with the law of the foreign country involved."[114]

### 2. Analysis[115]

Appellant was given a rights advisement under Belgian law and exercised his right to counsel, consistent with Belgian law. There is no allegation that Appellant was coerced into making the statements he did to Belgian authorities.

As with the previous AOE, we find that the Belgian authorities had their own legitimate interest in prosecuting Appellant and indeed were fully prepared to take the case to court. Indeed, Appellant points to no evidence that U.S. military authorities were directing any aspect of the Belgian investigation. At most, NCIS agents took some cooperative actions to assist Belgian authorities. As a result, we find Belgian authorities were not acting as agents of the United States military. We also find that the Belgian authorities' investigation was not so intertwined with the NCIS investigation that rights warnings were required.

While Appellant asserts in his brief that the "government always intended to assert jurisdiction over Appellant . . . U.S. authorities' intent was to allow the Belgian police to complete its investigation *and then* the United States would assert jurisdiction[,]"[116] this is contradicted by the fact that only three pages earlier in his brief, Appellant explicitly notes that the United States did

---

[112] *French,* 38 M.J. at 426-27; *Jones*, 6 M.J. at 230; *Grisham*, 4 C.M.A. at 697-98, 16 C.M.R, at 271-72; *Coleman*, 25 M.J. at 686-87.

[113] *Jones*, 6 M.J. at 227-28.

[114] *Id.* at 228 (noting that the Federal Republic of Germany permits "adverse comment upon the silence of an accused.").

[115] We note that Appellant's brief cites to material from Appellant's Fifth Motion to Attach, which this Court denied on 26 October 2023. In considering this AOE, we did not consider the material that was included with the denied Motion to Attach.

[116] Appellant's Brief at 65-66.

not assert jurisdiction until after Appellant filed a lawsuit against the Secretary of Defense in the U.S. District Court for the District of Columbia, which was ultimately dismissed as moot.[117]

After reviewing this issue *de novo,* we find that the military and civilian investigations were not merged into a single indivisible entity, and that the United States authorities did not purposely delay asserting jurisdiction for the purpose of depriving Appellant of his right to counsel. Accordingly, this AOE is without merit.

**C. The Military Judge Did Not Abuse His Discretion by Denying Appellant's Challenges to Two Members.**

After voir dire Appellant challenged two members for implied bias: Commander (CDR) Neal and CDR Owens.

The military judge denied both challenges. Regarding CDR Neal, the military judge found that he was reasoned, mature, thoughtful, and forthright, and that he had the proper temperament to serve as a member. As to the substance of CDR Neal's disclosure about his wife's suicidal ideation or gesture in the past, the military judge found that CDR Neal's incident and experience was meaningfully different from this case, namely it was five years earlier and it would not have an impact on CDR Neal's service as a member.

In the case of CDR Owens, Appellant begins by noting that he responded positively in group voir dire to "[d]o you believe if you were falsely accused of a crime, that you would definitely testify to clear your name?"[118]

Appellant argues that even after several follow up questions from both trial counsel and trial defense counsel, CDR Owens' responses demonstrated that he believed someone who is innocent would testify.[119] The military judge "noted after the voir dire process that [CDR Owens] seemed to be a good member."[120] The military judge referred to CDR Owens' statements in voir dire where he repeatedly stated that he would not hold Appellant's decision not to testify against him because "[e]veryone has their own circumstances."[121]

1. *Standard of Review*

---

[117] Appellant's Brief at 62. *See generally Becker v. Mattis*, et al., 1-2017cv02336 (D.D.C. Feb. 26. 2018)(stipulated dismissal with prejudice).

[118] R. at 952.

[119] Appellant's Brief at 101.

[120] R. at 1268.

[121] R. at 1269.

R.C.M. 912(f)(1)(N) provides "[a] member shall be excused for cause whenever it appears that the member . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."[122] This rule encompasses both actual bias and implied bias.[123] "The burden of establishing that grounds for a challenge exist is upon the party making the challenge."[124] Military judges should be "liberal in granting challenges for cause."[125]

In *United States v. Pyron,* this Court exhaustively restated the standards for review of a military judge's denial of a challenge for cause for implied bias.[126] We generally give a military judge's ruling on a challenge for cause great deference, but we review rulings on challenges for implied bias "under a standard less deferential than abuse of discretion but more deferential than de novo."[127] This is because implied bias views the issue from the vantage point of the "public's objective perception of the fairness of the military justice system, and not simply the military judge's assessment of whether a challenged member can serve in a fair and impartial manner."[128] "The test for implied bias takes into account, among other distinct military factors, the confidence appellate courts have that military members will be able to follow the instructions of military judges and thus, while it will often be possible to rehabilitate a member on a possible question of actual bias, questions regarding the appearance of fairness may nonetheless remain."[129] "The issue therefore is whether the risk the public will think the accused received anything less than a fair trial is 'too high.'"[130] Thus, errors in denying the defense's meritorious challenges for cause based on implied bias are akin to structural errors in the trial, and not tested for prejudice.[131]

---

[122] R.C.M. (2019) 912(f)(1)(N).

[123] *United States v. Rome,* 47 M.J. 467, 469 (1998) (citing *United States v. Harris,* 13 M.J. 288, 292 (CMA 1982)).

[124] R.C.M. (2019) 912(f)(3).

[125] *See, e.g., Rome,* 47 M.J. at 469.

[126] *United States v. Pyron*, 81 M.J. 637 (N-M. Ct. Crim. App. 2021).

[127] *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002).

[128] *Pyron*, 81 M.J. at 641 (citing *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008)); *see also United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008).

[129] *Id.* at 642 (citing *United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015)).

[130] *Id.* (citing *Townsend* 65 M.J. at 463).

[131] *See id.* at 642-43.

The CAAF placed a finer point on this standard of review in the recent case of *United States v. Keago*.[132] Acknowledging that earlier cases had not been entirely clear on how to apply the somewhat ambiguous "under a standard that is less deferential than abuse of discretion but more deferential than de novo," the *Keago* Court noted that placing the implied bias analysis on the record is not required, but that doing so is "highly favored and warrants increased deference from appellate courts."[133] The *Keago* Court also noted that "when a military judge fails to conduct an implied bias analysis, the standard of review shifts toward de novo."[134] "Further complicating matters, in the Court's view, is how the liberal grant mandate factors into the review."[135]

To clarify the application of the standard, the Court in *Keago*, interpreted its earlier case law as dictating a sliding standard of appellate review for implied bias challenges that fall somewhere on a spectrum between de novo review and abuse of discretion based on the specific facts of the case. A military judge who cites the correct law and explains his implied bias reasoning on the record will receive greater deference (closer to the abuse of discretion standard), while a military judge who fails to do so will receive less deference (closer to the de novo standard). Accordingly, the more reasoning military judges provide, the more deference they will receive. The Court also reaffirmed its statements on the liberal grant mandate, noting that "in close cases military judges are enjoined to liberally grant challenges for cause,"[136] and that judges are "mandated to err on the side of granting a challenge."[137] The Court interpreted the latter to mean that "if after weighing the arguments for the implied bias challenge the military judge finds it a close question, the challenge should be granted."[138] Based on this language, the Court found that "military judges retain their discretion to determine whether a challenge for cause constitutes a 'close case' of bias."[139] However, when a case is close, the liberal grant mandate prohibits military judges from denying the challenge. The Court did observe in a footnote that there were some cases that suggested a more limited application of the liberal grant mandate, favoring a clear abuse of discretion standard.

---

[132] *United States v. Keago*, 84 M.J. 367 (C.A.A.F. 2024).

[133] *Id.* at 373 (citing *United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017)).

[134] *Id.* (citing *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016)).

[135] *Id.*

[136] *Id.* (quoting *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007)).

[137] *Id.* (quoting *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015)).

[138] *Id.* (quoting *Peters*, 74 M.J. at 34).

[139] *Id.* (footnote omitted).

However, the Court in *Keago* found those cases of little precedential value in light of more recent decisions in *Peters* and *Clay*.

### 2. *Analysis of CDR Neal*

CDR Neal revealed in his questionnaire that he knew someone who had experienced suicidal ideation, attempted suicide, or committed suicide.[140] On 8 April 2022, he clarified during voir dire that his wife made a suicidal ideation or gesture sometime between 2014-2017, at least five, but possibly more than five years earlier.[141] He added that she received treatment and medication and that it seemed to work.[142] When asked by trial defense counsel, he also said it was in the past now and not something he and his wife still talk about.[143] He said it "wasn't anything really traumatic" and would not "trigger him in any way" to hear about suicide in this case.[144] When the military judge called him back a second time, he also said, "I don't think it will impact me. Like I said, it was more of an ideation, kind of a drunken cry for help sort of thing. There wasn't any attempt made, and it was just the one time. So, I don't think it will affect me."[145]

Although Appellant's appellate counsel argued during the 17 July 2024 oral argument that the military judge merely stated boilerplate language in his analysis, we find that the military judge's analysis was thorough. To give further context, we also considered the analyses he placed on the record for other members who were challenged for actual or implied bias. In other analyses, the military judge was also thoughtful and thorough in his application of the standards for actual and implied bias, and he repeated his correct understanding of the liberal grant mandate several times. Indeed, the military judge actually excused four other members on the basis of implied bias, using the liberal grant mandate. Given the combination of the analyses the military judge placed on the record regarding his application of the standards for actual and implied bias, combined with his discussion and application of the liberal grant mandate, we find that the military judge clearly understood and articulated the correct standards for each. Under these circumstances, we find that on the

---

[140] App. Ex. CXXVI at 60.

[141] R. at 1015-16; R. at 1296-97.

[142] R. at 1015.

[143] R. at 1021.

[144] R. at 1022.

[145] R. at 1297.

spectrum between abuse of discretion and de novo review, the standard of review is significantly closer to abuse of discretion.

One analysis by the military judge that stands out was in response to the challenge to LCDR H who also had some experience with suicide. The distinction in LCDR H's case was that he attempted suicide himself, albeit 20 years earlier.[146] Quite a few more detailed questions were asked of LCDR H, given that he was describing his own experience rather than another person's and naturally had more detailed information about it at his fingertips.[147] He was asked if he heard "stories of other people that had committed suicide, things like that, that would probably cause you to reflect back on your own experiences as well, right?"[148] He answered "[y]es sir, I--I would consider that experience."[149] Trial defense counsel also asked LCDR H despite his representations that he could be fair and impartial, "if you are hearing information about suicide . . . that would probably cause you to reflect back on--on your own experiences as well, right?"[150] LCDR H answered "I think I probably would. Yes, sir."[151] Following that, the military judge stated that he found LCDR H to be a very close call because he equivocated on some of the answers about how hearing testimony about suicide might "cause him to reflect on his own personal circumstances and it may be difficult for him."[152] Although LCDR H disclaimed any actual bias, and the military judge found that he did not have any, and that he was also "professional and forthright," the military judge granted the challenge to LCDR H for implied bias based on the liberal grant mandate.[153]

Comparing LCDR H and CDR Neal, we can see why LCDR H was a much closer case and that the military judge was correct in applying the liberal grant mandate in LCDR H's case. First, because in the case of LCDR H, the experience he had was his own and it involved an actual attempted suicide in which he took half a bottle of Advil PM.[154] LCDR H had also recently sought mental health counseling for mild depression and admitted that he does still think

---

[146] R. at 1280.

[147] R. at 1280-84.

[148] R. at 1284.

[149] R. at 1284.

[150] R. at 1284.

[151] R. at 1284.

[152] R. at 1285.

[153] R. at 1285.

[154] R. at 1162.

about his experience with suicide. Finally, he also admitted that he would probably reflect on his own experience if he heard information about suicide. In contrast, CDR Neal's wife only had a suicidal ideation five years earlier, sought treatment, and took medication that seemed to be working. CDR Neal said it was not very traumatic and was not something he and his wife still talk about. When asked later by the military judge if hearing evidence presented about suicide would impact him, he said he did not think it would impact him.

Given the level of detail the military judge placed on the record and the amount of thought that went into each of his decisions on implied bias and the liberal grant mandate, we find that in the case of CDR Neal, the military judge's findings of fact were not clearly erroneous and his application of the law was not arbitrary, fanciful, clearly unreasonable or clearly erroneous. Our only criticism of the military judge's analysis, in light of *Keago*, is that he did not explicitly explain why it was not a "close case whether a reasonable member of the public would have significant questions about the fairness of Appellant's panel."[155] Nevertheless, being able to review the military judge's analysis across all of his implied bias rulings, does illuminate his process of analysis of the implied bias standard. Also, given that he labeled another situation involving a member's experience with suicide as being a "close case," it is possible to understand how the military judge analyzed this question in other cases. This causes us to conclude the standard of review in this case is somewhat less than abuse of discretion, and very close to de novo. On that standard, we find that the military judge did not err in denying the challenge against CDR Neal for actual or implied bias, even in light of the liberal grant mandate.

Nevertheless, in light of the potential difficulty of explaining where on a sliding scale standard, we also review this issue de novo. We find that there is no evidence in the record to suggest CDR Neal was not being fully forthright in his description of his feelings about his wife's suicidal ideation. It happened several years earlier; it was not traumatic and was not something they still talked about. There was also no reason to believe it would impact him upon hearing evidence of suicide when he said it would not. We also do not see any reason to believe that CDR Neal feeling this way about his wife's suicidal ideation is reason to believe that he would view evidence of a suicide attempt as less credible or not serious. The two situations are distinct. As a result, we also conclude that CDR Neal does not present a close case whether a reasonable member of the public would have significant questions about the fairness of Appellant's panel.

---

[155] *Keago*, 84 M.J. at 375.

3. *Analysis of CDR Owens*

With regard to CDR Owens, Appellant focuses attention on CDR Owens' affirmative response on general voir dire to the question "[d]o you believe if you were falsely accused of a crime, that you would definitely testify to clear your name."[156] Also, to CDR Owens' response to trial counsel's invitation on individual voir dire to expand on his affirmative answer to that question when he said "[i]f I'm you know, innocent then of course I would like the opportunity to express my--my innocence."[157] That was followed by trial counsel's question "[c]an you think of a reason that, outside of, you know, guilt, that somebody would not want to testify?" and CDR Owens' response "[n]ot off the top of my head, I can't think of anything that would, no."[158]

We begin by observing that focusing on just a few questions glosses over a longer series of questions that clearly confused the members because they gave seemingly inconsistent answers as the wording of the questions shifted. For example, the general voir dire question that followed the first one in the preceding paragraph was "[d]o you believe if someone accused of a crime doesn't testify, they're probably hiding something?" To that question, CDR Owens and all of the other members gave a negative response.[159]

Trial defense counsel returned to this topic after asking another question, this time asking, "is there anyone here who would-- who does not want to hear what [Appellant] has to say about this case?" All of the members raised their hands, indicating a positive response.[160] The next question by trial defense counsel, attempting to clarify, was "[w]ho here would be disappointed if [Appellant] didn't testify based on my advice?"[161] There was then a negative response from all members. The next question was "[i]f Appellant doesn't testify, will you feel any hesitation in voting not guilty?" Again, there was a negative response from all members.[162]

One further question along these lines was asked - "[t]he military judge will instruct you that my client [Appellant] has the absolute right not to testify, knowing that who still wants [Appellant] to testify?" 11 members answered

---

[156] R. at 952.

[157] R. at 1073.

[158] R. at 1073-74.

[159] R. at 952.

[160] R. at 953.

[161] R. at 953.

[162] R. at 954.

affirmatively, including CDR Owens.[163] Given that the question was arguably confusing and that the members had not been instructed by the military judge, they did not yet understand the appropriate legal standards, which became clearer as the voir dire progressed.

After the questions about the accused testifying, there was a series of questions about the burden of proof, reasonable doubt, and the presumption of innocence.[164] The members universally answered each of these questions indicating they would follow the law.

We believe the specific series of questions focused on the accused's right to remain silent, while intended to reveal inelastic attitudes about exercising that right, when given to non-lawyers, only served to confuse the members rather than to shed light on their ability to apply the instructions given by the military judge.

In individual voir dire, CDR Owens was rehabilitated. There was still some confusion, but a pattern emerged that when asked about what he personally would do if accused of something, he would want to tell his story. However, he understood that the accused has a right to remain silent and that there may be good reasons for the accused in a criminal case to do so. Ultimately, CDR Owens affirmed that he would not hold it against Appellant if he did not testify. When CDR Owens was asked to expand on his response in general voir dire about whether he would testify to clear his name if he were accused of something, he said that he would want to express his innocence. When asked an open-ended question about whether he could think of a reason outside of guilt that a person would not want to testify, he responded that could not think of one "off the top of [his] head."[165] As the following questions illuminate, this was not because of an inelastic attitude toward the right to remain silent, but CDR Owens' lack of experience in, and at this point in the trial, lack of guidance on, how the right is applied in a criminal trial.

Trial counsel went on to ask nine more questions, including a number of leading questions to suggest situations in which an accused might not testify, even though not guilty. Among those were upon the advice of the accused's attorney or a fear of public speaking.[166] CDR Owens agreed not testifying in those situations make sense. CDR Owens also affirmed that he understands the Government must prove its case beyond a reasonable doubt and that the

---

[163] R. at 954.

[164] R. at 954-56.

[165] R. at 1074.

[166] R. at 1074-75.

burden never shifts to the defense. CDR Owens further affirmed, twice, in this line of questions that he would not hold it against Appellant if he did not testify.[167]

Trial defense counsel then also followed up with a few questions along these lines, ending with this one with "[s]o again, in this case, if--if you did not hear from [Appellant] . . . . would there be just anything in--in the back of your mind, kind of wondering why--why it is that he chose not to testify?[168] CDR Owens' response was "I wouldn't. That's his personal choice."[169]

The Government's brief cited *United States v. Ovando-Moran*, which provides an apt comparison in this situation, at least in terms of the facts.[170] In that case a prospective member said that he believed it would be "unnatural" for an accused not to testify on his own behalf.[171] The military judge then clarified the question and asked if now that the member understood that the accused is not required to testify, he would still "hold it against him."[172] The member said that he would not hold it against the accused, but he would still think it was "unnatural."[173] The member never swayed from that assessment and indicated it was just his personal opinion.[174] However, he also stated he would follow the military judge's instructions and would not use the accused's silence as an indication of either guilt or innocence.[175] The military judge denied the challenge without any amplifying explanation.[176] The CAAF observed that even though a layperson at the outset of a trial may believe that it would be "unnatural" for a criminal defendant not to testify, it is possible for that person to serve as an impartial court member after proper voir dire and instructions by the military judge.[177] The CAAF held that the military judge had

---

[167] R. at 1074-75.

[168] R. at 1080.

[169] R. at 1080.

[170] *See United States v. Ovando-Moran*, 48 M.J. 300 (C.A.A.F. 1998).

[171] *Ovando-Moran*, 48 M.J. at 301-302.

[172] *Id.* at 302.

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *Id.* at 304.

not abused his discretion in denying the challenge, even without an amplifying explanation from the military judge.[178]

In this case, the military judge did place his analysis of actual and implied bias on the record, and he stated the standard for the liberal grant mandate and that he considered it before he ruled on the challenge.[179] Nevertheless, this Court acknowledges, in light of *Keago*, that the military judge in this case did not explicitly place on the record his reasoning as to why a reasonable member of the public would not have questions about whether Appellant had received a fair trial. He also did not explicitly say whether or not he saw this as a close case. Nevertheless, on the sliding scale of the standard of review, we believe the standard is closer to abuse of discretion than de novo in this instance. We believe this was not a close case and that one can infer from the military judge's analysis that he believed a member of the public would not have questions about the fairness of Appellant's trial given CDR Owens' presence on the panel because he made it clear in follow up questions from both trial counsel and trial defense counsel that what he would do if he were personally accused of a crime may be different from what another person might do and that he would not hold it against Appellant if he did not testify. As a result, we find that the military judge did not abuse his discretion in denying the challenge to CDR Owens. Further, even after conducting a de novo review in this instance, we conclude CDR Owens was not impliedly biased because despite his responses about what he would do if accused of a crime, he clearly indicated that he would follow the military judge's instructions and would not hold it against the Appellant if he did not testify.

4. *Conclusion*

As a result, we find that the military judge did not abuse his discretion in denying Appellant's challenge to either CDR Nelson or CDR Owens for implied bias. Even reviewing de novo, we conclude that neither CDR Nelson nor CDR Owens was impliedly biased for the reasons stated above.

**D. The Military Judge Did Not Abuse His Discretion by Allowing the Government to Introduce Text Messages Sent by Appellant Several Days Prior to Mrs. Bravo's Death.**

On 5 October 2015, only three days prior to Mrs. Bravo's death, Appellant had a text conversation with the woman with whom he was having an extra-marital affair, Ms. Justine Robinson. The text conversation had to do with a missing dog named Luna that Ms. Robinson was helping someone named

---

[178] *Id.* at 304.

[179] R. at 1268-69.

Wendy to search for. Wendy speculated that someone named Dave might have had something to do with the dog's disappearance. Neither Wendy nor Dave have a connection to this case, but the Government's theory of relevance was that Appellant made a statement in the text exchange that demonstrated premeditation and intent related to the murder of Mrs. Bravo. The following was the text exchange:

> **Ms. Robinson:** …heading into the woods with Wendy (she is very persistent) to Check for Luna. She thinks Dave had something to do with the disappearance. I won't even qualify that with a response bc I would Go to prison.

> **Ms. Robsinson:** Nothing in the woods. Thank goodness. Neighbor told Wendy he saw vultures so that's what she suggested woods walk. Sheesh.

> **Ms. Robinson:** Wendy still here talking about Dustin.

> **Appellant:** Tell her I said hi. There would [be] a vulture (me) circling and descending if he fucked with that dog.

> **Ms. Robinson:** I made space and time for Wendy and I'm really glad I did. I should have earlier maybe but today was as good as any.

> **Ms. Robinson:** So, that's one thing I would have to weigh when telling if Dave did anything to Luna….would it be worth you going to jail? I'd do it myself I think so that I could keep you around. #imselfish

> **Appellant:** He wouldn't know it was me. Stupid people act on emotion…I don't like to do that. Subversive acts require well thought out plans . . . .

> **Ms. Robinson:** I'd happily help you draw up plans.[180]

Trial defense counsel filed a pretrial motion *in limine* to exclude these texts as improper character evidence based on Mil. R. Evid. 404(b). Trial counsel's argument for the relevance and admissibility of the text messages was that they were direct and/or circumstantial evidence of intent and premeditation to murder Mrs. Bravo, thus not subject to Mil. R. Evid. 404(b). In the alternative, trial counsel argued that that the text messages were admissible under Mil. R.

---

[180] Pros. Ex. 15 at 2-4.

Evid 404(b) as evidence of motive, intent, preparation and plan because Appellant carried out multiple "subversive acts" around the same time the statement was made.[181]

The military judge analyzed the texts under Mil. R. Evid. 404(b) and admitted them on the basis they were highly probative of the Government's theory of the case in that they were contemporaneous statements by Appellant expressing that "well-thought-out planning is required before committing a subversive act; that [Appellant] would not act on emotion in committing a subversive act; and that the subject (victim) of the subversive act would not know of [Appellant's] plan in advance."[182] However, Appellant argues that these texts could only have been relevant to this case if presented as character evidence to show Appellant as someone vengeful who had a propensity to carry out subversive acts against people who wronged him.[183] Appellant argues this is because there was no evidence to connect the remarks to Mrs. Bravo or the charged offenses and because propensity evidence is barred, the text messages should have been excluded.[184] Appellant goes on to dispute that the text messages were evidence of motive, intent or common plan and, even if they were, that they should nevertheless have been excluded under Mil. R. Evid. 404(b).[185]

### 1. Standard of Review

While "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" it may be admissible to prove, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[186] Evidence of this type must be offered for a proper purpose other than to demonstrate the propensity of an accused to commit the crimes charged.

In order to admit evidence of crimes, wrongs or other acts under Mil. R. Evid. 404(b): (1) the evidence must reasonably support a finding that the accused committed the uncharged misconduct; (2) a material fact in issue must be made more or less probable by the evidence; and (3) the danger of unfair

---

[181] *See* App. Ex. LXVI at 5-6.

[182] App. Ex. LXXXIV at 5.

[183] Appellant's Brief at 115.

[184] Appellant's Brief at 115.

[185] Appellant's Brief at 115-21.

[186] Mil. R. Evid. (2019) 404(b).

prejudice must not substantially outweigh the probative value of the evidence.[187]

The military judge is also empowered to exclude evidence if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."[188]

We review a military judge's evidentiary rulings for an abuse of discretion, that is, whether the "challenged action [is] arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[189] "Military judges abuse their discretion (1) if the findings of fact upon which they predicate their ruling are not supported by the evidence of record; (2) if they use incorrect legal principles; or (3) if their application of the correct legal principles to the facts is clearly unreasonable."[190]

### 2. Analysis

The "well thought out plans" series of text messages was the subject of a pretrial motion *in limine* that resulted in the military judge issuing detailed findings of fact and conclusions of law, in writing, denying the motion and ruling the evidence admissible.[191] The military judge's written ruling included a sufficient balancing of the probative weight of the evidence against the danger of unfair prejudice. To the extent this text exchange is viewed as Mil. R. Evid. 404(b) evidence, after applying the standard set forth in the forgoing section, we find that it meets the three prongs of the *Reynolds* test.

Appellant concedes that the first prong of the *Reynolds* test is met because the Government could present enough evidence to show that Appellant engaged in the text message thread.[192] As to the second prong, the text messages are relevant and make a material fact in issue more likely in that they may demonstrate premeditation, frame of mind, and intent on the part of Appellant to murder Mrs. Bravo. Reviewing de novo, under both the final prong of *Reynolds* and separately under Mil. R. Evid. 403, we also find that the probative

---

[187] *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).

[188] Mil. R. Evid. (2019) 403.

[189] *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citing *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

[190] *United States v. Wilson*, 84 M.J. 383, 390 (C.A.A.F. 2024) (citing *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[191] *See* App. Ex. LXXXIV.

[192] App. Ex. LXV at 2.

value of the text message is not outweighed by the danger of unfair prejudice because we agree with the military judge that it is unlikely that members would view the text messages as demonstrating an actual intent or a propensity to harm Dave.[193]

How the Government used this evidence also reflects on its propriety as evidence supporting their theory vice improper evidence of propensity or bad character. The Government led its closing argument by quoting this evidence saying, "[s]ubversive acts required well thought-out plans."[194] The theory of the Government's case centered on the preparatory steps of Appellant that the Government argued, and the members agreed, pointed to a premeditated plan to murder his wife. In his written ruling denying the motion to exclude this evidence, the military judge found,

> Contemporaneous expressions by the accused – made on 5 October 2015 – that well-thought-out planning is required before committing a subversive act; that the accused would not act on emotion in committing a subversive act; and that the subject (or victim) of the subversive act would not know of the accused's plan in advance would each be highly probative of the government's theory.[195]

In light of the evidence admitted during trial that addresses preparatory steps by Appellant, we agree with the military judge's assessment of the admissibility of this evidence. Thus, we conclude that this evidence could have established Appellant's state of mind and specifically the fact that he either recognized the need to plan a "subversive act" or was engaged in such planning at the time that he sent these text messages.

We also find that the text messages were not cumulative. They provided one building block among several that demonstrated Appellant was preparing to murder Mrs. Bravo in the days leading up to her death. Together with other evidence, including Appellant's report to SHAPE police about Mrs. Bravo's drinking, his retrieval of pills from his old desk, and his purchase of wine represent strong circumstantial evidence that Appellant murdered Mrs. Bravo with premeditation.

Lastly, we find that even if it was error to admit the messages, there was no prejudice. A finding or sentence of a court-martial may not be held incorrect

---

[193] Mil. R. Evid. 403 (2019).

[194] R. at 3870.

[195] App. Ex. LXXXIV at 5.

on the ground of an error of law unless the error materially prejudices the substantial rights of the accused.[196] For non-constitutional evidentiary errors, the test for prejudice is whether the error had a substantial influence on the findings.[197] In conducting the prejudice analysis this Court weighs (1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question.[198]

Here the Government's case was strong. While largely circumstantial, the Government presented overwhelming evidence of preparation, including Appellant retrieving pills from his former desk one day before Mrs. Bravo's death that match a description of zolpidem, and buying wine for someone he described as having a drinking problem. Additionally, intent and motive were also established though a number of misleading or false statements by Appellant before and following Mrs. Bravo's death, including the false report to the SHAPE police about her drinking, apparently for the purpose of creating a paper trail and lying about knowing the passcode to her phone to the local police officer who responded on the night of Mrs. Bravo's death. Sending text messages from Mrs. Bravo's phone shortly before her death to her boyfriend also create a paper trail pointing to suicide. Additionally, Appellant provided statements to Belgian police indicating that Mrs. Bravo went out the window head-first, which conflicted with both witness testimony and trails left on the roof of the apartment building showing that Mrs. Bravo slid along the roof feet first while trying to hold on to prevent her fall.

In contrast, the Defense case relied on the theory that Mrs. Bravo committed suicide, which is supported by a suicidal gesture she made years earlier and her intermittent mental health treatment. Yet, there was no indication that Mrs. Bravo was suicidal at the time of her death. Indeed, friends and co-workers described her as happy and moving on with her life. She also signed a lease on a new apartment on the same day as her death and was planning a trip to China with her father, Mr. Houston, the next day, for which she had packed a bag. She had further planned to meet her new boyfriend later that same evening and to have him drive her to the airport the next morning.[199] The

---

[196] Art. 59(a), UCMJ; 10 U.S.C. § 859(a).

[197] *United States v. Washington*, 80 M.J. 106, 110 (C.A.A.F. 2020) (quoting *United States v. Kohlbeck*, 78 M.J. 326, 334 (C.A.A.F. 2019)).

[198] *Id.* (citation omitted) (internal quotation marks omitted).

[199] R. at 2180.

evidence at issue was material in that it gave further insight into the Appellant's state of mind and how the preparatory actions fit together with his "well thought out plan."

### 3. *Conclusion*

The "well thought out plans" text message evidence was admissible as evidence of Appellant's state of mind, intent, and plan. Appellant conceded that he sent the text messages in question. The fact of consequence made more likely by this evidence is Appellant's recognition that a "well thought out plan" would be required to carry out a "subversive act" such as killing his wife. The Government offered substantial evidence that Appellant had motive and the opportunity to kill his wife by throwing her out of their apartment window, including in large part the preparatory steps that he took. The danger that the members drew an inference of propensity or bad character from this evidence is low because the text messages do not support such an inference. By comparison, the probative value is high because this evidence directly shows the state of mind of Appellant just three days before the death of the victim. Even if this evidence were not admissible under Mil. Rev. Evid. 404(b), there is no substantial prejudice to the material rights of Appellant due to the weight of the remaining evidence admitted at trial. We find the military judge did not abuse his discretion in admitting the "well thought out plans" text message evidence. Reviewing *de novo*, we also find that the probative value of the text message is not outweighed by the danger of unfair prejudice because we agree with the military judge that it is unlikely that members would view the text messages as demonstrating an actual intent or a propensity to harm Dave. Therefore, we conclude the admission of "well thought out plans" does not merit relief.

## E. The Military Judge Did Not Abuse His Discretion by Allowing the Government to Introduce Evidence that Appellant Picked Up Mrs. Bravo and Threw Her to the Ground in 2013.

The Government provided notice, pursuant to Mil. R. Evid. 404(b) of its intent to introduce evidence that Appellant picked up Mrs. Bravo and threw her to the ground on 9 August 2013.[200] The Government offered the evidence to prove Appellant's motive, intent, and state of mind—particularly after learning of Mrs. Bravo's alleged infidelity.

The incident allegedly occurred after Appellant found evidence that Mrs. Bravo had had an affair with Appellant's friend.[201] Mrs. Bravo fled the room and contacted the front desk clerk. Responding military police officers found

---

[200] *See* App. Ex. CXXIV.

[201] App. Ex. CXXIV at p. 5-7.

Mrs. Bravo curled up on the floor, crying.[202] She told the officer, SPC Richards, that Appellant picked her up and threw her down on the ground multiple times.[203] Mrs. Bravo did not receive medical treatment and, later that day, she attended crisis counseling with Appellant. Following the crisis counseling, Mrs. Bravo went to the military police office and recanted her initial allegation. Appellant provided a statement more than two months later stating that Mrs. Bravo attacked him and that she misperceived the events because she was taking an improper amount of medication. Mrs. Bravo separately told some of her friends that she recanted her allegation in order to protect Appellant's career.

Appellant objected to the introduction of the evidence. In an extensive written ruling, the military judge denied Appellant's motion to exclude the evidence finding that there was sufficient evidence that Appellant committed the act in 2013; the evidence was logically relevant to several aspects of the case; and, while the evidence harmed Appellant's defense, it did not do so "unfairly" because the evidence was "extremely probative" of Appellant's "intent and motive and state of mind for the 2015 incident."[204] As to Mrs. Bravo's recantation, the military judge found "false recantations are intuitively and demonstrably common in domestic violence cases" and it could be explained by both direct and circumstantial evidence.[205]

Appellant argues that the military judge abused his discretion because there was insufficient evidence to establish that the incident occurred, the evidence was irrelevant to Appellant's alleged intent in 2015, and the evidence was unduly prejudicial. We disagree.

*1. Standard of Review*

We apply the same standard of review as the preceding section. Furthermore, we take note of the observation made by the United States Court of Appeals for the Ninth Circuit:

> Other acts of domestic violence involving the same victim are textbook examples of evidence admissible under Rule 404(b) and courts have permitted this evidence under a variety of theories. Some have explained that additional assaults are admissible as a "critical part of the story" that clarifies the motive behind the

---

[202] R. at 1520.

[203] R. at 1523.

[204] App. Ex. CXXIV at 9-15.

[205] App. Ex. CXXIV at 10.

charged crimes. Other courts have allowed this evidence to illustrate the "history of [the] relationship" between the defendant and victim, which speaks to a defendant's intent. These cases say essentially the same thing—prior (and subsequent) acts of violence towards the identical victim can shed light on the mindset of the defendant during the charged crime, such as whether there was a grudge between the two, a desire for payback of some sort, or that the defendant had the intent to exert control over this particular victim through violence.[206]

### 2. Analysis

Analyzing the allegation that Appellant committed a battery against Mrs. Bravo in 2013, we find that reasonable court-martial members could have found that Appellant committed uncharged misconduct. The incident occurred on 9 August 2013 after Appellant learned that Mrs. Bravo engaged in an extramarital affair with someone described as Appellant's best friend. Mrs. Bravo fled the room between 0100 and 0130 and asked the front desk clerk to either call someone or the military police. The front desk clerk described her as looking "very in distress" and "like she was in panic, shock."[207] The front desk clerk did call the military police and then led Mrs. Bravo to the breakfast area, which was slightly more isolated and not in direct view from the room she came from. When the responding military police officer arrived, Mrs. Bravo was in the "dining room lobby area" curled up on the floor and crying. Mrs. Bravo described being angrily awakened by Appellant, and that Appellant picked her up and threw her down multiple times. As noted by the military judge in his March 2022 ruling on the admissibility of the 2013 allegation of battery, the fact that Mrs. Bravo later recanted her complaint is not as dispositive as Appellant asserts in his Brief. There was evidence that Mrs. Bravo told other people that she only did so out of concern for her husband's career. We also agree

---

[206] *United States v. Berckmann*, 971 F. 3d 999, 1002 (9th Cir. 2000); *See, e.g., United States v. Covington*, 565 F.3d 1336, 1342-43 (11th Cir. 2009); *See also United States v. Farish*, 535 F.3d 815, 820 (8th Cir. 2008) (prior domestic abuse evidence admissible to explain the defendant's motive to commit arson against a friend of the defendant's abused wife, who was sheltering the wife); *See, e.g., United States v. Johnson*, 860 F.3d 1133, 1142 (8th Cir. 2017) (prior assault convictions admissible to "help explain the history" between the victim and the defendant "from which [the defendant's] intent to commit violence upon [the victim] is derived"); *and United States v. Lewis*, 780 F.2d 1140, 1142 (4th Cir. 1986) (prior assault involving same victim admissible under Rule 404(b) as evidence of "[r]ising animosity" that "could easily provide the motive for an assault").

[207] R. at 1497-98.

with the military judge's observation that false recantations of domestic violence complaints are "intuitively and demonstrably common." As a result, we find there was sufficient evidence of the battery in 2013 to reasonably support a finding that Appellant committed the battery.

As to the second prong of the *Reynolds* test, we agree with the military judge that several material facts in issue are made more probable by the evidence of the 2013 battery. First, it does tend to show a pattern of Appellant having an angry reaction to discovering Mrs. Bravo having an extramarital affair. Second, some of the statements made by Appellant both after the 2013 battery and in the text messages to his own extramarital lover, Ms. Robinson, demonstrate that the 2013 battery and the investigation that followed had a damaging impact on Appellant's career that he described as a "living nightmare." This in turn could suggest to members that the text messages Appellant sent saying that "only stupid people act on emotion, subversive acts require a well thought out plan . . . " reflect that Appellant learned a lesson from the 2013 battery and provided Appellant with a motive to murder Mrs. Bravo rather than to merely commit a battery against her because doing so would prevent her from reporting the battery. Third, Mrs. Bravo's description of Appellant picking her up and throwing her down multiple times shows that Appellant was capable and had lifted Mrs. Bravo up and thrown her down in the past. This lends support to the explanation the Government offered at trial, that Appellant picked up Mrs. Bravo while she was still under the effects of tramadol, zolpidem and whatever amount of wine she consumed, and threw or dropped her out the window. Lastly, all the foregoing rebuts Appellant's argument at trial that Mrs. Bravo committed suicide.

The Government's closing argument further supports our findings as to the proper use of this evidence. In its closing argument, the Government makes three points connecting the 2013 incident to the 2015 incident. First, "[h]is intent is shown from the discovery of the affair in 2013 on his wife's computer."[208] Second, Appellant "controls the narrative" by saying "it's all because of the meds. It's all her fault."[209] "The premeditation is formed [in] October 2015 when he reflects upon that [2013] incident."[210] Each of these observations and arguments makes proper use of the prior act evidence to establish the motive, intent, and state of mind of Appellant at the time of his wife's death. They each

---

[208] R. at 3873.

[209] R. at 3873-74.

[210] R. at 3874.

match the military judge's written ruling as to the probative weight of the "considerable insight" that the 2013 incident provides on these matters of central importance to the Government's case.

For the above reasons, we conclude that evidence of the 2013 battery was highly probative. Probative evidence is by its nature prejudicial to an accused. The question under the third prong of *Reynolds* is whether the evidence is unfairly prejudicial.

> The term 'unfair prejudice' as to a criminal defendant speaks to the capacity of some otherwise relevant piece of evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. Such unfair prejudice means a tendency to convict on an improper basis. An accused may be unfairly prejudiced if the evidence that he committed an earlier bad act was offered solely to show that he must be of bad character, suggesting he likely committed the charged offense because he was acting in conformity with the bad character.[211]

In this case, we are convinced that Appellant was not unfairly prejudiced because the 2013 battery was probative for a number of reasons discussed above and, thus, would not have had a tendency to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. Rather, the 2013 battery tended to show that Appellant was physically abusive toward Mrs. Bravo; and that the means by which the Government alleged that he carried out the murder were consistent with both of the eyewitness accounts and the Government's functional anatomy expert, and to rebut the proposition that she committed suicide. Additionally, the military judge gave an instruction that the members could only consider the 2013 assault for the limited purpose of its tendency, if any, to show [Appellant] intended to murder Mrs. [Bravo] and to show that [Appellant] had a motive to murder Mrs. [Bravo].[212] As a result, we find that the military judge did not abuse his discretion in admitting evidence of the 2013 battery. However, reviewing *de novo*, we also find that the probative value of the 2013 battery is not outweighed by the danger of unfair prejudice.

---

[211] *United States v. Hamilton*, No. ARMY 9600200, 2001 CCA LEXIS 451, at *23 (A. Ct. Crim. App. Apr. 4, 2001) (citation omitted).

[212] R. at 3864.

**F. The Military Judge Did Not Err by Permitting the Government to Introduce Prosecution Exhibit 37.**

The Government called Mr. Charles Andrews, a pharmacist assigned to SHAPE, to testify at trial. Mr. Andrews was presented with four photographs of 10 mg of zolpidem, Prosecution Exhibit 37. Mr. Andrews provided the foundation for the photographs, identifying the images as 10 mg pills of zolpidem. Appellant argues that the military judge erred because the evidence was irrelevant, lacked foundation, and was demonstrative.

*1. Standard of Review*

A military judge's decision to admit evidence is reviewed for an abuse of discretion.[213] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[214] If there has been an abuse of discretion, there must also have been a showing of prejudice.[215]

Among other rules, evidence may be excluded because it is not relevant (Mil. R. Evid. 401) or because it is unduly prejudicial, confusing, or a waste of time (Mil. R. Evid. 403). Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence.[216] The military judge is empowered to exclude evidence if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."[217]

Under Mil. R. Evid. 901, the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support that a matter in question is what its proponent claims.[218] "Ordinarily, a photograph may be authenticated by the testimony of a witness who is famil-

---

[213] *Solomon*, 72 M.J. 176 at 179 (citing *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010)).

[214] *Id.* (quoting *United States v. White,* 69 M.J. 236, 239 (C.A.A.F. 2010) (citations and internal quotation marks omitted).

[215] *United States v. McWhorter*, No. NMCCA 200301592, 2006 CCA LEXIS 146, at *12 (N-M Ct. Crim. App. June 22, 2006) (citing *United States v. Garcia*, 44 M.J. 27, 30 (C.A.A.F. 1996)).

[216] Mil. R. Evid. (2019) 401.

[217] Mil. R. Evid. (2019) 403.

[218] Mil. R. Evid. (2019) 901(a).

iar with the scene depicted and states that the photograph is an accurate representation of that scene."[219] The testimony of the actual photographer is not necessary.[220] Once the witness has testified, the photograph is then incorporated by reference into the testimony of the witness and is admissible as an illustration of that witness' testimony.[221]

Demonstrative evidence "illustrates or clarifies the testimony of a witness."[222] "Demonstrative evidence is admitted solely to help witnesses explain their testimony."[223] However, "demonstrative exhibits are inadmissible where they do not make clearer some issue in the case, where they are irrelevant, or where their probative value is outweighed by the danger of unfair prejudice."[224]

*2. Analysis*

Appellant's argument overlooks important purposes for Prosecution Exhibit 37. Appellant argues that the photographs in Prosecution Exhibit 37 "would only be relevant if the photo would help place zolpidem in LTC Whiskey's hands."[225] Appellant also argues that "no one could state any of the photographs in the exhibit 'fairly and accurately' represented the pills LTC Whiskey saw."[226] Nevertheless, the photographs in Prosecution Exhibit 37 were not offered to prove that they were actual photographs of the pills Appellant retrieved from LTC Whiskey's desk, but rather simply to show what zolpidem pills look like. Whether the pills Appellant retrieved from LTC Whiskey the day before Mrs. Bravo's death were zolpidem pills was a fact in issue. LTC Whiskey did not know specifically what kind of pills Appellant retrieved, but he testified they were "small, round, pinky-nail size, pink."[227]

Indeed, the appearance of the pills was a fact in issue for two reasons. First, LTC Whiskey testified to a description of pills retrieved by Appellant, creating a need to establish that LTC Whiskey's description matched the appearance of

---

[219] *United States v. Richendollar*, 22 M.J. 231, 232 (C.M.A. 1986).

[220] *Id.* (citing *United States v. Clayton,* 643 F.2d 1071 (5th Cir.1981)).

[221] *Id.*

[222] *United States v. Pope*, 69 M.J. 328, 332 (C.A.A.F. 2011) (quoting *United States v. Heatherly*, 21 M.J. 113, 115 n.2 (C.M.A. 1982)).

[223] *Id.* (citing *Carson v. Polley,* 689 F.2d 562, 579 (5th Cir. 1982)).

[224] *Id.* (quoting *Benzel v. Keller Indus., Inc.*, 253 Neb. 20, 567 N.W.2d 552, 558 (Neb. 1997)).

[225] Appellant's Brief at 138.

[226] Appellant's Brief at 139.

[227] R. at 1732.

zolpidem pills. Second, later in Mr. Andrews' testimony, he contrasted the appearance of zolpidem pills with Strattera pills. Strattera is a medication for attention deficit and hyperactivity disorder (ADHD).[228] Appellant had a prescription for Strattera at the time of Mrs. Bravo's death and had picked up a 90-day supply of Strattera pills from the SHAPE Pharmacy on 15 September 2015, approximately three weeks before Mrs. Bravo's death.[229] Mr. Andrews testified that zolpidem and Strattera look very different. Zolpidem is a small round pill and Strattera is an oblong capsule.[230] Even if the colors of zolpidem pills in Prosecution Exhibit 37 did not precisely match the description of the color of the pills Appellant retrieved from LTC Whiskey's desk, the contrast in appearance between zolpidem and Strattera was an important fact because Appellant told LTC Whiskey he was picking up pills for his "ADD."[231] This could support an inference that Appellant lied to LTC Whiskey about what the pills were for.

Mr. Andrews also testified with certainty that all four photographs in Prosecution Exhibit 37 were of zolpidem pills, and that he was certain of that because of the imprint on them and because of his experience as a pharmacist. Although Appellant notes that trial counsel never specifically asked Mr. Andrews if any of the pictures fairly and accurately reflected what zolpidem 10 mg pills look like, Appellant overlooks that trial *defense* counsel actually did ask that very question on the record and Mr. Andrews said "[i]f I understand your question correctly, yes, because [the pill] has an imprint on it."[232] Additionally, there was extensive discussion on the record about the appearance of zolpidem pills, including color variations, and Mr. Andrews' knowledge of the appearance of zolpidem pills.[233] This discussion established that the photographs fairly and accurately represented zolpidem pills, even if the specific words "fairly and accurately" were not used. There was more than sufficient evidence to support a finding that the photographs in Prosecution Exhibit 37 were what they were purported to be, satisfying the foundational requirement of Mil. R. Evid. 901.

---

[228] R. at 1826-28.

[229] Pros. Ex. 12.

[230] R. at 1732; R. at 1828-29.

[231] R. at 1733; According to Psychology Today, "ADD" is an outdated term that has been replaced by "ADHD," https://www.psychologytoday.com/us/basics/adhd.

[232] R. at 1808.

[233] R. at 1805-20.

It is true that LTC Whiskey said only that the photograph on page 4 of Prosecution Exhibit 37 was close to what he recalled seeing.[234] Mr. Andrews also testified that the photograph on page 4 of Prosecution Exhibit 37 was the closest to what he would typically see when he would see a zolpidem 10 mg pill, but that the color in the photograph appeared slightly lighter or more pale than what he would see.[235]

Thus, whether Prosecution Exhibit 37 established that one of the photographs was identical to the pills Appellant retrieved from LTC Whiskey's desk was one of a number of inferences and arguments that could be made based on establishing for the members what zolpidem pills look like. Given the testimony of LTC Whiskey and Mr. Andrews, there were arguments that favored both the Government and the Defense.

These may include the inference that Appellant lied to LTC Whiskey about the pills being for his "ADD." Alternately, the members could have inferred that LTC Whiskey was mistaken about the precise color of pills he saw, or that perhaps they had been another color that faded and looked pink at the time he saw them. Additionally, while the pharmacist testified that the color in picture number 4 was slightly lighter than the actual zolpidem pills he was familiar with, it is not the color that leads him to conclude the pictures are of zolpidem pills. Indeed, he says that he is confident that all of the pictures are of zolpidem pills because they have the MZ2 imprint on them. He testified that the colors could vary from one lot to another.

Because Mr. Andrews was confident that all of the pills depicted in Prosecution Exhibit 37 were zolpidem, he was in effect saying that they were a fair and accurate representation of zolpidem pills. Any potential confusion was likely only introduced by trial defense counsel's argument rejecting the value of photographs that establish the general appearance of zolpidem pills unless they precisely match the actual zolpidem pills retrieved from LTC Whiskey's desk. It is just as likely that the inability of either LTC Whiskey or Mr. Anderson to say that the pills in the photographs were an exact match to the ones retrieved by Appellant from the desk, was actually helpful to Appellant's defense. As the military judge noted, the discrepancy about the color goes to weight, not admissibility.

3. *Conclusion*

Prosecution Exhibit 37 was properly admitted as substantive evidence of a fact in question. It was not offered as a demonstrative aid, but as evidence. We

---

[234] R. at 1738.

[235] R. at 1807-08; R. at 1820.

find that the appearance of zolpidem pills was a fact in issue. As a result, Prosecution Exhibit 37 was relevant. Its probative value was also not outweighed by the risk of undue prejudice, particularly since trial defense counsel was able to use the color discrepancy in Appellant's favor.[236] As a result, we find that the military judge did not abuse his discretion in admitting Prosecution Exhibit 37, and that it was properly admitted and published to the members.

**G. The Military Judge Did Not Abuse His Discretion When He Excluded Mrs. Bravo's Text Messages Sent Seven Months Prior to Her Death.**

Appellant attempted to admit 13 pages of text messages in surrebuttal. Some of the messages Appellant moved to admit were between himself and Mrs. Bravo and other messages were between Appellant and Ms. Robinson. The military judge admitted 11 of the 13 pages of messages over the Government's objection.[237] As to two of the pages, the military judge sustained the Government's objection based on hearsay, improper surrebuttal and on Mil R. Evid. 403 grounds. The evidence that the military judge excluded contained the following text exchange between Mrs. Bravo and Appellant and took place on 11 March 2015:

> Mrs. Bravo: Trying to work on not being nuts. Lol
>
> Appellant: GOOD! Nuts is not good and makes me scared
>
> Mrs. Bravo: Seriously I never asked for it. I'm terrified
>
> Appellant: Terrified of what?
>
> Mrs. Bravo: Something happening to me
>
> Mrs. Bravo: Nothing. I'm afraid that something could happen again. I'm just terrified
>
> Appellant: What is happening to you
>
> Appellant: What would happen again
>
> Mrs. Bravo: It is so f[***]ing scary
>
> Mrs. Bravo: Losing my memory and my wits
>
> Mrs. Bravo: Losing my mental faculties against my will.[238]

---

[236] Mil. R. Evid. 403 (2019).

[237] R. at. 3845.

[238] Def. Ex. H at 2-3.

Trial defense counsel cited "state of mind" as an exception to the hearsay rule and added that it was "surrebuttal, and if not, this is now a motion to reconsider based on now the testimony of Dr. Newman, as well as a misapplication of law."[239] The military judge ruled that the messages did not qualify as an exception to the rule against hearsay because her statements were "looking backwards" on losing her mental faculties, which also created an issue as to relevance.[240] The military judge also sustained the Government's objection based on Mil. R. Evid. 403 grounds because "bringing in these two statements would be unfairly prejudicial to the trial process" given that the messages were from seven months prior.[241] The military judge noted that Appellant's expert presumably reviewed the messages and had already testified to the members regarding Mrs. Bravo's "up and down mental health history."[242]

Trial defense counsel asked the military judge to reconsider because the messages refer to what Mrs. Bravo was "experiencing at the time, so we do believe that exception applies."[243] Trial defense counsel went on to say "from a 403 perspective, the . . . probative value of Mrs. [Bravo] foreshadowing her suicide, there's very little that can be more probative in this case as evidence of her mental health in the defense's theory what occurred in this case."[244]

The military judge reaffirmed his ruling because, in his view, the text messages were from seven months earlier and Mrs. Bravo was "not discussing that she's presently in some sort of mental health crisis."[245]

Appellant argues that the military judge abused his discretion because the military judge analyzed the incorrect hearsay exception and because the proffered evidence had a low risk of unfair prejudice and high probative value.

We observe that the military judge conflated two hearsay exceptions, "present sense impression" and "then-existing mental, emotional, or physical condition" and incorrectly ruled that Mrs. Bravo's text statements did not meet the elements required for a hearsay exception because he analyzed them as "present sense impressions" instead of "then-existing mental, emotional or

---

[239] R. at 3843.

[240] R. at 3844.

[241] R. at 3844.

[242] R. at 3844-45.

[243] R. at 3845.

[244] R. at 3845.

[245] R. at 3844-46.

physical condition."[246] However, while we believe the military judge was correct in excluding the text messages under Mil. R. Evid 403, we disagree with the reason the military judge gave. In our own de novo review, we conclude the probative value of the text messages was outweighed by the danger of confusing the issues by focusing not on Mrs. Bravo's mental state at the time of her death, but seven months earlier.

*1. Standard of Review*

Generally, we review a military judge's decision to admit or exclude evidence for an abuse of discretion.[247] Further, a military judge enjoys wide discretion in applying Mil. R. Evid. 403 and ordinarily appellate courts exercise "great restraint" in reviewing a judge's decision under Mil. R. Evid. 403.[248] When a judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a "clear abuse of discretion."[249] However, military judges are entitled to less deference if they fail to articulate their balancing analysis on the record and no deference if they fail to conduct a 403 balancing.[250]

"Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[251] "The military judge may exclude relevant evidence if is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues."[252]

The two exceptions to hearsay relevant to this analysis are present sense impression, Mil. R. Evid. 803(1), and then-existing mental, emotional, or physical condition, Mil. R. Evid. 803(3). To qualify as a present sense impression, the statement must describe or explain "an event or condition, made while or immediately after the declarant perceived it."[253] Conversely a then-existing mental, emotional, or physical condition is:

---

[246] Mil R. Evid. (2019) 803(3).

[247] *United States v. McElhany*, 54 M.J. 120, 126 (C.A.A.F. 2000) (citing *United States v. Schlamer*, 52 M.J. 80, 84 (C.A.A.F. 1999).

[248] *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997)) (quotations marks omitted).

[249] *Id.* (citing *United States v. Ruppel*, 49 M.J. 247, 250 (C.A.A.F. 1998)).

[250] *Id.*

[251] Mil. R. Evid. (2019) 401.

[252] Mil. R. Evid. (2019) 403.

[253] Mil. R. Evid. (2019) 803(1).

> A statement of the declarant's then existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.[254]

The difference between the two exceptions is the focus of the statement. Present sense impressions focus on recounting an event as the declarant is speaking (e.g., "I am watching the Hindenberg explode").[255] A statement of a then-existing mental, emotion, or physical condition focuses on the declarant's feelings, thoughts, or physical condition made contemporaneously with when the declarant is under that condition ("I am bleeding.").[256]

The rules of evidence do not exist in a vacuum. A statement may constitute a hearsay exception but may nonetheless be excluded because it is not relevant under Mil. R. Evid. 401 or because it is unduly prejudicial, confuses the issues, misleads the members, causes undue delay, is a waste of time, or needlessly presents cumulative information under Mil. R. Evid. 403.[257]

*2. Analysis*

As an initial matter, we observe there was a lack of clarity about what hearsay exception should apply to the 11 March 2015 text exchange. Notably, the military judge stated, "[t]he issue is, so first of all, with the hearsay issue, and it's tied to relevance, the present sense impression is then existing state of mind."[258] The military judge later said, "I don't think that meets the present sense impression."[259]

However, trial defense counsel twice stated that the hearsay exception he believed should apply related to Mrs. Bravo's "state of mind" when asked for their theory of admissibility.[260] Following that, trial counsel argued that the

---

[254] Mil. R. Evid. (2019) 803(3).

[255] *Navarette v. California*, 572 U.S. 393, 407 (2014) (citing 2 K. Broun, McCormack on Evidence 362 (7th ed. 2013)).

[256] *See United States v. DeMarce*, 564 F.3d 989, 996 (8th Cir. 2009).

[257] *See United States v. Nichol*, No. 201800286, 2020 CCA LEXIS 178, at *26 (N-M. Ct. Crim. App. May 28, 2020).

[258] R. at 3844.

[259] R. at 3844.

[260] R. at 3843.

text messages were improper surrebuttal and that Mil. R. Evid. 403 should apply.[261]

Moreover, when trial defense counsel asked for reconsideration on present state of mind exception arguing these statements indicate "what she is experiencing at the time," that "[she was] terrified . . . presently terrified,"[262] the military judge found that her statements were reflective and that she was "not discussing that she's presently in some sort of mental health crisis."[263]

Nevertheless, while Mrs. Bravo's text messages may not have been present sense impressions because they were not describing an event she was perceiving, we conclude they should have qualified as a then-existing mental, emotion, or physical condition because she was expressing a present mental or emotional state of being "terrified" of losing her memory, her wits, and her mental faculties against her will. Still, there remains whether that fear in March 2015 was relevant, and even if relevant, whether it should still be excluded under Mil. R. Evid. 403.

The military judge placed a 403 balancing analysis on the record. The military judge stated "on 403 grounds, it's six or seven months before the actual incident in this case, so I think her state of mind around the time of incident is more relevant and much more probative, and bringing in these two statements would be unfairly prejudicial to the trial process."[264] Later, the military judge said "[a]nd under 403, I find the probative value of that evidence is substantially outweighed by danger of *unfair prejudice to the trial process*."[265]

However, "unfair prejudice to the trial process" is not one of the enumerated bases for exclusion in Mil. R. Evid. 403. Given the error in the military judge's 403 balancing test, we find that his ruling is entitled to less deference, and we therefore review the military judge's decision de novo.[266]

In conducting our own de novo review, we find that the text messages presented a clear risk of confusing the issues because of their focus on Mrs. Bravo's mental state seven months earlier than her death. We also find that the probative value of the text messages was very limited because while they may have reflected a fear at the time of losing her memory, her wits and her mental

---

[261] R. at 3843-44.

[262] R. at 3845.

[263] R. at 3846.

[264] R. at 3844.

[265] R. at 3845 (emphasis added).

[266] *Manns*, 54 M.J. at 166.

faculties, they did not express that she was suicidal. More importantly, the text messages from seven months earlier probably did not reflect her mental state *at the time* of her death at all. The probative value of the text messages was further limited, as well as being cumulative, because the Defense expert had already testified that Mrs. Bravo was at elevated risk of suicide at the time of her death.

In any case, we also find there was no prejudice because Appellant was able to introduce significant evidence of Mrs. Bravo's mental health history, including the expert testimony that she was at elevated risk of suicide. Accordingly, this AOE is without merit.

## H. The Military Judge Did Not Err by Refusing to Grant a Mistrial.

Appellant cites two instances when a government witness made a statement that would have been inadmissible, each for a different reason, and argues the remedy should have been for the military judge to declare a mistrial. Trial defense counsel moved for a mistrial on two grounds following the testimony of SA Schmidt. The military judge denied the motion.

The first ground was when SPC Richards mentioned, in response to a question from trial defense counsel, that Appellant had invoked his Fifth Amendment rights when questioned after the 2013 battery.[267] The second was when SA Schmidt testified that he had been investigating Appellant for "strangulation of his wife" in connection with the 2013 battery at the Chievres Army Lodge, even though there had been an earlier motion upon which the military judge ruled that "strangulation" should not be mentioned.[268] Appellant argues that even though the military judge gave curative instructions after each incident, the instructions were inadequate and the military judge abused his discretion by denying a mistrial.

In the case of SPC Richards, we observe there was the following colloquy in the record:

> **Q (ADC).** And that night, you actually did take a statement from Lieutenant Becker?
>
> **TC:** Objection.
>
> **MJ:** Basis.
>
> **TC:** Calls for a hearsay response.
>
> **ADC:** I'm simply asking whether he took a statement or not, not

---

[267] R. at 1533.

[268] R. at 1540.

for any particular statement.

**TC:** Relevance, then.

**MJ:** Overruled. You can't get into specifics of his statement.

**A.** I didn't necessarily take a statement. He invoked his rights, he said---

**MJ:** Stop. You brought that on.

**ADC:** No, sir. I disagree.

**MJ:** Disregard that question and answer. The objection is sustained. You must completely cast that out of your mind, like you didn't hear it.

**Q.** Lieutenant Becker did speak to you that night?

**A.** Yes.

**Q.** And he spoke to you about what happened?

**A.** Yes.[269]

The second ground involved SA Schmidt where trial counsel asked a series of questions about an interview with Appellant held on 14 November 2013, following the August 2013 battery at the Chievres Army Lodge. Agent Schmidt testified that Appellant had been advised of his Article 31(b) rights and that the crime Appellant was suspected of at the time was assault.[270] Although it was unclear why, trial counsel asked Agent Schmidt this question, "[a]nd what subject, you talked about assault. What specific subject were you talking about?"[271] Agent Schmidt's response was "[t]he strangulation of his wife."[272] However, statements by Mrs. Bravo about strangulation during the 2013 battery had been ruled as inadmissible hearsay.[273]

Following SA Schmidt's response, trial counsel changed the subject. Trial defense counsel did not immediately raise an objection. Trial counsel did not raise the subject again or include it in closing arguments.

---

[269] R. at 1533.

[270] R. at 1539.

[271] R. at 1540.

[272] R. at 1540.

[273] Appellate Exhibit LXXIX, at 8; *see also United States v. Becker*, 81 M.J. 483 (C.A.A.F. 2021) (upholding the military judge's ruling after an Article 62 appeal by the United States).

In each instance, the military judge opted to give a curative instruction instead of granting a mistrial in response to the motion by trial defense counsel. Appellant argues that doing so was an abuse of discretion. We disagree.

### 1. *Standard of Review*

The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings.[274] "[M]istrial is an unusual and disfavored remedy."[275] It should be applied only as a last resort to protect the guarantee for a fair trial, "or where the military judge must intervene to prevent a miscarriage of justice."[276] However, "[a]bsent clear evidence of an abuse of discretion, this Court will not reverse a military judge's determination on a motion for a mistrial."[277] Curative instructions are the preferred remedy, and "absent evidence to the contrary, a jury is presumed to have complied with the judge's instructions."[278]

Where an alleged error implicates the right to remain silent, we must be able to declare our belief that it was harmless beyond a reasonable doubt.[279]

### 2. *Analysis of SPC Richards's Testimony*

We are mindful that because this alleged error implicates the right to remain silent, we must be able to declare our belief that it was harmless beyond a reasonable doubt.[280] However, we also note, as the military judge observed, that trial defense counsel did invite the error,[281] and we acknowledge cases holding that invited error by a party cannot serve as the basis for relief for the

---

[274] R.C.M. (2019) 915(a).

[275] *United States v. Short*, 77 M.J. 148, 150 (C.A.A.F. 2018) (quoting *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003)).

[276] *Id.* (quoting *Diaz*, 59 M.J. at 90 and *United States v. McFadden*, 74 M.J. 87, 89 (C.A.A.F. 2015)).

[277] *Id.* (citing *McFadden*, 74 M.J. at 90).

[278] *United States v. Barron*, 52 M.J. 1, 5 (C.A.A.F. 1999) (quoting *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990).

[279] *See United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[280] *Id.*

[281] R. at 1533.

same party.[282] The invited error doctrine prevents a party from "creat[ing] an error and then tak[ing] advantage of a situation of his own making [on appeal.]"[283] Still, we do not find that the invited error doctrine is the decisive issue in this instance because we are able to conclude that despite the invited error, it was harmless beyond a reasonable doubt.

We are convinced that SPC Richards' statement was harmless beyond a reasonable doubt. The military judge stopped SPC Richards before he could even finish speaking and then immediately gave an instruction to the members. That instruction was reinforced later and all members indicated they could follow it. Trial defense counsel then immediately picked up the line of questioning using leading questions and elicited that Appellant actually did speak to SPC Richards. The military judge also assessed that SPC Richards was not a sophisticated witness and was likely attempting to answer the question asked to the best of his ability, rather than purposely trying to introduce inadmissible evidence. This was a singular incident and was not repeated at any point during the trial or in closing arguments.

Under the above facts, we find this situation similar to that in *United States v. Sidwell*.[284] With regard to the improper rights invocation testimony, we conclude it did not have great potential to prejudice Appellant. It was also extremely brief, providing no details as to the rights invoked or the offense or offenses for which those rights were invoked. In addition, the military judge gave an immediate instruction and followed that up later, confirming the members could follow the instruction. The testimony was also not exploited by trial counsel to buttress his case against Appellant on any of the charged offenses.

As a result, we also find that the military judge did not abuse his discretion in denying the motion for a mistrial with regard to the testimony by SPC Richards that Appellant "invoked his rights." Further, we find that it was harmless beyond a reasonable doubt, even if it was error.

### 3. Analysis of Agent Schmidt's Testimony

This is a somewhat different situation than in the case of SPC Richards since it did not involve a reference to Appellant's invocation of rights. Thus, it does not involve a constitutional dimension in the same way. As noted above,

---

[282] *See, e.g.*, *United States v. Martin*, 75 M.J. 321, 325 (C.A.A.F. 2016) (citing *United States v. Eggen*, 51 M.J. 159, 162 (C.A.A.F. 1999).

[283] *Id.*

[284] 51 M.J. 262, 265 (C.A.A.F. 1999).

trial defense counsel moved for a mistrial, but the military judge opted to give a curative instruction instead, as follows:

> MJ: Members, before we continue, I want to note that Special Agent [Schmidt] erroneously and inaccurately made reference to strangulation. That was an improper statement, an inaccurate statement, and you must completely disregard that statement. You may not consider it for any purpose whatsoever. You must decide the issues in this case solely on the evidence that properly comes before you. That was not properly before you, because it was inaccurate. Is there any member who cannot follow that instruction?
>
> MEMBERS: [No response.]
>
> MJ: Negative response from all members.[285]

In this instance, trial defense counsel agreed to the wording of the instruction by the military judge. When the military judge proposed the instruction, trial defense counsel said:

> DC: I think if--yes, do we want to continue to brief it, yes. But if you're going to give that instruction, we would like you to go stronger on erroneous, that he incorrectly, that he erroneously and incorrectly, inaccurately, so that it's not a concern that's a legal issue, but that it is factually wrong.[286]

The military judge then gave the instruction with added emphasis on the statement being inaccurate by adding the word "inaccurately" to the first sentence and the sentence "[t]hat was not properly before you, because it was inaccurate."[287]

Because this was an isolated mention of the word "strangulation" and the military judge gave an instruction, modified as requested by trial defense counsel, that emphasized that the mention of "strangulation" was inaccurate, the members likely believed it was genuinely a mistake. In any case, no member indicated they would not be able to follow the instruction. As a result, we find the military judge did not abuse his discretion in denying the motion for a mistrial relating to the testimony of Agent Schmidt.

---

[285] R. at 1558-59.

[286] R. at 1557.

[287] R. at 1559.

*4. Conclusion*

The Military Judge did not abuse his discretion in denying a mistrial. SPC Richards' mention of Appellant invoking his rights was made in response to a question from trial defense counsel, was extremely brief, apparently without the intention to introduce inadmissible prejudicial evidence, and was immediately and adequately cured by an instruction from the military judge. Agent Schmidt's mention that the subject of his 2013 investigation involved strangulation of Appellant's wife was similarly cured by the military judge using an instruction that was influenced by the Defense's tailoring arguments. Both instructions sufficiently addressed the relatively minor effect that such testimony may have had on the mind of any member. The disfavored remedy of a mistrial was not called for in this instance because the aforementioned remarks did not threaten to create a miscarriage of justice under the circumstances.[288] Even if there was error in either case, we find that it was harmless beyond a reasonable doubt.

## I. The Military Judge Properly Instructed the Panel.

Appellant questions whether the military judge gave the panel all of the instructions fairly raised by the evidence presented.[289] Specifically, Appellant argues there were four instructions raised by the evidence that the military judge should have given sua sponte: (1) spoliation; (2) Appellant's right to remain silent; (3) propensity evidence with regard to text messages; and (4) use of demonstrative evidence. Trial defense counsel did affirmatively propose an instruction that the Belgian investigation in no way relieves or lessens the Government's burden to establish the guilty of [Appellant] beyond a reasonable doubt, which the military judge rejected.[290]

Appellant does not challenge the military judge's ruling rejecting trial defense counsel's proposed instruction.[291] Rather, Appellant argues there were instructions raised by the evidence, yet not requested by either party at trial, that the military judge should have provided. Specifically, Appellant suggests the military judge should have given an instruction on spoliation. Yet, spoliation was not the topic of the instruction proposed by trial defense counsel. As discussed below, we find that the panel was properly instructed.

---

[288] Because we find the military judge did not abuse his discretion relating to either the statement by SPC Richard or Agent Schmidt, we likewise find that there was no cumulative harm that warrants a mistrial.

[289] Appellant's Brief at 164-71.

[290] R. at 3805-06.

[291] Appellant's Brief at 165-166.

In this case, as in many cases, the military judge prepared a set of findings instructions and gave the parties an opportunity to review them, provide any desired modifications and to propose their own additional instructions, as noted in the record. Both parties also had an opportunity to submit instructions before the military judge finalized the findings instructions and both parties did so. In submitting their desired tailored instructions, trial defense counsel proposed two novel instructions, one of which was included in the final instructions given and one that was not.

One of the tailored instructions concerned remote testimony, which the military judge adopted. Since that instruction was adopted, we need not discuss it further. The military judge rejected the second Defense proposal to add language to the burden of proof instruction as follows: "[y]ou have heard evidence in this matter was investigated in part by Belgian authorities. This fact in no way relieves or lessens the Government's burden to establish the guilt of the accused beyond a reasonable doubt."[292] The proposal for this tailored instruction did not mention spoliation of material evidence, as suggested in Appellant's brief, and there is no logical connection between an instruction on the burden of proof and one relating to spoliation of evidence. Appellant does not elaborate on whether he challenges the military judge's ruling on the proposed addition to the burden of proof instruction, or if evidence of spoliation raised a requirement for the military judge to give a spoliation instruction independent of the proposed instruction. Nevertheless, the burden of proof instruction was added following a lengthy discussion on the record during which trial defense counsel raised a number of objections and proposed modifications to instructions. Also, the military judge adopted a modified version of the Military Judges' Benchbook instruction on confessions as a result of this colloquy.[293]

Not mentioned in Appellant's brief, but relevant for our analysis is that the military judge also included a novel instruction proposed by trial defense counsel regarding remote testimony.[294] Trial counsel did not object to the remote testimony instruction. We also considered that trial defense counsel moved to include an instruction on unanimous verdict, which was denied by the military judge.[295] That decision is not challenged by Appellant.

Trial defense counsel not only failed to object to the instructions, but affirmatively stated on the record in response to two questions from the military

---

[292] R. at. 3806.

[293] R. at 3810-11.

[294] R. at 3797.

[295] R. at 797.

judge that they had no objections and also had no further instructions to request.[296] Appellant now argues that the members were not properly instructed in three ways: (1) there was no instruction as to spoliation; (2) the military judge did not provide a second instruction specifically relating to SPC Richards' inadvertent comment on Appellant's right to remain silent; and (3) the military judge failed to instruct the members that Appellant's texts to Mrs. Robinson could not be used to show a general tendency to hatch intricate criminal plots.[297]

We find that Appellant waived any assignment of error relating to the instructions. Further, even if Appellant did not waive the issue, we hold that Appellant forfeited the issue, in which case we would review for plain error. In analyzing plain error, even if we presume the military judge erred, we find the error was not plain and obvious, and there was no prejudice to Appellant.

### 1. Standard of Review

Rule for Courts Martial (R.C.M.) 920(e) sets forth the required instructions on findings.[298] They include a description of the elements of each offense; a description of the elements of any lesser included offense in issue; a description of any special defense under R.C.M. 916 in issue; a direction that only issues properly before the court-martial may be considered; charges relating to presumption of innocence, reasonable doubt and burden of proof; directions on the procedures under R.C.M. 921 for deliberations and voting; and such other explanations, descriptions or directions as may be necessary and which are properly requested by a party or which the military judge determines, sua sponte, should be given. Courts review de novo whether an appellant waived review of instructions.[299] This court reviews the military judge's denial of a tailored instruction for abuse of discretion.

Indeed, Appellant correctly acknowledges in the standard of review section on this AOE that "[i]f the accused has not preserved an instructional error through an adequate objection or request at trial, the accused has forfeited the

---

[296] R. at 3853-54.

[297] Appellant also argues that the military judge failed to properly instruct the members limiting the permitted uses of demonstrative evidence in connection with Prosecution Exhibit 37. We find this sub-AOE to be without merit. *See Matias*, 25 M.J. at 363.

[298] R.C.M. (2019) 920(e).

[299] *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

right to the instruction, and military appellate courts will only review for plain error."[300]

Whether an appellant has waived an issue is a legal question that this Court reviews de novo.[301] "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right."[302] Consequently, while we review forfeited issues for plain error, we cannot review waived issues because a valid waiver leaves no error for us to correct on appeal.[303]

Appellant correctly cites caselaw discussing the standard of review for forfeiture of a right to a particular instruction. While acknowledging some understanding of the distinction that *Davis* makes between waiver and forfeiture,[304] Appellant goes on to argue that this Court should apply a plain error review to the four instructions Appellant asserts the military judge should have given.[305] Nevertheless, given the express and unequivocal acquiescence by trial defense counsel in the military judge's proposed findings instructions, any potential objection to the omission of the three instructions identified by Appellant is waived and this court has no error to review.

### 2. Analysis

#### a. Waiver

The record is clear that trial defense counsel took the opportunity to raise a number of objections to instructions, proposed additional instructions, and proposed modifications to the military judge's proposed instructions. Still, the instructions trial defense counsel proposed to add or modify did not include any of those raised in Appellant's brief.

As to the military judge's proposed instructions in the record, Appellant not only failed to object to instructions proposed by the military judge, but trial

---

[300] Appellant's Brief at 164.

[301] *See United States v. Haynes*, 79 M.J. 17, 19 (C.A.A.F. 2019).

[302] *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (*quoting United States v. Olano*, 507 U.S. 725, 733 (1993)).

[303] *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009).

[304] Appellant's Brief at 164, n. 625.

[305] We note that the *Davis* case cites R.C.M. 920(f), but that the cite is to the 2012 version, which titles R.C.M. 920(f) as "Waiver." In the 2019 version of the Manual for Courts-Martial, R.C.M. 920(f) was amended to change the title of the subsection to "Forfeiture and objections," which aligns R.C.M. 920(f) with the analysis in the *Davis* case.

defense counsel affirmatively stated on the record in response to two questions from the military judge that they did not have any objections to the instructions and had no additional instructions to request. Nevertheless, this was not a case where inexperienced trial defense counsel passively forfeited an opportunity to shape the instructions given to the members. Here, a sophisticated trial defense counsel team clearly understood the importance of and took an active role in shaping the findings instructions the members received.

The proposed instructions at Appellate Exhibit CCLXXXI are comprised of all of the required instructions under R.C.M. 920, applicable to this case. All of the instructions in the proposed instructions contained in Appellate Exhibit CCLXXXI were actually given and appear in the record.[306] The instructions also included a novel instruction on remote testimony requested by trial defense counsel, as noted in Appellate Exhibit CXXXVI.[307]

On these facts, this case is analogous to *Davis*, which involved a case where the accused made a recording of the private area of another person without her knowledge or consent and when she had a reasonable expectation of privacy.[308] The military judge gave an instruction on the elements of the offense of indecent video recording, which included an element that the accused "did so without the consent of the [victim]."[309] A definition of "consent" followed.[310] Before giving the instruction, the military judge asked the trial defense counsel whether there were any proposed changes to the instructions to which the trial defense counsel replied "[n]o changes, sir."[311] At a later point, after the military judge granted a finding of not guilty on one of the specifications, the military judge again asked the trial defense counsel if there were any objections to the findings instructions and the trial defense counsel responded "[n]o, Your Honor."[312] On appeal, the appellant in *Davis* argued that it was plain error for the military judge to instruct the members that a required element of Article 120c(a)(2) is lack of consent, without also specifying that the accused must have subjectively known that the alleged victim did not consent. However, the

---

[306] R. at 3855-70.

[307] *See* Defense Proposed Instructions, App. Ex. CXXXVI.

[308] *Davis*, 79 M.J. at 330.

[309] *Id.*

[310] *Id.*

[311] *Id.*

[312] *Id.*

CAAF in *Davis* found that it could not decide whether appellant's interpretation of Article 120c(a)(2) was correct since the appellant had waived the claim.[313]

In this case, as in *Davis*, Appellant expressly and unequivocally acquiesced to the military judge's proposed findings instructions. When asked by the military judge whether either party had any objections to the proposed findings instructions that the military judge described as having been discussed in depth, both parties stated that there were no objections. Then, when asked if either party had any other instructions that they requested, both parties stated they had none. Further, in this case, there is the added fact that trial defense counsel did propose and ultimately influenced the instructions that were finally given.

### b. No Plain Error

Still, as stated above, even if the objection to the omission of the four instructions identified by Appellant were not waived, we also find no plain error. We take each one in order, except for the omission of an instruction on demonstrative evidence relating to Prosecution Exhibit 37, which we found to be without merit in a footnote earlier in this section.

### c. Spoliation

To the extent spoliation of evidence was raised in the record, the military judge provided an instruction on lost or destroyed evidence relating to blood samples.[314] Since Appellant does not identify what evidence Appellant alleges was spoiled or why it was important, and also does not acknowledge the instruction provided at trial, it is not clear what Appellant's argument is. As a result, we find there is no showing of any error, and the issue is forfeited. Even if we presume there was an error by the military judge, it was not plain and obvious and there was no prejudice to Appellant. To the extent Appellant raised spoliation of evidence in his brief as an indirect challenge the military judge's rejection of the proposed addition of language to the burden of proof instruction, we find that it was not an abuse of discretion on the military judge's part to deny the additional language trial defense counsel proposed to the burden of proof instruction.[315]

---

[313] *Id.*

[314] R. at 3866.

[315] *See United States v. Harrington*, 83 M.J. 408 (C.A.A.F. 2023) (citing *United States v. Carruthers*, 64 M.J. 340, 345-346 (C.A.A.F. 2007)) (for the proposition that we review a judge's denial of a proposed instruction for abuse of discretion). Also, that an

### d. Right to Remain Silent

The military judge's failure to provide an instruction regarding Appellant's right to remain silent, referring to SPC Richards' brief mention of Appellant's invocation of rights, invited by trial defense counsel's question, was not plain error. As noted in the Government's brief, this situation is similar to *Sidwell*.[316] There as here, there was a brief reference to an invocation of rights without specifics. In this case, trial defense counsel asked SPC Richards if he took a statement from Appellant and SPC Richards responded "I didn't necessarily take a statement, he invoked his rights, he said---" and the military judge immediately cut off the response.[317] The military judge then immediately told the members to disregard that question and answer, sustained trial counsel's objection to hearsay, and instructed the members to completely cast it out of their minds as if they never heard it.[318] Once the witness was done testifying, the military judge again said to the members "[o]kay so members, you heard testimony about potentially invocation of rights. I'm not sure whether that happened or it didn't happen. But regardless, you must cast that from your mind that you've heard that, and it's not relevant evidence in this case."[319] Trial counsel did not mention the invocation of rights in closing.[320] Similar to this case, in *Sidwell*, the CAAF observed that a single reference to invocation of rights without detail about what rights were invoked, and where trial counsel made no reference to invocation of rights in closing, did not have great potential to prejudice the appellant. Although circumstantial, the Government's case was overwhelming on charges that were separate from the 2013 assault and relied on a significant amount of evidence other than SPC Richards.

---

abuse of discretion will occur if: (1) the requested instruction was correct; (2) the instruction was not substantially covered by the main instruction; and (3) the instruction was on such a vital point in the case that the failure to give it deprived the accused of a defense or seriously impaired its presentation. *Carruthers*, 64 M.J. at 346. Although Appellant does not make clear how the requested instruction would meet any of the foregoing criteria, we find that while the requested additional language was not incorrect, it was not necessary and that it was substantially covered by the burden of proof instruction that was given. The failure to add the proposed language did not deprive the Appellant of a defense or impair Appellant's presentation.

[316] *See generally United States v. Sidwell*, 51 M.J. 262 (C.A.A.F. 1999).

[317] R. at 1533.

[318] R. at 1533.

[319] R. at 1535.

[320] R. at 3870-98.

We find that the issue was forfeited and on plain error review, even if it was an error for the military judge not to give an instruction on Appellant's right to remain silent, it was not plain and obvious and there was no prejudice to Appellant.

###### e.   Propensity Evidence with Regard to Text Messages

With regard to the text messages, as noted above, we do not find that the text messages are improper character evidence or evidence of propensity. We do not believe in context that the statement in the text indicated Appellant had any actual intent or propensity to threaten or harm the person named "Dave" and it was not offered or used in that way. The evidence was offered to show Appellant's state of mind in the days leading up to murdering Mrs. Bravo. We also find that the text messages were not meant to show a "general tendency by Appellant to hatch intricate criminal plots."

In any case, the military judge provided a spillover instruction telling the members that "an accused may be convicted only on evidence before the court, not on evidence of a general criminal disposition. Each offense must stand on its own and you must keep evidence of each offense separate."[321] As a result, we also find the issue was forfeited and on plain error review even if there was error in the military judge not giving an instruction, it was not plain and obvious and there was no prejudice to Appellant.

### 3. Conclusion

We find that Appellant waived any assignment of error relating to the instructions provided to the panel. Even if we did not find waiver, we find that the panel was properly instructed, the issues raised were forfeited, and as noted above, there was no plain error.

## J. Trial Defense Counsel Were Not Ineffective.

Appellant argues that his trial defense counsel team were ineffective in several ways: (1) failing to obtain Mrs. Bravo's medical records that pre-dated Appellant's service in the Navy; (2) failing to challenge three members; (3) failing to call Mr. Burkowsky as a witness; (4) failing to call Dr. Draper as an expert witness in brain function and memory; (5) failing to adequately prepare Dr. Newton; and (6) failing to call Appellant's mother to testify.

---

[321] R. at 3864.

*1. Standard of Review*

We review claims of ineffective assistance of counsel de novo.[322] The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms."[323] In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice.[324] With respect to the first prong, counsel are presumed to be competent and our inquiry into a attorney's representation is "highly deferential" to that attorney.[325] We employ "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."[326] An appellant has the burden of establishing a factual foundation for a claim of ineffective representation.[327] We will not second-guess strategic or tactical decisions made by the trial defense counsel.[328] If an appellant attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were unreasonable under prevailing professional norms.[329] To put a finer point on it, "[j]udicial scrutiny of such a claim is highly deferential and should not be colored by the distorting effects of hindsight."[330] The CAAF further used an apt football analogy to more clearly illustrate this point by saying "this Court does not engage in second guessing tactical decisions that might be characterized as Monday-morning quarterbacking."[331]

In order to show prejudice under the second prong, an appellant "must show that there is a reasonable probability that, but for counsel's unprofes-

---

[322] *United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018) (quoting *United States v. Captain*, 75 M.J. 99. 102 (C.A.A.F. 2016)).

[323] *Strickland v. Washington,* 466 U.S. 668, 688 (1984).

[324] *Strickland*, 466 U.S. at 687.

[325] *Id.* at 689.

[326] *Id.*

[327] *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000).

[328] *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)).

[329] *Mazza*, 67 M.J. at 475 (citing *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)).

[330] *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000) (citing *United States v. Moulton*, 47 M.J. 227, 229 (1997)).

[331] *United States v. Sanders*, 37 M.J. 116, 118 (C.M.A. 1993).

sional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[332] The Court in *Strickland* went on to say "[m]oreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[333]

In terms of the sequencing of the two prongs of *Strickland*, the CAAF found that:

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.[334]

*2. Analysis*

Before turning to the merits of each allegation of ineffective assistance of counsel, we begin by addressing the proactive affidavits submitted by trial defense counsel.

a. <u>Trial Defense Counsel's Affidavits</u>

As a threshold matter, we note that affidavits by trial defense counsel on the issue of ineffective assistance of counsel submitted with Appellant's Fourth Motion to Attach were neither ordered by this Court nor requested by Appellate Government Counsel. Rather they were proactively offered in support of this assignment of error without an affidavit from Appellant. We were unable to identify another case before this Court where this was done.

In 1989, the Army Court of Military Review devised a procedure for pleading ineffective assistance of counsel cases by which appellate defense counsel would assist appellants in drafting as specific an affidavit as possible and appellate government counsel would contact trial defense counsel and request they prepare an affidavit explaining their actions.[335] This process was later modified by the CAAF in 1995 to better account for the presumption of competence such that trial defense counsel should only be compelled to prepare an

---

[332] *Strickland,* 466 U.S. at 694.

[333] *Id.* at 696.

[334] *Id.* at 697.

[335] *United States v. Burdine*, 29 M.J. 834, 836 (A.C.M.R. 1989).

affidavit upon a finding by a court of criminal appeals that an appellant's allegation left unrebutted would overcome the presumption of competence.[336] Since the attorney-client privilege is waived as to matters reasonably related to the allegation, trial defense counsel may voluntarily respond before such a finding.[337] In either case, this process allows an appellant to first make an allegation and for the trial defense counsel to then explain his or her decision-making. Clearly, an assumption has long been made that trial defense counsel would not openly and proactively confess to providing ineffective assistance.

If there are facts in dispute between Appellant's and trial defense counsel's affidavits, following a line of cases under *United States v. Ginn*, this Court may order affidavits, interrogatories, or a post-trial *DuBay* hearing in order to make further factual findings.[338] In this way, we allow trial defense counsel to explain themselves in an appropriate way, give meaning to the presumption of competence, and balance the role of being an appellate court and not a fact-finder. We observe that trial defense counsel in this case have collapsed this multi-step process into one step by proactively and voluntarily providing affidavits.

Since we were unable to find cases in military courts that have dealt with this situation, we looked at the federal courts for guidance on how we should treat these affidavits. Two United States Circuit Courts of Appeal have found that "[a] defense counsel's self-confessed admission of deficient representation does not constitute ineffectiveness per se; it is just one factor to be considered in determining whether counsel was constitutionally ineffective."[339]

As a result, we treat trial defense counsel's affidavits as satisfying the need for Appellant to allege ineffective representation. We also find that trial defense counsel voluntarily submitted the affidavits providing their explanation of their actions. Nevertheless, we find that we are not bound by the affidavits to conclude that trial defense counsel were actually ineffective; nor are we bound to find that trial defense counsel were either deficient in their represen-

---

[336] *United States v. Lewis*, 42 M.J. 1, 5-6 (C.A.A.F. 1995).

[337] *Id.* at 6.

[338] *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

[339] *United States v. Jansen*, 884 F.3d 649, 658 (7th Cir. 2018) (quoting *United States v. Laird*, 591 Fed.Appx. 332, 337 (6th Cir. 2014)).

tation; nor that there was any prejudice to Appellant. Indeed, Appellate Defense Counsel conceded in oral argument that he did not believe the issue of ineffective assistance of counsel "lives or dies" based on the affidavits.[340]

Since we are applying a de novo review, we considered the affidavits along with the entire record of trial. Particularly included in that review were: the affidavits from trial defense counsel and from Dr. Newton, the Defense expert in forensic psychiatry with a specialty in suicide, which was included with Appellant's Fourth Motion to Attach; statements by Appellant's appellate defense counsel during oral argument; the trial testimony of Dr. Newton and the cross-examinations of Mr. Houston, Special Agent Charlie, Dr. Rainey, Dr. Magneson and Belgian law enforcement officers. Considering these things together, we find there is no conflict between competing affidavits and there are sufficient facts in the complete record of trial and appellate filings to resolve this issue without an additional fact-finding hearing.

In reviewing the affidavits of trial defense counsel, we note that there are conclusory statements such as the statement in one of the affidavits that Appellant's was a "wrongful conviction."[341] We likewise note the affidavits use hedging language such as decisions where counsel were "unable to identify a strategic or tactical reason for having made them."[342] Not being able to recall a strategic reason, or choosing or not choosing an action, is not the same as saying there was no strategic or tactical reason at the time of trial. Further, stating that counsel had no strategic reason for not seeking mental health records, except that counsel expected the Government to "stonewall" indicates there actually was a reason. Moreover, we find that it strains credulity to state that there were two expert witnesses who were available to testify, including one who was present for most of the trial, but that in retrospect, counsel cannot now identify a strategic or tactical reason for not putting the experts on the stand. This statement indicates the obvious: trial defense counsel recognized some value in having these witnesses available, but made a tactical choice based on their assessment at the time of the trial that they were not necessary, or that it was inadvisable to call them. This is not to say we dismiss these post-hoc statements, but in balancing them against the remainder of the record of trial, we must make our own legal conclusions as to whether trial defense counsel provided effective representation in this case.

---

[340] Oral Arg. at 52:53, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[341] Appellant's Fourth Motion to Attach, App. O.

[342] Appellant's Fourth Motion to Attach, App. O.

In contrast to the affidavits and Appellant's arguments, we also note that while not required to prove Appellant's innocence, trial defense counsel put on a competently presented and disciplined case that Mrs. Bravo committed suicide. The record of trial is almost 4,000 pages long, reflecting a long and complex case. Trial defense counsel filed over 30 motions and succeeded in limiting some of the Government's evidence. They also successfully challenged seven members. Trial defense counsel also called expert witnesses in forensic psychiatry with a specialty in suicide and in physics, biomechanics and safety assessment. On cross-examination of the Government's witnesses, trial defense counsel were competent in presenting evidence that there were deficiencies in the investigation and noting that a key eyewitness did not see Appellant in the window when Mrs. Bravo fell. In putting on the Defense case-in-chief, trial defense counsel were also competent in having Dr. Newton testify that in his expert opinion, Mrs. Bravo was at elevated risk of suicide. Indeed, in ruling on a late motion to challenge chain of custody, the military judge specifically observed that trial defense counsel had been "effective in choosing their tactical decisions, examining witnesses and presenting evidence."[343] We further note that before trial, one of Appellant's trial defense counsel vigorously advocated for Appellant's case to be taken over by the Navy from the Belgian authorities through a letter writing campaign to senior military leaders and members of Congress, and finally through a petition for a Writ of Mandamus to the U.S. District Court for the District of Columbia.[344] We find that these points demonstrate that trial defense counsel in this case competently and vigorously represented Appellant and were far from falling below prevailing professional standards of legal representation.

While trial defense counsels' affidavits were replete with hindsight and what we would characterize as "Monday morning quarterbacking," neither one contends that the outcome of the trial would have been any different if one or more of the things discussed had been done differently. As discussed further below, regarding the pre-Navy mental health records, the affidavits do not reach a conclusion that any such actual records exist, or state what the records would have shown.

We further observe that both affidavits begin with the caveat that they were prepared at the request of Appellant's appellate defense counsel, rather than on their own initiative. During oral argument one of Appellant's Appellate Defense Counsel explained that the affidavits came about after a telephone conference in which the appellate defense counsel expressed their belief

---

[343] R. at 3367.

[344] *See* App. Ex. V, Attach. U; *see also* App. Ex. V, Attach. X.

that trial defense counsel "messed up."[345] Appellate Defense Counsel denied having any hand in writing the affidavits, but acknowledged that trial defense counsel were not as receptive to the idea of writing the affidavits as the appellate defense counsel hoped, and noted that there was some "hedging."[346] There was apparently some discussion among appellate and trial defense counsel of topics to be included and some review of drafts.[347] However, there was at least one topic trial defense counsel were unwilling to include because, according to Appellate Defense Counsel, they believed the theory was "nonsensical."[348] That was the appellate theory that Appellant's mother provided Appellant with Ritalin pills.[349]

The origin of the affidavits, and the discussion and process that went into preparing them, further reveal that the affidavits are merely a product of a retrospective critique of what could have been done differently in light of an undesired outcome. They were not an account of legal representation that fell below prevailing professional norms. We review each of the allegations below; and while we do not believe there was any deficiency in trial defense counsel's representation, in light of the affidavits, we find that it is more efficient to dispose of Appellant's ineffectiveness claims on a lack of sufficient prejudice.

b. <u>Pre-Navy Medical Records</u>

We note that during oral argument, Appellant conceded that not obtaining Mrs. Bravo's pre-Navy medical records from her hospitalization in Florida in 2003 was not ineffective assistance of counsel.[350] As noted by Appellate Government Counsel, Appellant attached a record showing that trial defense counsel did attempt to retrieve these records, but were told by the hospital that the records no longer existed.[351]

---

[345] Oral Arg. at 51:19, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[346] Oral Arg. at 51:34-52:12, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[347] Oral Arg. at 29:34-30:08, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[348] Oral Arg. at 51:27-55:17, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[349] Oral Arg. at 51:27-55:17, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[350] Oral Arg. at 53:35, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[351] Gov't Answer at 202.

During oral argument, Appellant's counsel introduced a nuance not clearly reflected in either of the affidavits of trial defense counsel and not made clear in Appellant's brief. The nuance was that there were other "pre-Navy" medical records aside from Mrs. Bravo's hospitalization in 2003. Still, it was not entirely clear what records, specifically, Appellate Defense Counsel was referencing. Appellate Defense Counsel argued that there was testimony of Mr. Houston at trial in which he stated that he did not think to review Mrs. Bravo's medical records before his testimony. Appellate Defense Counsel also argued that Mr. Houston's testimony was that he also had not thought to bring the medical records with him to trial, but that he would have if someone had asked.[352] This suggests that there were some medical records of Mrs. Bravo in Mr. Houston's possession, if that had been his testimony. However, it would still not be clear what any such records would have shown.

In a portion of testimony from Mr. Houston, trial defense counsel asked about his knowledge of medications and treatment Mrs. Bravo received between 2004 and 2008, which he denied any knowledge about.[353] The following colloquy ensued:

> Trial defense counsel: And you never volunteered her pre-Navy medical records to NCIS?
>
> Mr. Houston: I don't think they asked. I mean if they would have asked for it, we would surely done that.
>
> Trial defense counsel: Did you review them before coming here to testify? Did you review her medical records before she was in the Navy?
>
> Mr. Houston: No.
>
> Trial defense counsel: The prosecutor got up here and asked you all these questions about did you have any reason to suspect or any reason to believe that she had suicidal issues and mental health issues and you said no.
>
> Mr. Houston: Right.
>
> Trial defense counsel: Knowing that they were going to ask you those questions, did you think it was important to review her pre-Navy medical records?

---

[352] Oral Arg. at 52:45-53:13, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[353] R. at 2885.

Mr. Houston: Yeah, I didn't think about it.[354]

We find that this colloquy does not explicitly reveal the existence of any specific medical records during the period in question. Nor does it reveal that Mr. Houston was actually in possession of any of Mrs. Bravo's medical records. He may have meant that if NCIS agents had asked, he would have sought them out. In any case, the series of questions seemed more designed to discredit Mr. Houston's testimony that he was not aware of Mrs. Bravo's mental health treatment or what medications she may or may not have been taking following her 2003 hospitalization, rather than to demonstrate the actual existence or content of any such records. The line of questions could also have been confusing to Mr. Houston because the questions were not very precisely worded. For example, one question suggests Mrs. Bravo was in the Navy while there was no evidence that she was ever in the Navy.

In any case, given that neither affidavit, or anything else in the record confirms the existence of any "pre-Navy" medical records after Mrs. Bravo's 2003 hospitalization or what they would have shown, any impact such records could have had on the outcome of the case is entirely speculative. Additionally, since the Defense expert on forensic psychiatry with a specialty in suicide gave his expert opinion that Mrs. Bravo was at elevated risk of suicide, we find Appellant has not shown there was prejudice. Indeed, this is reinforced by Dr. Newton's affidavit of which he states that despite the absence of a comprehensive record set, he was still provided sufficient evidence that Mrs. Bravo had a "many-fold increase in her risk of suicidal behavior."[355]

Accordingly, we find that trial defense counsel were not constitutionally ineffective for failing to obtain Mrs. Bravo's medical records that pre-dated Appellant's naval service, should any even have existed.

c. <u>Failing to challenge CDR Holcombe, LCDR Benjamin, and LCDR Washington</u>

Trial defense counsel's affidavit attached to Appellant's Fourth Motion to Attach as Appendix P gives little to no explanation of what basis any challenges for cause could have been raised against any of the three named members. The affidavit states merely that they had experiences with mental health and domestic violence.[356] There is no explanation of how this would have biased them in the case. For each of the three, there were follow-up voir dire questions asked, but none revealed any actual biases and would likewise not have been

---

[354] R. at 2886.

[355] Appellant's Fourth Mot. to Attach, App'x Q.

[356] Appellant's Fourth Mot. to Attach, App'x P.

sufficient to demonstrate implied bias. Appellant's brief argues that questions later asked by these members help demonstrate bias, but this argument mistakes the perspective from which ineffective assistance of counsel is analyzed. There is no way trial defense counsel could have known what questions members would ask at the point when they decided not to challenge these members. Trial defense counsel successfully challenged seven members. We find there is no deficiency in the choice not to challenge CDR Holcombe, LCDR Benjamin, and LCDR Washington, but that in any case, there was no prejudice to Appellant.

### d. Mr. Burkowsky's Testimony

Appellant contends that Mr. Burkowsky, a purported forensic investigation expert, would have helped trial defense counsel show that Mrs. Bravo's death was suicide rather than homicide.[357] However, Mr. Burkowsky's testimony would have been highly speculative and inadmissible. At best, he could say that it in his opinion, as a forensic investigation and investigation best practices expert, there were deficiencies in the collection of evidence and that he believed the evidence "strongly suggested" it was more likely Mrs. Bravo committed suicide than that she was murdered.[358] The latter would likely have been found to invade the province of the members as the finders of fact. The former was already established through the testimony of Special Agent Charlie and cross-examination of the Belgian law enforcement witnesses. We find it was reasonable for trial defense counsel not to call Mr. Burkowsky, but that in any case, Appellant was not prejudiced because the outcome would not have been different if he had testified.

### e. Dr. Draper's Testimony

Appellant contends that Dr. Draper, a purported expert in brain function and traumatic memory would have allowed trial defense counsel to demonstrate the many problems with eyewitness testimony, especially if those witnesses are subsequently permitted to participate in re-enactments.[359] However, Appellant fails to demonstrate how such an expert would have assisted the members any better than trial defense counsel's cross-examination of eyewitnesses. Appellant's brief mentions that several witnesses noted there were things they did not remember, but Appellant does not point to specific testimony or evidence that would have been better illuminated with the assistance of a memory expert or show how the outcome of the trial would have been any

---

[357] Appellant's Brief at 177.

[358] Appellant's Fourth Mot. to Attach, App'x M.

[359] Appellant's Brief at 177-178.

different with the assistance of Dr. Draper. We find that it was reasonable for trial defense counsel not to call Dr. Draper, but that in any case, Appellant was not prejudiced.

### f. Toxicology Experts

Appellant argues that because the Government had two toxicologists, trial defense counsel's failure to call a toxicologist at trial deprived Appellant of a "battle of the experts" as if that is a goal unto itself. Trial defense counsel had retained a toxicology expert and an affidavit from him was submitted by Appellate Defense Counsel as part of Appellant's Fourth Motion to Attach.[360] Nevertheless, the affidavit does not dispute the presence of zolpidem in Mrs. Bravo's system, but rather seems to take issue with how the Government's toxicologists analyzed whether there was a "therapeutic," "toxic" or "lethal" level of zolpidem in her system. The Defense expert does not seem to disagree with the Government toxicologists' conclusion that the level of zolpidem in Mrs. Bravo's system would not have been the cause of her death. Yet, this was not an issue. There was no question at trial that Mrs. Bravo's death was caused by her fall. Under these circumstances, we find that it was reasonable for trial defense counsel not to call their toxicology expert to testify. We also find that the outcome of the trial would not have been any different if the expert retained by trial defense counsel had been called to testify, as a result, we find there was no prejudice.

### g. Preparation of Dr. Newton

Appellant contends that trial defense counsel failed to prepare Dr. Newton, the defense expert forensic psychologist with a specialty in suicide, to testify successfully.[361] At the outset, we are compelled to note that Dr. Newton testified at trial that Mrs. Bravo, due to a number of factors, was at elevated risk of suicide.[362] Dr. Newton also said in his affidavit that:

> Despite the absence of a comprehensive record set, even the records available provided me considerable insight into several psychiatric diagnoses likely experienced by Mrs. [Bravo], along with numerous significant risk factors relevant to suicidality. Some of these risk factors were longstanding, while others were more relevant in the final years of her life. Combined, this data was sufficient, in my opinion, to testify from the extensive psychiatric literature concerning suicide risk assessment, particularly in

---

[360] Appellant's Fourth Mot. to Attach, App'x K.

[361] Appellant's Brief at 178.

[362] R. at 3743.

areas where Mrs. [Bravo] had risk factors that provided evidence that she had a many-fold increase in her risk of suicide behavior based on large studies of individuals with similar behaviors and risk factors.[363]

Nevertheless, Appellant argues that trial defense counsel was ineffective because Dr. Newton conceded that suicide is "very rare" on cross-examination and that trial defense counsel failed to elicit testimony comparing the relative rarity of suicide to murder, or to place his remarks on the rarity of suicide in proper context. Still, we are not persuaded that this slight nuance falls below prevailing professional norms in criminal defense practice. Moreover, we find that this would not have made any difference to the outcome of the case. Trial defense counsel competently guided Dr. Newton through his detailed testimony and obtained the most valuable opinion they could have from Dr. Newton. Indeed, it was likely the strongest evidence in Appellant's favor. Nevertheless, the overwhelming evidence that Appellant murdered Mrs. Bravo ultimately overcame Dr. Newton's expert opinion despite trial defense counsel's best efforts. As a result, we find there was no prejudice.

### h. Appellant's Mother

Appellant argues for the first time on appeal that his mother could have testified that Appellant had been diagnosed with ADHD as a child and that in December 2011, four years before Mrs. Bravo's death, she gave him some Ritalin pills that were small and peach colored. An affidavit from Appellant's mother was included with Appellant's Fourth Motion to Attach.[364] Appellant argues this could have provided an alternate explanation for the pills LTC Whiskey testified that Appellant retrieved from his desk shortly before Mrs. Bravo's death because there is similarity in their appearance to what LTC Whiskey described. As further proof, there are prescription receipts attached showing that Appellant's mother was prescribed Methylphenidate between 2011 and 2013. There are also some receipts for prescriptions and an actual prescription for Appellant for the same drug from 1995 to 1997.[365]

There is no evidence that trial defense counsel were aware of this potential alternate explanation for a key piece of evidence at trial. Trial defense counsel also do not address it in their affidavits. Further, there is no allegation that Appellant told his trial defense counsel or anyone else about these pills. Additionally, during oral argument, Appellate Defense Counsel stated that during

---

[363] Appellant's Fourth Mot. to Attach, App'x Q.

[364] Appellant's Fourth Mot. to Attach, App'x L.

[365] Appellant's Fourth Mot. to Attach, App'x L.

a discussion about what topics should be addressed in the affidavits from trial defense counsel that trial defense counsel refused to include in the affidavits the theory that Appellant's mother provided him with the pills that resembled zolpidem because they believed it was "non-sensical."[366]

Additionally, there was testimony at trial from Mr. Andrews, that Appellant had a different prescription for ADHD. This is supported by Prosecution Exhibit 12 which provided Appellant's prescriptions for ADHD in 2015. At that time, Appellant was prescribed a different medication called Strattera. According to Prosecution Exhibit 12, Appellant had just received a 90-day supply of Strattera on 15 September 2015, only about three weeks before Mrs. Bravo's death.[367] Mr. Andrews testified that Strattera does not resemble zolpidem because it comes in an oblong capsule form, and that it's a different size, different shape and different color from zolpidem.[368]

Even if trial defense counsel had been aware of Appellant's mother allegedly giving him some of her medication in 2011, we find it would be a reasonable choice not to call his mother to testify because this theory would be a stretch to believe, especially given a lack of explanation why he would need those pills when he had a current prescription for a different medication that just been filled. There also would have been a risk of putting on evidence that Appellant committed uncharged misconduct by wrongfully possessing and possibly wrongfully using prescription medication that was not lawfully prescribed to him.[369] In any case, we find there is no prejudice to Appellant in his trial defense counsel's decision not to pursue a theory that was unknown at the time, had dubious credibility, and could have undermined the credibility of other evidence they put on the case.

*3. Conclusion*

None of Appellant's alleged deficiencies constitute ineffective assistance of counsel and, moreover, Appellant cannot show any likelihood that the result would have been different had counsel taken any of the actions he now raises on appeal. Accordingly, there was no prejudice.[370]

---

[366] Oral Arg. at 552:00-52:08, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[367] Pros. Ex. 12.

[368] R. 1828-1829.

[369] MCM, pt. IV, para. 112a.

[370] *Strickland*, 466 U.S. at 687.

**K. The Record of Trial is Not Incomplete.**

Appellant argues that the record of trial is incomplete for three reasons. First, there were mistranslations for two witnesses—June LaPlume and Dr. Rainey. Second, the record is incomplete because the audio did not capture some testimony given in French. And third, the record is incomplete because the reconstruction of Special Agent Charlie's testimony that was given at an Article 39(a) session was deficient.

At the outset, we note that Appellant has framed this AOE by commingling different underlying issues and characterizing them as a single AOE challenging the completeness of the record of trial. In the course of doing so, Appellant also invokes other legal issues, including a constitutional violation of the right to confrontation because of mistranslations, and structural error, the latter being raised for the first time during oral argument.[371] In one sub-issue, we find that, rather than any of the issues identified by Appellant, the applicable legal analysis is that of objections to the accuracy of courtroom interpretations not preserved at trial. Below, we set out the applicable standards for each of the legal issues, discuss the use of interpreters generally, and that is followed by an analysis of each of the underlying allegations of error. We address structural error last.

*1. Standard of Review*

Appellant asserts constitutional error in the alleged mistranslations of testimony by June LaPlume and Dr. Rainey, as well as other unidentified witnesses. We review allegations of constitutional law *de novo*.[372]

a. Use of Interpreters

Before approaching the individual issues, we believe it useful to make note of the rules governing qualification and use of courtroom interpreters. R.C.M. 502(e)(1) states that the qualifications of court interpreters shall be as prescribed by the Secretary concerned.[373] R.C.M. 502(e)(2) describes certain circumstances under which a person who served in certain previous roles in the same case is disqualified from being an interpreter. For example, a person is disqualified from acting as an interpreter if that person had also been the accuser, a witness, an investigating or preliminary hearing officer or counsel for

---

[371] Oral Arg. at 11:34-14:00, *United States v. Becker*, No. 202200212 (N-M. Ct. Crim. App. July 14, 2024).

[372] *United States v. Busch*, 75 M.J. 87, 91 (C.A.A.F. 2016) (citing *United States v. Castillo*, 74 M.J. 160, 165 (C.A.A.F. 2015)).

[373] R.C.M. (2019) 502(e)(1).

one of the parties.[374] R.C.M. 502(f) states that any person who discovers that a person detailed to a court-martial is disqualified, or lacks the qualifications specified by this rule, shall cause a report of the matter to be made to the military judge if the court-martial is in session.[375] Mil. R. of Evid. 604 states that an interpreter must be qualified and must give an oath or affirmation to make a true translation.[376] R.C.M. 807(b)(1)(A) also requires that interpreters take an oath to perform their duties faithfully.[377] The Manual of the Judge Advocate General states that in each case before a court-martial, the convening authority, or the officer directing such proceeding, shall appoint, when necessary, a properly qualified and sworn interpreter for the court.[378] Also, Rule 26.5 of the Uniform Rules of Practice Before Navy and Marine Corps Courts-Martial provides that counsel who intend to use an interpreter at trial must notify the military judge and opposing counsel of the interpreter's identity and qualifications not later than 10 business days before trial and any objections must be provided to the military judge as soon as practicable, but no later than five days before trial.[379]

In light of the above, this Court is persuaded by a series of United States District Court cases, that

> [b]ased on the requirements that court interpreters must satisfy certain objective standards and must take an oath to translate truthfully, and based on the decisions of other courts assigning similar presumptions to other qualified professionals, this court holds that court interpreters are entitled to a presumption that they execute their official duties with propriety, accuracy, and integrity.[380]

"To rebut this presumption, an individual must adduce specific evidence of impropriety by the interpreter."[381]

---

[374] R.C.M. (2019) 502(e)(2).

[375] R.C.M. (2019) 502(f).

[376] Mil. R. Evid. (2019) 604.

[377] R.C.M. (2019) 807(b)(1)(A).

[378] JAGINST 5800.7G, CH.2, para. 0130(d)(2)(B).

[379] Uniform Rules of Practice Before Navy and Marine Corps Courts Martial, Rule 26.5 (Sept. 27, 2021). These rules were re-promulgated on 18 December 2024, and Rule 26.5 remains unchanged.

[380] *Michel v. United States,* 849 F. Supp. 2d 649, 657 (W.D. Va. 2012).

[381] *Id.*

"Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse."[382] Further, like other complaints about the conduct of trial, a challenge to the competence of an interpreter may be waived if not raised in a timely fashion.[383]

While the Court Interpreters Act[384] does not apply to military courts, given limited precedent in courts-martial regarding the adequacy of interpreters, we have looked to federal cases applying it to that question. The Court Interpreters Act does require a judge to inquire as to the need for an interpreter, but if one is present, the only question is whether the interpreter performed adequately.[385] Further, the Second Circuit in *Huang* held that "[t]he giving of summaries rather than word-for-word translation is not . . . plain error . . . ."[386] The basic question is whether any inadequacy in the interpretation "made the trial fundamentally unfair."[387]

In yet another case from the Seventh Circuit, the Court held that

> a defendant in a criminal proceeding is denied due process when: (1) what is told to him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.[388]

Since the trial in this case was conducted in English, except for testimony from a subset of ten of forty-plus witnesses, which was simultaneously interpreted into English by interpreters who were mutually satisfactory to the parties at trial, we find that the only element of the Seventh Circuit's analysis

---

[382] *United States v. Valladares*, 871 F.2d 1564, 1566 (11th Cir. 1989).

[383] *United States v. Villegas*, 899 F.2d 1324, 1348 (2nd Cir. 1990) (citation omitted).

[384] 28 U.S.C. § 1827.

[385] *Valladares*, 871 F.2d at 1566 (citations omitted).

[386] *United States v. Huang*, 960 F.2d 1128, 1135-36 (2d Cir. 1992).

[387] *Valladares*, 871 F.2d at 1566 (quoting *United States v. Tapia*, 631 F.2d 1207, 1210 (5th Cir. 1980)).

[388] *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985).

that applies here is the second one: "the accuracy and scope of a translation at a hearing or trial is subject to grave doubt."[389]

The appellant in *Cirrincione* relied on a Second Circuit case, *United States ex rel. Negron v. New York*'s holding that "the limited use of a translator in the prosecution and jury trial of a Spanish-speaking defendant violated the requirements of fundamental due process."[390] However, the Seventh Circuit drew several key distinctions where the criteria for such a holding emerge. In *Negron*, the defendant neither spoke nor understood any English. In addition, in respect to the testimony against him, the defendant in *Negron* had an interpreter available to him only twice in the course of his four-day trial. On those two occasions, the interpreter spent approximately 20 minutes with him summarizing the testimony of all the witnesses who had testified against him. The interpreter never translated their testimony simultaneously for him, and the interpreter was apparently not even present for all of the testimony. Therefore, in *Negron* the testimony was undoubtedly incomprehensible to the defendant, and because the interpreter was not even present during some testimony, the accuracy and scope of her summary were subject to grave doubt.[391] By contrast, the defendant in *Cirrincione* spoke the language in which the trial was held, and the defense conducted extensive direct and cross-examination rarely using the aid of the interpreter that was available to them.[392] As a result, the Seventh Circuit held the use of the interpreter in the *Cirrincione* case did not subject the scope and accuracy of the translation to grave doubts as in *Negron* and upheld the conviction.[393]

In this case, there were a total of four official interpreters. All of them were qualified and sworn and trial defense counsel never objected to any of them based on their qualifications or on the quality of their translation. There was also an unofficial interpreter seated behind trial defense counsel, in the gallery. At a certain point, the unofficial interpreter got sick and was unable to continue. At trial defense counsel's request, the military judge crafted a solution by which the official interpreters would rotate, and he one would be available to assist the Defense. Trial defense counsel accepted this solution.[394]

---

[389] *Id.*

[390] *Id.* at 634-35.

[391] *Id.* at 635.

[392] *Id.* at 634.

[393] *Id.* at 635.

[394] R. at 1678-79.

We also note that Appellant hired a translator to review the record post-trial and submitted that interpreter's 500-plus page written translation of the audio recordings from the trial of the ten French speaking witnesses as part of Appellant's Fourth Motion to Attach.[395] Neither this Court nor the Government had an opportunity to review the qualifications of the post-trial interpreter. Also, while there is an oath with a notary stamp attached to the transcriptions of each witnesses' translated testimony, the oath is not the same as the one set forth in R.C.M. 807(b)(2).[396] As discussed further below, while we generally accept that the post-trial interpreter is likely a competent interpreter and translator, we find that he is not entitled to the same presumption of regularity that the courtroom interpreters receive, as described above. While we do not disregard the post-trial translations, this goes to the weight we give them.

### b. Completeness of the Record

Whether a record of trial is complete represents a question of law which courts review *de novo*.[397] "A substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the Government must rebut."[398]

A complete record of proceedings is required for cases resulting in a dismissal.[399] A record of trial is complete if it complies with the requirements of R.C.M. 1112(b).[400] A record of trial shall include a substantially verbatim recording of the court-martial proceedings.[401] A certified verbatim transcript of the record of trial shall be prepared when the judgment includes a punitive discharge or confinement for more than six months.[402]

---

[395] Appellant's Fourth Motion to Attach, Attach. A-J.

[396] *Compare* Appellant's Fourth Motion to Attach, Attach. A-J *with MCM*, pt. II, para. 807 at II-82.

[397] *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

[398] *Id.* at 111 (citing *United States v. McCullah*, 11 M.J. 234, 237 (C.M.A. 1981)).

[399] Article 54, UCMJ ; 10 U.S.C. § 854.

[400] R.C.M. (2019) 1112(b).

[401] R.C.M. (2019) 1112(b)(1).

[402] R.C.M. (2019) 1114(a)(1).

Verbatim means "word for word; in the same words."[403] "Nevertheless, we have from the beginning recognized that literal compliance with this requirement is impossible. Accordingly, we have interpreted Article 54(a) to require that such records 'be substantially verbatim.'"[404]

When there is a claim of an omission, the military judge must first determine if the record is substantially verbatim. The "threshold question is whether the omitted material was qualitatively or quantitatively substantial."[405] Omissions are qualitatively substantial if "they related directly to the sufficiency of the Government's evidence on the merits."[406] Omissions are not quantitatively substantial if the "totality of omissions in this record becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness."[407] Despite a missing word or phrase in a question by counsel, or overlap of question and response to a witness, the overall context of the examination allowed the appellate court to discern the substance of the answer through the remainder of the witness' responses.[408]

Second, if the military judge finds the record is not verbatim, then there are three possible remedies: declare a mistrial, reconstruct the record, or start the proceeding anew.[409]

The third and final step is to address prejudice. Substantial omissions render records incomplete and raise a presumption of prejudice, which as noted above, the Government must rebut.[410] If the record "is sufficiently complete to permit reviewing agencies to determine with reasonable certainty the substance and sense of the question, answer, or argument, then prejudice is not present."[411]

---

[403] *United States v. Nelson*, 3 C.M.A. 482, 486, 13 C.M.R. 38, 42 (1953).

[404] *United States v. Lashley*, 14 M.J. 7, 8 (C.M.A. 1982) (quoting *United States v. Gray*, 7 M.J. 296, 297 (C.M.A. 1979).

[405] *United States v. Tate*, 82 M.J. 291, 295 (C.A.A.F. 2022) (citing *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982)).

[406] *Lashley*, 14 M.J. at 9.

[407] *Nelson*, 3 C.M.A. at 487, 13 C.M.R. at 43.

[408] *United States v. Vazquez*, No. 201700363, 2019 CCA LEXIS 249, at *5-6 (N-M Ct. Crim. App. June 13, 2019).

[409] *Tate*, 82 M.J. at 295-96.

[410] *Henry*, 53 M.J. at 110-11(citing *McCullah*, 11 M.J. at 237).

[411] *Nelson*, 3 C.M.A. at 486, 13 C.M.R. at 42.

Courts review the accuracy of translation for plain error when the appellant forfeits the issue by failing to object before the court-martial adjourns. In reviewing a due process challenge to the accuracy of translations, the United States Court of Appeals for the Seventh Circuit found that "a district court denies a criminal defendant due process where 'the accuracy and scope of a translation at a hearing or trial is subject to grave doubt.'"[412] The *Leiva* Court went on to find that the "inquiry is whether any inadequacy in interpretation made the trial fundamentally unfair" and that mere interpretation "hiccups" do not create grave doubt.[413]

*2. Analysis*

a. Officer Frank Vale

Officer Frank Vale, an officer with the local Mons, Belgium police and one of the first responders on the night Mrs. Bravo fell to her death, testified as a Government witness with the assistance of an interpreter. Although he spoke some English, he said he was more comfortable testifying in French.[414] There were actually two different interpreters during his testimony.[415] The post-trial translator hired by Appellant identified, and this Court confirmed in its review, that there are quite a few places in the audio recording of the proceedings that Officer Vale's original French testimony is inaudible. In contrast, the audio of the courtroom interpreters' translation of Officer Vale's testimony is clearly audible, and the written transcript reflects the substantially verbatim English testimony.

Officer Vale was clearly an important Government witness. He covered a number of topics about what he observed when he arrived at the scene of Mrs. Bravo's fall and inside the apartment, what Appellant's demeanor appeared to be, and what Appellant told him about what happened. He also laid the foundation for a number of photographs he took, and he discussed the bottle of pills Appellant gave him. Importantly, Officer Vale also testified about his exchange with Appellant regarding the pin code for Mrs. Bravo's phone, and the problematic location of the phone on the couch in the living room (not the bedroom

---

[412] *United States v. Leiva*, 821 F.3d 808, 820 (7th Cir. 2016) (quoting *Cirrincione*, 780 F.2d at 634) (other citation omitted).

[413] *Id.* at 820 (quotation omitted).

[414] R. at 1984-86.

[415] R. at 2018.

where Mrs. Bravo exited the window) in one of the photographs, including Officer Vale's assurance that he had not moved the phone before taking the photograph.[416]

On cross-examination, trial defense counsel made a number of points about the absence of wounds or scratch marks on Appellant, absence of signs of a struggle in the apartment, and Officer Vale's failure to collect fingerprints.[417] Further, trial defense counsel confirmed on cross-examination that Officer Vale did not collect the wine bottle or the wine glass Mrs. Bravo was drinking from, and that he initially secured Mrs. Bravo's phone in his car, but returned it to Appellant after being authorized by a magistrate.[418] Additionally, he testified that he did not search Mrs. Bravo's purse, he did not collect her computer, and he turned over the pill bottle Appellant gave him to the ambulance crew, and when he went back the next day to retrieve it, he found out they had thrown it away.[419] He also testified on cross-examination that at 2226, after waiting at the scene for nearly an hour and a half, a magistrate not present at the scene determined it was a suicide and, as a result, Officer Vale did not secure the scene.[420] Throughout direct and cross-examination, there were no issues understanding Officer Vale's testimony. Although at times he did not remember the answer to a specific question and deferred to his report, his testimony appeared to be in line with what counsel for both sides expected.

Trial defense counsel was able to make a number of arguments in closing that were favorable to Appellant based on the cross-examination of Officer Vale. Indeed, there was a central theme woven throughout trial defense counsel's closing argument of criticizing the investigation and evidence collection by the Belgian authorities that was partly supported by Officer Vale's testimony.

We find there are similarities between this case and *United States v. Smith*, where there were two German speaking witnesses, in which the appellant identified three translation irregularities and speculated that there might be additional ones that could not be identified because there was no recording of the German testimony. In that case, the Court of Military Appeals held that because there was no objection made at the time of the interpreter's appointment, and no objection was made to his continued use, it is presumed that the

---

[416] R. at 1985-2001

[417] R. at 2010-16.

[418] R. at 2029-45.

[419] R. at 2032-36.

[420] R. at 2045.

trial defense counsel was satisfied with the interpreter.[421] Objection to the appointment or continuance of an interpreter must be definite and timely.[422] Mere speculation that there might be other instances of irregularity furnished through the interpreter without evidence will not suffice.[423] Error is not to be presumed, but must be made affirmatively to appear by the party asserting it.[424] The burden is on the party alleging error to show it affirmatively on the record.[425]

Although *Smith* dates from 1963 and pre-dates changes to the Rules for Court Martial, including R.C.M. 1112(b), which requires a substantially verbatim recording of the record of trial, we find that it remains instructive. Also instructive is a more recent case from this Court, where testimony was given in Japanese language and translated into English by an interpreter, and the appellant argued that both the Japanese and English language testimony should have been transcribed as part of the record of trial to enable a post-trial review to ensure the accuracy of the translation and that the record is substantially verbatim.[426] After considering the record as a whole, this Court found that there was no possibility of prejudice resulting from the Government's failure to have testimony in Japanese transcribed in Japanese and attached to the record of trial as an appellate exhibit.[427]

Turning to the analysis whether the missing French testimony is quantitatively and qualitatively substantial, we find that the missing portions are quantitatively substantial given that there are long parts of Officer Vale's French testimony that are completely inaudible on the audio recording. It also constitutes a key part of the Government's case, and it could be tempting to say that the missing French testimony is qualitatively substantial. However, the Rules for Courts-Martial do not specify a requirement for the recording to include both languages when a witness testifies in a foreign language and an interpreter translates the testimony into English. There is also certainly no

---

[421] *United States v. Smith*, 13 C.M.A. 553, 561 (1963).

[422] *Id.* (citing *State v Sauer*, 217 Minn 591, (1944)).

[423] *Id.* at 564 (quoting *United States v. Justice*, 13 C.M.A. 31, 34, 32 C.M.R. 31, 34 (1962)).

[424] *Id.* at 561 (quoting *Wabash Ry. Co. v Bridal*, 94 F2d 117, 121 (CA 8th Cir) (1938), *cert. denied*, 305 U.S. 602 (1938)).

[425] *Id.* (citing *Earle v Myers*, 207 US 244 (1907)).

[426] *United States v. Oliver*, No. NMCCA 200101259, 2005 CCA LEXIS 129, at *28-31 (N-M Ct. Crim. App. Apr. 29, 2005).

[427] *Id.* at *31.

rule requiring written transcription into both languages and there are practical difficulties in making such requirement.

Accordingly, we are persuaded that in this case, because the recording of the English translation is clear, the written transcription is substantially verbatim. There was no significant confusion about Officer Vale's testimony at trial and there is no barrier to this Court's ability to review Officer Vale's testimony on appeal. The recording of Officer Vale's testimony satisfies the R.C.M. 1112(b) requirement for a substantially verbatim recording. Further, there was no objection to the two interpreters or to the quality of their interpretation at the trial. Appellant identifies no error that was plain or obvious, and trial defense counsel effectively used points made during the cross-examination of Officer Vale in closing. Thus, even if the recording was not substantially verbatim, we find that the Government has overcome the presumption of prejudice and there is no prejudice to Appellant.

    b.  <u>Analysis of June LaPlume and Dr. Rainey</u>.[428]

---

[428] Since the issues are grouped together and this distinction is not clearly delineated in Appellant's brief, we reviewed the record for completeness as well as for mistranslations. In reviewing the post-trial translation transcripts submitted by Appellant and the audio recording of the original testimony of both June LaPlume and Dr. Rainey, they are both clearly audible in both the French and the English translation. There are some small gaps where there are voices overlapping or a word is inaudible; but even in cases where this occurs, it is clear from surrounding context or other questions and answers what the testimony was. We find that for these two witnesses, the audio recording is substantially verbatim. Because Appellant made an allegation that there were other unspecified places where the audio was unintelligible, we also reviewed both the post-trial translation transcripts and the audio recordings for the other French speaking witnesses. Although in reviewing the post-trial translations along with the audio recording, we did find a number of small gaps of inaudible testimony, we were nonetheless able "to discern the substance of the answer through the remainder of the witness' responses." We find that many of the alleged mistranslations identified by the privately hired translator who reviewed the audio recordings and transcribed them on Appellant's behalf, are at most "hiccups," but still clearly articulate the same ideas, in some cases using slightly different words. While not literally verbatim, slight variations between the way two different interpreters might interpret testimony, especially considering that the official courtroom interpreters were doing it in real time, as opposed to reviewing an audio recording later with the luxury of time, do not render the record incomplete or anything less than substantially verbatim. As a result, we find that the audio recording of the remaining unspecified French speaking witnesses is substantially verbatim. To the extent there are any unidentified mistranslations with regard to testimony by the unidentified witnesses, we find that issue is forfeited by the failure to raise any objection at trial. Appellant fails to identify plain error on this appeal.

June LaPlume and Dr. Rainey were both key Government witnesses. June LaPlume was the only eyewitness who saw Mrs. Bravo at the point she exited the window and began sliding down the sloped roof while trying to hold on. Dr. Rainey was the Belgian toxicologist who tested Mrs. Bravo's blood and bile for alcohol and drugs. In contrast to Officer Vale, Appellant alleges mistranslations during their testimonies rather than large portions of inaudible testimony. In this sense, with regard to these witnesses, it is not so much that the record is incomplete, but that Appellant disputes the accuracy of the courtroom interpretation of portions of their testimonies. Turning to the specific alleged mistranslations of June LaPlume and Dr. Rainey, we note first that no objection was made at the trial to the quality of interpretation by the courtroom interpreters. As a result, we find the issue was forfeited and that Appellant fails to identify error that was plain and obvious.

However, even if that were not the case and we presume the post-trial translator was more accurate than the qualified and sworn courtroom interpreters, we also observe that the mistranslations identified in Appellant's brief are at best very minor variations in interpretation, perhaps even less than "hiccups."

For example, in the first alleged mistranslation for June LaPlume, the difference in interpretation is whether she said she saw Mrs. Bravo "wearing something, the color pink" or that "she had a pink nightgown."[429] Appellant's brief then cites several follow-up questions and answers in which it was clear the issue counsel was focused on was that the light was sufficient for the witness to distinguish the color pink, but on appeal, Appellant argues that where the courtroom interpreter translated testimony as "something pink" or Mrs. Bravo's robe was pink, should have been more definitively translated to a "pink nightgown." Nevertheless, what specific garment she was wearing, or whether it was characterized as a robe or a nightgown, was not the focus of the questioning at trial. The point that was being made by counsel's questioning was that there was enough light for June LaPlume to see the color pink.

In another example, this time from Dr. Rainey's testimony, there was allegedly a mistranslation on the record that should have read as follows "[w]hether it's *femoral blood, peripheral blood or cranial blood,* it's the same result."[430] In the record of trial, the courtroom interpreter translated the same testimony as "[a]nd whether it be femoral, the cranial one or the *abdominal*

---

[429] Appellant's Brief at 77.

[430] Appellant's Brief at 82.

result, it's the same result."[431] Appellant alleges "abdominal" instead of "peripheral" was a significant mistranslation. This is because there had been a lot of testimony about the fact that a jar of Mrs. Bravo's blood used to test for alcohol had been labeled as "peripheral" when it was most likely "cranial," according to the autopsy report. There was also a jar of blood labeled "abdominal." Over ten pages of testimony in the transcribed record for Dr. Rainey were dedicated to this issue. There was even more testimony from other witnesses regarding the mislabeling of the jar of blood used to test for alcohol. Dr. Rainey testified that abdominal blood should not be used to test for alcohol because the test can be affected by stomach contents.[432] This was a helpful fact for the Defense because it both supported the Defense's argument that the investigation was faulty and there was a flaw in the chain of custody. It was also helpful because the blood test for alcohol showed that Mrs. Bravo had only a trace amount of alcohol in her system, contradicting Appellant's story that she consumed almost an entire bottle of wine before her death and that she had been drinking heavily for a while before that.

Assuming, arguendo, the Appellant's post-trial translator is correct, it is significant that "abdominal" and "peripheral" are different and carried different consequences in terms of how each kind of blood can affect the toxicology test. However, we first note that the interpreter audibly said the word "abdominal" in English on the record and there was no objection or clarification requested at the time.[433] Instead, trial defense counsel moved on to ask whether it was possible to be sure the blood used for testing was "cranial," which is what Dr. Rainey believed she used for testing.[434] This follow-up question itself likely resolved any potential for misunderstanding. However, we also find that in the full context of the testimony, it was clear that "abdominal" blood is not recommended for alcohol testing and that Dr. Rainey believed she used "cranial" and not "abdominal" blood in the test she conducted. As a result, we find first that this issue was forfeited because no objection was raised at the time. Even if this issue was not forfeited, we would find that while there was an error and that was plain and obvious, it did not result in material prejudice to Appellant's rights. We also find that it did not rise to the level of creating "grave doubt" about the accuracy and scope of the translation.

Likewise, we find the other specific alleged errors Appellant highlights in his brief were also forfeited because there was no objection at trial, and no error

---

[431] R. at 2671 (emphasis added).

[432] R. at 2670-71.

[433] R. at 2671.

[434] R. at 2671.

that was plain and obvious was identified. Even if they were not forfeited, assuming the translation errors highlighted were actually errors, we would find there was no prejudice because the members were able to "discern the substance of the answer through the remainder of the witness responses" and because trial defense counsel were still able to make the points they wanted to make in closing regarding the sub-therapeutic dosage of zolpidem, the elimination of alcohol between the time Mrs. Bravo consumed it and when she died, and the chain of custody of Mrs. Bravo's blood. Moreover, we find there was no due process violation because there were four courtroom interpreters qualified and sworn, including at least one available to the Defense, Appellant spoke English and was able to understand the English testimony and the English translation of the French testimony. Lastly, we also find there was no violation of Appellant's right to confrontation because Appellant was able to speak in the same language as his counsel and his counsel were able to effectively cross-examine both the English and French speaking witnesses.

### c. Reconstruction of Special Agent Charlie's Testimony

Special Agent Charlie testified at a pretrial Article 39(a) session on 11 December 2019. The military judge notified the parties on 16 June 2022 and 14 July 2022 that the audio recording of Special Agent Charlie's Article 39(a) testimony was missing and asked the parties to submit their notes from the session.[435] The missing audio covered 58 minutes of testimony.

After discovering the omission, the military judge elected to take the action authorized under R.C.M. 1112(d)(3)(A) to reconstruct the missing portion of the record. This is a common and authorized remedy, and we find that it was the most practical approach in this case. "A reconstruction occurs when the necessary actors - the military judge, with the assistance of the parties and relevant witnesses - act promptly and thoroughly to recreate the lost testimony through their collective memories and notes."[436] "There are however limits to what can be reconstructed. If the reconstruction results in a record that is equivocal such that it leaves uncertainty as to the substance of lost testimony, it will not suffice."[437]

In *United States v. Davenport*, a reconstruction failed because almost the entirety of the testimony of a government merits witness was lost. Upon attempting reconstruction of the Government merits witness' trial testimony at

---

[435] App. Ex. CCCIII at 1.

[436] *Tate,* 82 M.J. at 296.

[437] *Id.* (citing *United States v. Davenport,* 73 M.J. 373, 378 (C.A.A.F. 2014)).

a later *DuBay* hearing, the witness was unable to remember much of his testimony and no one who was present at the original hearing kept notes. The *DuBay* judge concluded in the findings of fact that the witness' testimony was "not altogether clear."[438]

In this case, between the court reporter's notes, and the notes of the military judge who presided over the Article 39(a) session, there was a very detailed account of what Special Agent Charlie testified to. This was corroborated by trial counsel's submission of their notes in response to the military judge's request. Trial defense counsel did not respond to the military judge's request for their notes.[439] Even without trial defense counsel's notes, there was still a much more detailed accounting of Special Agent Charlie's testimony in this case than there was in *Davenport*.

Trial defense counsel responded after the reconstruction was complete in the form of a motion to dismiss all charges and for the military judge to recuse himself.[440] Still, in that motion trial defense counsel did not provide any significant substantive evidence. Rather, both at trial and here, Appellant relies on a variety of arguments and inferences that there must be aspects of Special Agent Charlie's testimony missing and, therefore, the reconstruction is incomplete. Yet, Appellant fails to identify any specific deficiencies. One example is that Appellant alleges the time to read the first paragraph of the reconstructed testimony only takes 12 seconds to read out loud and the court reporter's log shows the testimony lasted for 42 seconds, thus 30 second of testimony is missing. Another is that the reconstruction appears as a series of statements by Special Agent Charlie without the questions they respond to. These speculative observations do not demonstrate that the reconstruction leaves any uncertainty as to the substance of the lost testimony.

Further, Special Agent Charlie testified on the same or similar topics more than once, including in several other pretrial Article 39(a) sessions and at trial as a Defense witness, and the reconstructed testimony is consistent with her testimony in those other instances. Also, when Special Agent Charlie was called as a Defense witness, she testified in extensive detail on the actions she, NCIS agents, and Belgian authorities did, or did not, take in the investigation, which was likely helpful to the Defense in facilitating the argument that the investigation was lacking.[441]

---

[438] *Davenport*, 73 M.J. at 376.

[439] App. Ex. CCCIII at 1.

[440] App. Ex. CCCIII at 2.

[441] R. at 3470-579.

We adopt an earlier conclusion this Court made in an unpublished opinion, finding that:

> [a]n appellant may not decline to participate in the reconstruction of the record and thereafter ask an appellate court to give more than minimal weight to speculative assertions that error might or might not actually exist. While the appellant has the absolute right to remain silent and make the Government and the military judge reconstruct an inadvertently erased portion of the record of trial to the best of their ability, he may not thereafter use his own silence and refusal to participate as a sword to attack the adequacy of the reconstructed record with vaporous references to the mere possibility of inaccuracy.[442]

We find that the reconstruction to be a reasonably thorough and accurate reconstruction. But to the extent there may be omissions, we find that they are not quantitatively or qualitatively substantial. None of Special Agent Charlie's testimony relates to the sufficiency of the Government's evidence on the merits. Indeed, the testimony in question was not given at trial. Special Agent Charlie gave testimony at trial and during other pretrial hearings consistent with the missing testimony. Other percipient witnesses also testified at trial on the same matters that Special Agent Charlie testified about in the reconstructed section and, as noted above, trial defense counsel did not highlight any inconsistencies. We find that the reconstructed testimony of Special Agent Charlie, including any not identified omissions does not prevent the record of trial in this case from being "substantially verbatim" as required by R.C.M. 1112(b)(1). In any case, we also find that there was no prejudice to Appellant because the reconstruction of this segment of testimony did not inhibit appellate review of this case. Special Agent Charlie's testimony was reasonably reconstructed and substantively available elsewhere in the record and from other witnesses.

### d. Structural Error

As the CAAF has noted, a structural error involves an error in the trial mechanism so serious that "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence."[443] Structural errors require no proof of prejudice for reversal.[444] "Generally, for all other errors an

---

[442] *United States v. Smith*, No. NMCCA 200500852, 2007 CCA LEXIS 228, at *9-11 (N-M. Ct. Crim. App. June 26, 2007).

[443] *United States v. Wiechmann*, 67 M.J. 456, 463 (C.A.A.F. 2009) (citing *United States v. Brooks*, 66 M.J. 221, 224 (C.A.A.F. 2008).

[444] *United States v. Brooks*, 66 M.J. 221, 224 (C.A.A.F. 2008).

appellant must show an effect on the proceedings or prejudice to substantial rights."[445] The CAAF further found that there is a strong presumption that an error is not structural.[446] "The Supreme Court has recognized two tests for structural error: (1) when the court is faced with 'the difficulty of assessing the effect of the error'"[447]; and (2) when harmlessness is irrelevant."[448] For example, the denial of counsel of choice is not subject to harmless error analysis because of difficulty in assessing the effect of the error in light of the many unquantifiable and indeterminate variables involved in representation.[449] Thus, unless the error undermines the reliability of the criminal trial to serve its function to determine guilt or innocence, then it is not a structural error and it must be tested for prejudice.[450]

Appellant points to *United States v. Christopher* in which we set aside the findings and sentence and dismissed a remaining charge after observing that "the requirement that a record of trial be complete and substantially verbatim . . . is one of jurisdictional proportion that cannot be waived."[451] However, we did not state or hold in that case that there was a structural error. Instead, we analyzed the error in that case as one of an incomplete record of trial with a substantial omission, raising a presumption of prejudice that may be rebutted by the Government.[452] In our analysis, we found that the record of trial in *Christopher* was profoundly and hopelessly incomplete. After an extensive effort to reconstruct the record by the military judge, the court reporter and counsel, this Court concluded that it was unlikely anything could be added that would make returning the case for the purpose of reconstruction fruitful.[453]

---

[445] *Id.* (citing *Arizona v. Fulminante,* 499 U.S. 279, 309-10 (1991)).

[446] *Id.* (citing *Rose v. Clark,* 478 U.S. 570, 579 (1986), *overruled on other grounds by Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)).

[447] *Id.* (quoting *United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006)).

[448] *Id.* (citing *Gonzalez-Lopez*, 548 U.S. at 149 (citing *McKaskle v. Wiggins,* 465 U.S. 168, 177 n.8 (1984) ("Since the right to self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis")).

[449] *Gonzalez-Lopez*, 548 U.S 140.

[450] *Fulminante,* 499 U.S. at 310.

[451] *United States v. Christopher*, No. 201600249, 2023 CCA LEXIS 362, at *11 (N-M Ct. Crim. App. Aug. 31, 2023) (quoting *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014)).

[452] *Id.* at *12.

[453] *Id.* at *13-14.

Over half of the appellate exhibits in that case were either missing or there were significant unexplained gaps in the appellate exhibit numbers. Complicating matters, the court reporter's notes were also missing. Above, we discuss in detail the reconstruction of Agent Charlie's testimony in an Article 39(a) session and Appellant's other allegations that the record is incomplete, but for purposes of this analysis, we do not find that the record in this case is comparable to that in *Christopher*. Despite Appellant's attempt to cast record deficiencies and errors as so pervasive that they not only render the record incomplete, but that they also undermine the ability for Appellant's court-martial to reliably serve its function for determination of guilt or innocence, we find the over 4,000-page record of transcribed court proceedings, more than 300 appellate exhibits and 80 trial exhibits, plus the more than 500 pages of additional translation Appellant submitted with his Fourth Motion to Attach, to be a remarkably complete record of trial from which we are fully able to conduct our appellate review.

The contrast between this case and *Christopher* could not be more stark. All of the deficiencies identified by Appellant have established mechanisms for our legal analysis and we find the record is sufficiently complete for us to conduct those analyses. This case does not fit into either of the categories of cases the Supreme Court has recognized for structural error. Likewise, the identified deficiencies do not undermine the ability of Appellant's court-martial to reliably serve its function for determination of guilt or innocence. Thus, we also find that Appellant has not overcome the presumption that any error in this case is not structural in nature.

### 3. Conclusion

As a result, except for the French testimony of Officer Vale, we find the record is complete and substantially verbatim. With regard to Officer Vale's French testimony, we find that Appellant has identified no plain error in the English translation of Officer Vale's testimony and that there was no prejudice to Appellant. We find the issue of mistranslations to have been forfeited, but in any case that any errors in translation did not cause grave doubt in the accuracy and scope of the translation and there was no prejudice to Appellant. We also find that the reconstruction of Special Agent Charlie's testimony was reasonably reconstructed and any omissions do not cause the record of trial to fall below "substantially verbatim."

## L. The Evidence was Legally and Factually Sufficient to Support a Finding of Guilty for Appellant's Conviction.

### 1. Legal Sufficiency

#### a. <u>Standard of Review</u>

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[454] In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[455]

### b. Analysis of Charge I—Premeditated Murder

The elements of premeditated murder in violation of Article 118 are as follows:

> (a) A certain named or described person is dead;
>
> (b) That the death resulted from the act or omission of the accused;
>
> (c) That the killing was unlawful; and
>
> (d) That at the time of the killing, the accused had a premeditated design to kill.[456]

As to the first element, there was no dispute over whether Mrs. Bravo is dead. Prosecution Exhibit 1 is the report of her death. Appellant contends that Mrs. Bravo committed suicide, thus it follows Appellant disputes the legal sufficiency of the evidence for the remaining three elements. While there was no direct eyewitness testimony from someone stating that they saw the Appellant push Mrs. Bravo out the window, there was significant and compelling circumstantial evidence from which a reasonable fact-finder could have found all three of the remaining elements beyond a reasonable doubt.

### c. Analysis of Charge II—Assault Consummated by a Battery

The elements of this offense are as follows:

> (a) That the accused did bodily harm to a certain person; and
>
> (b) That the bodily harm was done with unlawful force or violence.[457]

This charge related to the Appellant poisoning Mrs. Bravo with zolpidem. As noted above, there was testimony that the Appellant retrieved a plastic "baggie" with pills from a desk drawer he used to occupy the day before Mrs.

---

[454] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[455] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (quoting *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001)).

[456] Art. 118, UCMJ.

[457] Art. 128, UCMJ.

Bravo's death.[458] The occupant of the desk at the time, LTC Whiskey, testified that the pills appeared to be bright pink, which is consistent with a formulation of zolpidem pills.[459] Zolpidem is also known as "Ambien" and is a sleeping aid that makes a person drowsy.[460] Appellant claimed to LTC Whiskey that the pills were for "ADD."[461] However, Appellant's medication for Attention Deficit Hyperactivity Disorder were oblong capsules, not pills, that do not look like zolpidem pills.[462] Appellant's own statements suggest that Mrs. Bravo was drowsy when bathing their child and that he helped her to bed. Toxicology evidence was presented that zolpidem was present in Mrs. Bravo's system at the time of her death. Hair analysis showed that she had not been regularly taking zolpidem within six months before her death.[463] Further, neither Appellant nor Mrs. Bravo had a current prescription for zolpidem.[464] Mrs. Bravo last had a prescription for zolpidem in 2011.[465] Appellant had access to zolpidem because he sometimes picked up prescriptions for the flag officer he formerly worked for, including zolpidem.[466] The flag officer did have a prescription for zolpidem at the time Appellant worked for him, between the Summer of 2013 and the Summer of 2014.[467] According to pharmacy receipts, someone other than the flag officer picked up the flag officer's zolpidem 10 mg prescriptions for him five times during that time period.[468] Sometimes the pills came in a bottle, but at times they also came in a plastic Ziploc bag.[469]

Unlawful force or violence means the accused caused the contact, in that no legally cognizable reason existed that would justify or excuse the contact.[470] Given the presence of zolpidem in Mrs. Bravo's system and the fact that she had not been taking zolpidem in the preceding six months, and also had no

---

[458] R. at 1730-33.

[459] R. at 1733.

[460] R. at 2742-43.

[461] R. at 1733.

[462] R. at 1828-29.

[463] R. at 2472.

[464] R. at 1795-96.

[465] R. at 1796.

[466] R. at 1713-18.

[467] R. at 1716-17; Pros. Ex. 11.

[468] R. at 1717; Pros. Ex. 10.

[469] R. at 1721.

[470] *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011).

active prescription for zolpidem, it would have been reasonable to conclude that Mrs. Bravo did not voluntarily take the zolpidem. Since Appellant was the only other person present in the apartment, a reasonable fact-finder could have concluded Appellant was the one who administered zolpidem to Mrs. Bravo. There was no evidence that Mrs. Bravo consented to administration of zolpidem, thus a reasonable fact-finder could conclude it was done with unlawful force or violence.

We acknowledge that there was toxicology evidence that Mrs. Bravo also had tramadol in her system.[471] Tramadol is a pain killer that can enhance the effects of zolpidem when combined with zolpidem.[472] Hair testing also showed that Mrs. Bravo had regularly consumed tramadol over a nine-month period before her death.[473] The Government initially included tramadol along with zolpidem in this specification, but removed it before trial. No evidence was presented that Appellant administered tramadol to Mrs. Bravo in addition to zolpidem, but there was evidence that the effects of zolpidem would have been magnified if zolpidem were combined with tramadol. With the addition of alcohol, the combination of medications would have a depressive effect that would result in a loss of dexterity and coordination, cause dizziness and instability, and motor activity would be impaired, slow, and cumbersome.[474] It is also possible that the combination of tramadol, zolpidem, and alcohol can itself be lethal.[475]

Despite the inference that Mrs. Bravo was likely taking tramadol on her own, we find that a reasonable fact-finder could nevertheless have concluded beyond a reasonable doubt that Appellant retrieved a bag with zolpidem pills from his former desk and administered the zolpidem to Mrs. Bravo without justification.

    d. Analysis of The Additional Charge—Conduct Unbecoming of an Officer and a Gentleman

The elements of this offense are as follows:

---

[471] R. at 2652.

[472] R. at 2652-53.

[473] R. at 2468.

[474] R. 2758-61.

[475] R. at 2759.

(a) That the accused did or omitted to do certain acts; and

(b) That, under the circumstances, these acts or omissions constituted conduct unbecoming an officer and a gentleman.[476]

Although Appellant did not specifically address the Additional Charge in his brief, we address it here. The Additional Charge and its two specifications dealt with the allegation that Appellant impersonated Mrs. Bravo when sending text messages to her then boyfriend, and that he later falsely denied knowing the PIN code to access Mrs. Bravo's cell phone when asked by Belgian police.

Here, as noted above, Mrs. Bravo's boyfriend, Craig Jones, testified that he received text messages close in time to Mrs. Bravo's death, but that the messages were out of character for Mrs. Bravo and inconsistent with her plans to move away from Appellant and her scheduled upcoming trip the next day to China with her father, Mr. Houston.[477] The messages further referred to Appellant as "Craig" rather than "him" that were at odds with the way she described Appellant in other texts to Mr. Jones.[478] She also said "I hate my life," which Mr. Jones felt was inconsistent with his perception of her personality as an "outgoing, caring mother . . . [a]nd always willing to help someone in need."[479] He felt the text messages were so out of the ordinary that after he learned what happened to Mrs. Bravo, he reported the text message to the police.[480] Appellant was the only other person in the apartment with Mrs. Bravo who could have accessed her phone and sent the text messages. Although there had been evidence that Appellant was speaking on the phone with his girlfriend in Virginia that evening, a comparison on the times of his calls with his girlfriend and the times the text messages were sent showed that the text messages were sent at times when he was not on the phone with his girlfriend, in between calls to her.[481] The inference is that Appellant was the one who sent the text messages in order to cover up his murder of Mrs. Bravo by making it appear that he had rejected her attempt to reconcile and that she became suicidal as a result.

---

[476] Art. 133, UCMJ.

[477] R. at 2183-86.

[478] R. at 2184.

[479] R. at 2185; Pros. Ex. 16.

[480] R. at 2186.

[481] R. at 2132; Pros. Ex. 20.

After Mrs. Bravo fell from the window and emergency personnel responded, there was evidence that a police officer, Officer Vale, came into the apartment to look around. At the time the officer believed Appellant's account that Mrs. Bravo committed suicide, and he was not seeking evidence of murder. Nevertheless, he found Mrs. Bravo's cell phone on the couch in the living room, away from the bedroom from where she fell. Officer Vale did not testify that the location of the phone caused him to be suspicious. However, in the full context of the evidence presented at trial, including Mrs. Bravo's state of incapacity, it was incriminating that the phone Mrs. Bravo used to text her boyfriend before jumping out a window was located in a different room. In any case, Officer Vale asked Appellant if he knew the PIN code to access the phone, to see if there were any messages on it. Appellant told Officer Vale that "he was not aware of the PIN code of this device."[482]

Still, after Mrs. Bravo's father, Mr. Houston, arrived in Belgium, Appellant demonstrated that he was able to open the phone and showed Mr. Houston the messages that were sent to Mrs. Bravo's boyfriend. Mr. Houston also testified that the previous Christmas he observed Appellant use the code "0252" to open Mrs. Bravo's phone.[483] Appellant also texted screenshots of text messages between Mrs. Bravo and Mr. Jones to his girlfriend, Ms. Robinson, on September 13, 2015, demonstrating his ability to access Mrs. Bravo's phone.[484]

Further, a SHAPE police officer testified that during a later statement by Appellant that the officer was present for, Appellant said Mrs. Bravo "was always using the same codes and always the middle column of the numbers from bottom to up or up to bottom."[485] Additionally, Appellant made different statements to different people about the PIN code to his wife's phone. Mr. Jones testified that Mrs. Bravo told him Appellant was going into her phone.[486] One witness testified that when he and Appellant were together in a car the morning after Mrs. Bravo's death, Appellant was able to guess the PIN code in front of him.[487] Appellant told Mrs. Bravo's friend, Jennifer Fred, that "after the Belgian police cleared him [the night Mrs. Bravo died], he came back upstairs and found [Mrs. Bravo's] phone, and he cracked the code to get into her phone."[488]

---

[482] R. at 1998.

[483] R. at 2817.

[484] Def. Ex. U at 18-20.

[485] R. at 3051.

[486] R. at 2240.

[487] R. at 1857.

[488] R. at 2269.

This latter statement also conflicts with uncontested testimony from Officer Vale, in which he stated that he took custody of Mrs. Bravo's phone after discovering it on the couch in the living room, and kept it in his car until he received word from a magistrate that the magistrate determined based on information available at that point that Mrs. Bravo committed suicide. Upon hearing from the magistrate, Officer Vale returned Mrs. Bravo's phone directly to Appellant.[489]

### 2. Factual Sufficiency

Appellant contends that the evidence is factually insufficient to support a finding of guilty for all charges where the alleged misconduct occurred before Article 66 was amended, effective 1 January 2021, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of Appellant's guilt beyond a reasonable doubt."[490] In conducting this unique appellate function under the version of Article 66, UCMJ, applicable to cases like this one which occurred in 2015, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[491] Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[492]

Given the weight of the evidence described above, making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### M. The Timeliness of Appellate Review

Although not directly raised as an AOE by Appellant before this Court, we recognize the period of time between the docketing of this case with this Court and the issuance of this opinion, has been longer than most. We also acknowledge that Appellant made two demands for speedy appellate review on 22 April 2025 and 21 November 2025. As a result, we analyze whether there was a violation of Appellant's right to due process and speedy appellate review.

---

[489] R. at 2001.

[490] *United States v. Rosario,* 76 M.J. 114, 117 (C.A.A.F. 2017).

[491] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[492] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

*1. Standard of Review*

Whether an appellant has been deprived of his due process right to speedy appellate review is a question we review *de novo*.[493] In *United States v. Moreno*, the CAAF determined that when a court of criminal appeals renders its decision more than 18 months after the case is docketed with the Court, there is a presumption of unreasonable delay.[494] The presumption of unreasonable delay was not meant to usurp legislative or rule-making authority by setting an explicit deadline, but only to trigger the four-factor analysis under *Barker v. Wingo*.[495] The four-factor analysis being: (1) the length of the delay; (2) the reasons for the delay; (3) Appellant's assertion of the right to timely review and appeal; and (4) prejudice.[496]

For the fourth factor, prejudice, there are three sub-factors to be considered: (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeal; and (3) limitation of the possibility that the convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial might be impaired.[497]

Some cases will present specific circumstances warranting additional time, thus making those additional periods reasonable upon assessment of the *Barker* factors.[498] Further, we note that in light of recent developments in post-trial processing under the Military Justice Act of 2016, a 2016 Supreme Court opinion on speedy trial holding that the right to a speedy trial detaches upon conviction,[499] and a 2022 CAAF concurring opinion,[500] the continued validity of *Moreno*'s reliance on specific timing gates as a guide for evaluating post-trial delay may be in question. Still, the Supreme Court and, in turn, the CAAF, recognize that post-trial delay may yet violate due process, but note that the

---

[493] *United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

[494] *Moreno*, 63 M.J. at 142.

[495] *Id.*

[496] *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005)).

[497] *Moreno*, 63 M.J. at 138-39.

[498] *Id.* at 143.

[499] *Betterman v. Montana*, 578 U.S. 437, 441 (2016).

[500] *United States v. Anderson*, 82 M.J. 82, 88-90 (C.A.A.F. 2022) (Maggs, J., concurring).

due process standard may be more "pliable" than the speedy trial standard.[501] In evaluating the more pliable due process violation, the Supreme Court noted in a footnote that "[r]elevant considerations may include the length of and reasons for delay, the defendant's diligence in requesting expeditious sentencing, and prejudice," suggesting a softer reliance on the four factor *Barker* test.[502] Since our superior court has not yet had occasion to revisit the continued validity of *Moreno* because, as Judge Maggs notes in his concurring opinion in *Anderson*, it was not directly challenged in that case, we leave that determination to our superior court. However, we continue to use the four factor *Barker* analysis. Whether the four-factor analysis is more or less pliable, in this case, we find makes no difference in the outcome.

*2. Analysis*

Trial was held in this case from 8-30 April 2022. Sentencing was on 30 April 2022. The case was docketed with this Court on 21 September 2022, 144 days after sentencing. This opinion is issued on 17 December 2025, after 1184 days elapsed, exceeding 18 months since docketing. While under *Moreno* standards this raises the presumption of an unreasonable delay, in weighing the three factors other than the length of the delay under *Barker v. Wingo*,[503] we find there was no lack of institutional vigilance in this case given the length of the record of trial and the complexity of the issues. However, there were a number of case-specific factors that contributed to this case taking longer than others.

Before filing a brief, Appellant filed two post-trial motions for discovery and five motions to attach, as well as motions for overlength briefs. An oral argument was held on several of the pre-brief motions in August 2023, which resulted in a published order.[504]

Appellant's brief was filed on 14 October 2023, after 13 enlargements of time. The Government's Answer was filed on 12 March 2024, after four enlargements of time. Appellant only objected to the last two enlargements of time requested by the Government. Appellant's Reply was filed on 10 June

---

[501] *Id.* at 90, citing *Betterman* at 448.

[502] *Betterman*, at 448 fn12.

[503] *Barker*, 407 U.S. at 530 (establishing the following four factor analysis to assess whether there was a violation of an appellant's due process right to timely post-trial and appellate review – (1) the length of the delay; (2) the reasons for the delay, (3) the appellant's assertion of the right to timely post-trial and appellate review, and (4) prejudice).

[504] See *United States v. Becker*, 2023 CCA LEXIS 443 (N-M. Ct. Crim. App., September 11, 2023) (Order).

2024, after four enlargements of time, despite having objected to the last two requests for enlargements of time by the Government for its Answer.

After the third request for an enlargement of time for Appellant's brief, this Court began holding chambers conferences after each new one to discuss progress and maintain forward motion on the case. In these chambers conferences, Appellate Defense Counsel routinely acknowledged the lengthy record and complexity of the case, even when it was the Government requesting an enlargement of time and Appellant opposed it. Appellant's appellate defense counsel also acknowledged many times the importance of working through the issues diligently rather than just for speed. This Court issued written orders for many of the enlargements of time summarizing the progress reported in the chambers conferences, all of which are contained in the record in this case.

Appellant requested oral argument on the AOEs and that was held on 17 July 2024. Six of the AOEs were argued; each party was allotted one hour for argument. At that point, 665 days had elapsed since the case was docketed with this Court. The Government opposed oral argument and was willing to rest on the briefs for the sake of expediency, but this Court found that given the complexity of the case, the Court would benefit from the opportunity to sharpen its understanding of the parties' arguments.

The record of trial is 4,055 pages of transcribed text and a total of 8,507 pages, plus 597 additional pages of added documents from Appellant's motions to attach, including alternate translations of the French testimony into English of ten witnesses by an independent translator hired by Appellant. This review necessitated a detailed review of the record transcript, the alternate translations and the recordings of the trial.

Appellant's brief consisted of 188 pages and 29,937 words addressing 15 AOEs.[505] Appellant's brief also included 741 footnotes, many of which contained substantive argument. The Government's Answer consisted of 222 pages. The Appellant's Reply consisted of 106 pages and 431 footnotes. We have also addressed 12 of the AOEs raised by Appellant, including some that raised and compounded more than one legal issue. Some of the AOEs also required extensive and time-consuming review of the entirety of the voluminous record of trial. Additionally, many sections of Appellant's brief were unfocused and analytically diffuse making this Court's task harder. Although this opinion

---

[505] Appellant moved to file an overlength brief on 15 August 2023, requesting double the 15,000 words permitted under Rule 17.3 of the NMCCA Rules of Appellate Procedure, which this Court granted. This Court also granted the Government's motion to file an overlength brief filed on 12 March 2024.

is issued beyond 18 months since the docketing of the case with this Court, we find there are good reasons for that.

In weighing the *Barker* factors, we continue to be bound by the measure that exceeding 18 months between docketing this case and the publication of this opinion is presumptively unreasonable. As to the second factor, the reasons for the delay, as noted above, we find there were good reasons for the delay and there was no lack of institutional vigilance. Thoroughly analyzing all of the issues raised by Appellant and drafting this 111-page opinion was a time-consuming process.

Regarding the third factor, Appellant's assertion of the right to speedy appellate review, we observe that two and a half years elapsed between the docketing of this case in September 2022 and the first demand for speedy appellate review in April 2025, during which time Appellant requested a total of 17 enlargements of time. At least as communicated to this Court many times through his Appellate Defense Counsel, Appellant seemed to appreciate the length and complexity of the case and was more interested in a thorough review than merely a speedy one, but we nevertheless weigh this factor as neutral at best given that Appellant has now indicated a shift in priorities.

As to the fourth factor, prejudice, Appellant cites a family probate court case involving his daughter in which the judge of the family probate court "specifically referenced a need for a decision on appeal as the requirement for her to afford [Appellant] any agency in our family court case" as unique harm that is causing him prejudice. Appellant also cites $250,000 in attorney fees that the family probate court case has cost his family over the past three years. Further, Appellant cites that his daughter has been placed in counseling due to the stress, instability and emotional harm caused by years of litigation, constant disruptions and uncertainty surrounding [Appellant's] legal status. Lastly, Appellant cites stress, anxiety, financial hardship and loss of family engagement "due to the extraordinarily long appellate decision timeline."

To analyze prejudice, we take the sub-factors for prejudice in order. As to the first factor, prevention of oppressive incarceration pending appeal, we find that Appellant is in no worse position due to the length of this Court's appellate review because we find that none of the bases for appeal are meritorious.

As to the second factor, anxiety and concern, our superior court has held that an appellant must demonstrate a particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision.[506] "This particularized anxiety or concern is thus related

---

[506] *Moreno*, 63 M.J. at 140.

to the timeliness of the appeal, requires an appellant to demonstrate a nexus to the processing of his appellate review and ultimately assists this court to 'fashion relief in such a way as to compensate [an appellant] for the particular harm.'"[507]

In *Moreno*, the particularized anxiety and concern related to the appellant having to register as a sex offender after he was released from incarceration. If the appeal had been more timely in *Moreno*, it would have been completed before he was released and, if it was meritorious, he might not have been required to register. The CAAF found that this was distinguishable from the normal anxiety experienced by prisoners awaiting appeal.[508] In a more recent case, *United States v. Merritt*, the CAAF found that because the appellant in that case would have been required to register as a sex offender anyway since he remained convicted of receiving child pornography, he did not suffer any particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting appeal.[509]

In another case, *United States v. Toohey*, the CAAF found that the change of appellate defense counsel three times, "overly restrictive and unsanitary conditions" in confinement, and the requirement to register as a sex offender after release from confinement did not meet the requirement for particularized anxiety and concern distinguishable from the normal anxiety experienced by prisoners awaiting appeal and did not grant relief.[510] Notably, in the same case, the CAAF found that even though the appeal had been fully briefed and was pending before the Court of Criminal Appeals for 601 days before an opinion was issued, this period requires a more flexible review because it involves the exercise of judicial decision-making authority.[511]

In reviewing Appellant's assertions of prejudice, we do not find that there is a nexus between this appeal or the length of time it has taken to issue this opinion and the family probate court case. Also, while it is tragic Appellant's daughter has been placed in counseling, we again find that there is no nexus between that fact and the length of time it has taken to issue this opinion.

---

[507] *Id*. (quoting *Burkett v. Fulcomer*, 951 F.2d 1431, 1447 (3d Cir. 1991)).

[508] *Moreno,* 63 M.J. at 140.

[509] *United States v. Merritt*, 72 M.J. 483, 491 (C.A.A.F. 2013).

[510] *United States v. Toohey*, 63 M.J. 353, 361 (C.A.A.F. 2006).

[511] *Id*. at 360 (citing *Moreno*, 63 M.J. at 137).

Lastly, the stress, financial hardship and loss of family engagement is not distinguishable from the normal anxiety and concern experienced by all prisoners awaiting an appellate decision.

As to the final sub-factor, limitation of the possibility that the convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial might be impaired, we find that this factor weighs against Appellant because none of Appellant's bases for appeal have been meritorious. Also, because Appellant has not identified any particular impairment.

*3. Conclusion*

Though the post-trial delay was lengthy enough to trigger a review under *Moreno*, it resulted in no prejudice to Appellant, nor did it threaten the public's trust in the fairness and integrity of the military justice system. Therefore, no due process violation occurred.

### III.CONCLUSION

After careful consideration of the record and briefs of appellate counsel, as well as the oral arguments heard on 29 August 2023 and 17 July 2024, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[512]

The findings and sentence are **AFFIRMED.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[512] Articles 59 & 66, UCMJ (2019).